1

2

3                                                           Honorable Richard A. Jones

4

5

6

7                    UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF WASHINGTON
                              AT SEATTLE
8

9   SEATTLE MIDEAST AWARENESS            )
    CAMPAIGN, a Washington non-profit    )
    corporation,                         )      No. 2:11-cv-00094-RAJ
10                                       )
                           Plaintiff,    )      **KING COUNTY'S BRIEF IN**
11                                       )      **OPPOSITION TO SEATTLE**
                                         )      **MIDEAST AWARENESS**
12          vs.                          )      **CAMPAIGN'S MOTION FOR**
                                         )      **PRELIMINARY INJUNCTION**
    KING COUNTY, a municipal corporation,)
13                                       )
                           Defendant.    )      *Noted for February 11, 2011*
14                                       )
                                         )      Oral Argument Requested
15                                       )

16                      I.      INTRODUCTION

17          This motion is about whether a private political organization can force a local

18  government to transform its transit system into an open, unregulated, public-forum for speech

19  that creates a reasonably foreseeable risk of harm or disruption to the public transportation

20  system and the riders who use it.   Defendant King County (King County) respectfully submits

21  this Response to the Motion for Preliminary Injunction filed by the ACLU on behalf of the

22  Plaintiff Seattle Mideast Awareness Campaign (SeaMAC).  Plaintiff seeks an injunction

23

KING COUNTY'S BRIEF IN OPPOSITION TO SEATTLE
MIDEAST AWARENESS CAMPAIGN'S MOTION FOR
PRELIMINARY INJUNCTION - 1 (11-00094 RAJ)

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-8820  Fax (206) 296-8819

1    directing King County to accept and run a bus advertisement that was rejected by the County on

2    December 23, 2010. Plaintiff's motion should be denied.

3           The advertising policy of King County's Department of Transportation (Metro) creates a

4    limited public forum for advertising on Metro buses. SeaMAC's advertisement was rejected

5    because it did not comply with the civility and disruption of service restrictions of this

6    government forum. These restrictions are reasonable -- in light of Metro's mission to provide a

7    safe and reliable public transportation -- and have been consistently applied. Therefore, the

8    application of this viewpoint-neutral policy does not violate Plaintiff's rights. Similarly, because

9    SeaMAC's claim is meritless, it cannot show irreparable harm; whereas, if this Court were to

10   mandate that King County accept and post the rejected ad on its buses, the risk of potential harm

11   to the County--and the riders for whom it is responsible--is significant.

12   **II.  STATEMENT OF FACTS**

13   **A.  <u>Metro's Mission</u>**

14          Metro's bus service is the backbone of the public transportation system of King County,

15   including the Seattle metropolitan area. Declaration of Dow Constantine at ¶4; Declaration of

16   Kevin Desmond at ¶ 5. It operates 245 bus routes over a service area of 2,134 square miles, with

17   approximately 350,000 daily passenger boardings and 110 million annually. Desmond Dec. at

18   ¶7. Metro's ridership consists of people who are dependent on or choose public transportation

19   for their mobility needs, and includes riders with special needs and disabilities. *Id*. at ¶5.

20          The King County Code (KCC) describes Metro's mission as the provision of safe, secure,

21   comfortable, convenient and reliable transportation services for the riding public. KCC

22   28.96.020.A.1-5; *see also* KCC 28.96.210; Desmond. Dec. at ¶4. To improve regional mobility,

23   Metro also tries to attract new users to public transit. *Id.*; KCC 28.96.020.A.2.

KING COUNTY'S BRIEF IN OPPOSITION TO SEATTLE
MIDEAST AWARENESS CAMPAIGN'S MOTION FOR
PRELIMINARY INJUNCTION - 2 (11-00094 RAJ)

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington 98104
(206) 296-8820 Fax (206) 296-8819

1

### B.   The Transit Advertising Program

2

Metro runs a revenue-based advertising program to provide supplemental financial

3

support for its transit operations.  Desmond Dec. at ¶8; Declaration of Sharron Shinbo at ¶4.  As

4

part of is advertising program, Metro sells advertising space on the exterior of its buses.  Shinbo

5

Dec. at ¶7.  Titan Outdoor LLC (Titan) serves as Metro's advertising contractor.  *Id.* at ¶2.  The

6

current Titan Contract covers a seven-year period beginning in 2005.  *Id.* at ¶4, Ex. A.

7

### C.   King County's Code and Contract-Based Advertising Restrictions

8

King County's advertising policy is expressed both in the King County Code and in

9

specific restrictions outlined in Section 6 of the Titan Contract.  Shinbo Dec., Ex. A at 4-5.

10

First, KCC 28.96.020.A provides that transit properties are not forums for public debate:

11

> In furtherance of its proprietary function as provider of public transportation, the
> county makes a variety of transit properties available to persons who use public

12

> transit services.  Although transit properties may be accessed by the general
> public, *they are not open public forums either by nature or by designation.*

13

> Transit properties are intended to be used for public transit-related activities and
> provide little, if any space for other activities.

14

(empashis added)

15

Similarly, KCC 28.96.210 regulates commercial activities on transit property as follows:

16

> As part of its proprietary function as the provider of public transportation, the

17

> county seeks to generate revenue from the commercial use of transit vehicles, the
> tunnel and other passenger *facilities to the extent such commercial activity is*

18

> *consistent with the security, safety, comfort and convenience of its passengers.*
> Accordingly, all commercial activity is prohibited  on transit property except as

19

> may be permitted by the county in a written permit, concession contract, license
> agreement, *advertising agreement* or other written agreement.

20

(emphasis added)

21

Second, Section 6 of the Titan Contract enumerates specific subject-matter and content-

22

based advertising restrictions.  Shinbo Dec.at ¶6, Ex. A.  Those restrictions prohibit advertising

23

that depicts tobacco or alcohol products, illegal activity, certain films and video-games, and

KING COUNTY'S BRIEF IN OPPOSITION TO SEATTLE
MIDEAST AWARENESS CAMPAIGN'S MOTION FOR
PRELIMINARY INJUNCTION - 3 (11-00094 RAJ)

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-8820  Fax (206) 296-8819

sexual or excretory activity. *Id.* In addition, Sections 6.4 D & E contain the two restrictions that are at issue here:

> The Consultant shall not place in or on a transit vehicle any advertising that contains or involves the following:
>
> …
>
> D.   Any material this is so objectionable under contemporary community standards as to be reasonably foreseeable that it will result in harm to, disruption of, or interference with the transportation system.
>
> E.   Any material directed at a person or group that is so insulting, degrading or offensive as to be reasonably foreseeable that it will incite or produce imminent lawless action in the form of retaliation, vandalism or other breach of public safety, peace and order.

Shinbo Dec., Ex A at 5.

Metro has actively enforced this policy and has consistently rejected advertisements that violate the restrictions contained in Section 6 of the Titan Contract. Shinbo Dec. at ¶¶5-6. Alcohol and tobacco content have been the most common reasons that a proposed ad has been rejected, but ads have been rejected on other bases as well. *Id.* at ¶8.

### D.   The SeaMAC Advertisement

On October 18, 2010, Titan notified King County that SeaMAC was proposing an external bus ad with the text "ISRAELI WAR CRIMES: YOUR TAX DOLLARS AT WORK" and accompanying graphics of a refugee camp. *Id.* at ¶ 14, Ex. B. Eventually, SeaMAC altered the graphic to show a group of children next to a bomb-damaged building. *Id.*, Ex. C. Although the County found the Ad controversial, it was determined that there was insufficient information to conclude that the Ad would result in the adverse impacts described in Sections 6.4 D & E, i.e., harm to or disruption of the Metro transit system. *Id.* at ¶15; Constantine Dec. at ¶5. On

KING COUNTY'S BRIEF IN OPPOSITION TO SEATTLE
MIDEAST AWARENESS CAMPAIGN'S MOTION FOR
PRELIMINARY INJUNCTION - 4 (11-00094 RAJ)

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-8820  Fax (206) 296-8819

December 14, 2010, the SeaMAC Ad was approved and scheduled to run on 12 Metro buses for four weeks, beginning December 27, 2010.  Shinbo Dec. at ¶¶15-16, Ex. D.

On Friday, December 17, 2010, a local television station aired a news story about the SeaMAC Ad.  Constantine Dec.at ¶6; Shinbo Dec. ¶17.  In response, King County began to receive unprecedented numbers of calls and emails from the public; the overwhelming majority of the feedback was negative.  Brezonick Dec. at ¶¶6-17, Exs. A-D; Brown Dec. at ¶¶5-11.  The volume and content of the complaints exceeded the scope of any prior response to advertisements run on Metro buses.  Brezonick Dec. at ¶18; Shinbo Dec. at ¶8.  In addition, numerous calls and emails conveyed the intent to block or vandalize Metro buses, while other communications expressed more violent, if less specific, intentions.  Brezonick Dec.at ¶ 12-14, 15-16, Exs. B, C; Brown Dec.at ¶ 5-8("Those signs will not go up"); Bush Dec. at ¶4, Ex A at 4, 5 ("If you run these ads we will … shut metro down", "KC ATTY IS FORCING ME TO VIOLENCE[.]").   Some customers also expressed fear that Metro buses or passengers would become targets for violence or disruption.  Brezonick Dec. at ¶ 14, Ex. A at 3, 5("Is it safe for my son to ride the bus?", "I do not intend to endanger myself by riding on a vehicle that has emblazoned on the side of it hate messages".)

Metro transit operators reported similar concerns.  Paul Bachtel, president of the transit union, informed King County that numerous operators expressed fears about their personal safety and some stated that they would not drive buses with the SeaMAC Ad.  Declaration of Paul Bachtel at ¶¶5-8, Ex.A.  Injuries could also result from bus-pedestrian collisions if persons attempted to deface the ads or prevent buses from operating.  Declaration of Michael Lemeshko at ¶¶5-12.  As a result of these issues, Metro Transit Police (MTP) and Metro Operations began to develop contingency plans to address safety concerns and possible service disruptions due to

KING COUNTY'S BRIEF IN OPPOSITION TO SEATTLE MIDEAST AWARENESS CAMPAIGN'S MOTION FOR PRELIMINARY INJUNCTION - 5 (11-00094 RAJ)

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-8820  Fax (206) 296-8819

operator unavailability or acts of civil disobedience.  Declaration of Lisa Mulligan at ¶¶13-20;

Declaration of Jim O'Rourke Dec. at ¶ 8-12. This planning was time-consuming, costly,

disruptive, and likely to undermine Metro's ability to monitor other on-going security issues.

O'Rourke Dec at ¶¶9, 13; Declaration of Jill Krecklow at ¶¶5-9; Declaration of Captain Lisa

Mulligan at ¶¶10-12, 19.

###    E.    The Counter-Ads

On December 21, 2010, the situation became even more polarized.  Titan informed the

County that two other groups, the Horowitz Freedom Center (HFC) and the American Freedom

Defense Initiative/Stop Islamization of America (AFDI), submitted proposed ads (Counter-Ads)

in response to the SeaMAC Ad. Shinbo Dec.at ¶ 21.  The text of the ad proposed by HFC was

"PALESTINIAN WAR CRIMES-YOUR TAX DOLLARS AT WORK" with two versions of

accompanying graphics: one showing an image of a burning bus, the other showing injured and

bleeding passengers in a damaged bus. *Id*., Ex E. The text of the ad proposed by AFDI was "IN

ANY WAR BETWEEN THE CIVILIZED MAN AND THE SAVAGE, SUPPORT THE

CIVILIZED MAN".  This text was accompanied by seven graphic images; including one

showing Adolf Hitler with what appears to be a Palestinian youth wearing traditional head-garb

and other images that appear to be Muslim people with Swastika flags.  *Id*., Ex. F.

Law enforcement officials also raised safety concerns. Sheriff Sue Rahr opined that the

SeaMAC Ad and the Counter-Ads created a security risk for the Metro transit system.

Declaration of Sheriff Sue Rahr at ¶¶6-9; Constantine Dec.at ¶13. She stated that buses are

vulnerable targets and incendiary transit messages put passengers at risk by converting them into

human billboards.  *Id*.  Similarly, the United States Attorney for the Western District of

Washington, Jenny Durkin, advised that public transportation systems are "targets of choice" for

KING COUNTY'S BRIEF IN OPPOSITION TO SEATTLE
MIDEAST AWARENESS CAMPAIGN'S MOTION FOR
PRELIMINARY INJUNCTION - 6 (11-00094 RAJ)

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-8820  Fax (206) 296-8819

terrorists and extremists because they are spread out and difficult to secure; she reference the Madrid commuter train bombings and the subway and bus bombings in London.  Constantine Dec. at ¶14.  She then advised extreme caution regarding any action "that inches up the dial" and draws the international attention of extremists to the Metro transit system.  *Id.*

By December 22, 2010, the SeaMAC Ad had garnered such international attention. Stories about the Ad appeared in the Jerusalem Post and other international press.  *Id.* at ¶15.  In addition, information about the SeacMAC Ad was posted on the website of the Ezzedeen Al-Qassam Brigades--the armed branch of Hamas--a known terrorist organization.  Declaration of Michael DeCapua at ¶¶6-8, Ex A.

Based on the security, safety and service disruption fears expressed by the riding public, transit operators and law enforcement, King County Executive Dow Constantine determined that the SeaMAC Ad and the Counter-Ads violated King County's advertising policy; i.e., both sets of ads not only offended the civility standards contained in Sections 6.4 D&E of the Titan Contract, but service disruptions, civil disobedience and other lawless and violent actions had become reasonably foreseeable. Constantine Dec. at ¶17.  On December 23, 2010, the Executive directed that neither the SeaMAC Ad, nor the Counter-Ads be displayed on Metro buses.  *Id.* at ¶ 23.

III.    ARGUMENT

A.    SeaMAC Bears a High Burden for Obtaining Injunctive Relief

A preliminary injunction is a "drastic and extraordinary remedy that is not routinely granted".  *Intel Corp. v. ULSI Systems Technology, Inc*., 995 F.2d 1566, 1568 (Fed Cir. 1993); see *Munaf v. Geren*,  553 U.S. 674, 690 (2008)(a preliminary injunction is "never awarded as of right").  To obtain a preliminary injunction, the moving party must demonstrate either:  (1) a

KING COUNTY'S BRIEF IN OPPOSITION TO SEATTLE MIDEAST AWARENESS CAMPAIGN'S MOTION FOR PRELIMINARY INJUNCTION - 7 (11-00094 RAJ)

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-8820  Fax (206) 296-8819

1    likelihood of success on the merits and the possibility of irreparable injury; or (2) serious

2    questions going to the merits and a balance of hardships strongly favoring the movant.

3    *Paramount Land Company LP v. California Pistachio Commission,* 491 F.3d 1003, 1008 (9th

4    Cir. 2006).  "These two formulations represent two points on a sliding scale in which the

5    required degree of irreparable harm increases as the probability of success decreases."

6    *Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc*., 204 F.3d 867, 874 (9th Cir. 2000).

7    "They are not separate tests, but rather 'outer reaches of a single continuum.'"  *Paramount*, 491

8    F.3d at 1008, *citing, Los Angeles Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197,

9    1201 (9th Cir. 1980).  Moreover, a heightened standard of proof is required in this case because

10   SeaMAC is seeking a *mandatory* injunction that directs King County, a local *government*, to take

11   a specific *action* that would dispose of the matter in dispute.

12        Unlike a prohibitory injunction, which restrains a party from acting, a mandatory

13   injunction orders a party to take action.  *Meghrig v. KFC Western, Inc*, 516 U.S. 479, 485

14   (1996).  Mandatory injunctions are "particularly disfavored" because they alter, rather than

15   preserve, the *status quo;* such an injunction should not issue absent a showing that "extreme and

16   serious harm" will result.  *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d

17   873, 879 (9th Cir. 2009); *see also Martin v. International Olympic Comm.*, 740 F.2d 670, 675 (9th

18   Cir. 1984).  In addition, a heightened probability of success and irreparable injury is required

19   where the moving party seeks injunctive relief regarding a governmental action that was taken in

20   the public interest pursuant to a regulatory scheme.  *NAACP, Inc. v. Town of East Haven*, 70

21   F.3d 219, 223(2nd Cir. 1995).

22        Finally, if this Court grants Plaintiff's Motion for a Preliminary Injunctive, Plaintiff will

23   receive *full relief*.  A moving party has a heavy burden of proof where granting the preliminary

KING COUNTY'S BRIEF IN OPPOSITION TO SEATTLE
MIDEAST AWARENESS CAMPAIGN'S MOTION FOR
PRELIMINARY INJUNCTION - 8 (11-00094 RAJ)

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-8820  Fax (206) 296-8819

injunction will give the moving party substantially the same relief it would receive after a trial on the merits. But, even absent this heightened standard, the extraordinary remedy of injunctive relief is wholly inappropriate in this case.

**B.   SeaMAC is Not Likely to Succeed on the Merits**

**1.   King County Created a *Limited* Public Forum for Speech in the Advertising Space of its Buses.**

Plaintiff's motion is predicated on the erroneous assumption that the advertising space on Metro buses is a designated public forum. Plaintiff's Brief in Support of Preliminary Injunction (Plaintiff's Brief) at 7-10. In fact, King County's advertising policy, which is set forth, in part, in the King County Code, created a *limited* public forum wherein certain speech is prohibited. The Code makes clear that "[a]lthough transit properties may be accessed by the general public, they are ***not open public forums*** either by nature or by designation." KCC 28.96.020.A (emphasis added). The Code further emphasizes that "[a]s part of its proprietary function as the provider of public transportation, the county seeks to generate revenue from the commercial use of transit vehicles, the tunnel and other passenger facilities *to the extent such commercial activity is consistent with the security, safety, comfort and convenience of its passengers.*" KCC 28.96.210 (emphasis added). In short, Plaintiff's presumptive assertion -- that it has ***full*** First Amendment rights of access to this government forum -- is unfounded.

Rather, it is beyond cavil that the County, as a governmental entity, may limit access to property under its control. In *Cornelius v. NAACP Legal Defense & Ed. Fund. Inc*., the Supreme Court held:

> Even protected speech is not equally permissible in all places and all times. Nothing in the constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or the disruption that might be caused by the speakers' activities.

KING COUNTY'S BRIEF IN OPPOSITION TO SEATTLE
MIDEAST AWARENESS CAMPAIGN'S MOTION FOR
PRELIMINARY INJUNCTION - 9 (11-00094 RAJ)

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-8820  Fax (206) 296-8819

473 U.S. 788, 800 (1985).

Subsequently, in *Capital Square Review & Advisory Board v. Pinette*, the Court reaffirmed, "[I]t is undeniable of course, that speech which is constitutionally protected against state suppression is not accorded a guaranteed forum on all property owned by the State." 515 U.S. 753, 761 (1995).

To balance the government's interest in regulating the use of its property and the public interest in free speech, courts have utilized forum analysis. Accordingly, the existence of a right of access to government property -- and the standard by which limitations on that right are evaluated-- depends on the nature of the forum at issue. *Perry Education Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 44-5 (1983).

### a.    Forum analysis

In conducting forum analysis, the Supreme Court has sorted government property into one of three categories; i.e., traditional public forums, designated public forums, and limited public forums. *Pleasant Grove City v. Summum*, __U.S.__, 129 S.Ct. 1125, 1132 (2009). Traditional public forums are streets, sidewalks, and parks, "which have been immemorially held in trust for the use of the public--for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. CIO*, 307 U.S. 496, 515 (1939). Designated public forums are created when a governmental entity intentionally converts government property that has traditionally been regarded as a non-public forum into an open forum for public discourse. *Pleasant Grove City*, 129 S.Ct. at 1132. Any content-based restriction on speech in traditional or designated public forums "must satisfy strict scrutiny, that is, the restriction must be narrowly tailored to serve a compelling government interest." *Id.*

KING COUNTY'S BRIEF IN OPPOSITION TO SEATTLE
MIDEAST AWARENESS CAMPAIGN'S MOTION FOR
PRELIMINARY INJUNCTION - 10 (11-00094 RAJ)

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington 98104
(206) 296-8820  Fax (206) 296-8819

1    In contrast, limited public forums are created when a governmental entity intentionally

2    opens government property for only limited use by certain groups or the discussion of certain

3    subjects.  *Id.*, 129 S. Ct. at 1132*; See also, Hopper v. City of Pasco,* 241 F.3d 1067, 1074 (9th Cir

4    2001).  In such a forum, a lenient reasonableness standard applies and access may be restricted as

5    long as the restrictions are (1) reasonable and (2) viewpoint-neutral.  *Perry*, 460 U.S. at 46.

6            **b.**     **The advertising space in a public transit system is a non-public forum.**

7    It is well-established that the interior and exterior panels of publicly-owned buses are ***not***

8    traditional public forums.  In *Lehman v. City of Shaker Heights*, a political candidate sought

9    advertising space on the City of Shaker Heights' buses.  418 U.S. 298 (1974).  The bus system

10   refused the advertisements and Lehman brought an action for violation of his First Amendment

11   and Fourteenth Amendment rights.  First, the Court distinguished the advertising space on the

12   side of a city bus from a traditional public forum by relying upon the following analysis in

13   *Packer Corp. v. Utah:*

14   >     * * * viewers of billboards and streetcar signs [have] no 'choice or volition' to
15   > observe such advertising and [have ] the message 'thrust upon them by all the arts
16   > and devices that skill can produce . . .The radio can be turned off, but not so the
17   > billboard or the streetcar placard.' [citation omitted] 'The streetcar audience is a
18   > captive audience. It is there as a matter of necessity, not of choice.'[citations
19   > omitted] * * *In such situations, '(t)he legislature may recognize degrees of evil
20   > and adapt its legislation accordingly.' [citations omitted].

18   285 U.S. 105, 110 (1932).

19   The Court found no constitutional violation, nor the presence of any indicia of a

20   traditional or designated public forum, stating:

21   > *Here, we have no open spaces, no meeting hall, park, street corner, or other
22   > public thoroughfare. Instead, the city is engaged in commerce.*  It must provide
23   > rapid, convenient, pleasant, and inexpensive service to the commuters of Shaker
     > Heights.   The car card space, although incidental to the provision of public
     > transportation, is a part of the commercial venture.  In much the same way that a
     > newspaper or periodical, or even a radio or television station, need not accept

KING COUNTY'S BRIEF IN OPPOSITION TO SEATTLE
MIDEAST AWARENESS CAMPAIGN'S MOTION FOR
PRELIMINARY INJUNCTION - 11 (11-00094 RAJ)

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-8820  Fax (206) 296-8819

1
2

every proffer of advertising from the general public, *a city transit system has discretion to develop and make reasonable choices concerning the type of advertising that may be displayed in its vehicles.*

3    *Lehman*, 418 U.S. at 303 (emphasis added).

4    Thus, the starting point for forum analysis here is that Metro's buses are a non-public

5    forum.  Further analysis will show that neither Metro's policy, nor its practice, transformed this

6    into an unregulated, designated public forum.

7                  c.    **Allowing selective access to a non-public government forum does not create a designated public forum.**

8

9    A municipal transit system does not create a designated public forum simply by granting

10   selective access to the advertising space on it vehicles.  For example, in *Children of the Rosary v.*

11   *City of Phoenix*, an anti-abortion organization and a civil rights organization sued the city of

12   Phoenix, after the city refused to run the organizations' bus advertisements.  154 F.3d 972 (9th Cir

13   1998).  The Court held that the city had not created a designated public forum by opening up its

14   exterior panels for advertising to the general public.  Instead, the city maintained control over its

15   non-public forum by consistently applying its blanket restriction on political and religious

16   advertising.  The Court also found that the city policy, which banned noncommercial speech,

17   was viewpoint neutral and reasonable in light of the purpose of the forum, i.e., to raise revenues

18   without offending riders or the community.

19   Similarly, in *Ridley v. Massachusetts Bay Transportation Authority (MBTA)*, the Court

20   held that the regional transportation authority did not create a designated public forum in its

21   advertising spaces.  390 F.3d 65 (1st Cir 2004).  MBTA's policy allowed a broad spectrum of

22   speech including speech concerning religion and public issues.  But the policy also prohibited a

23   narrowly defined class of political speech concerning candidates and ballot measures.  In

addition, it prohibited speech that promoted illegal activities to minors and speech that violated

KING COUNTY'S BRIEF IN OPPOSITION TO SEATTLE
MIDEAST AWARENESS CAMPAIGN'S MOTION FOR
PRELIMINARY INJUNCTION - 12 (11-00094 RAJ)

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-8820  Fax (206) 296-8819

civility standards.  The Court held that while MBTA did allow a substantial amount of speech, its limited restrictions showed that the agency had ***selectively opened*** its non-public forum to advertising in manner that did not create a designated public forum.  The Court also found that both guidelines were reasonable and did not, *on their face*, violate free speech guarantees.[1]

These cases also follow clear precedent holding that a designated public forum may only be created when the government expresses an affirmative intent to create a public forum. ***"The government does not create a public forum by inaction or by permitting limited discourse,*** but only by intentionally opening a non-traditional forum for public discourse." *Cornelius*, 473 U.S. at 802 (emphasis added).

Here, King County evinced no intent to open its advertising forum to *all* public discourse.  Instead, it maintained restrictions on advertising content that included considerations of civility and potential disruption to service.  Shinbo Dec. at ¶¶5-6.

> d.   Imposing narrow, content-based restrictions on access to a
> non-public government forum creates only a *limited* public
> forum.

Both the Supreme Court and the Ninth Circuit Court of Appeals have recognized that the government creates a limited public forum not only when it imposes broad categorical prohibitions, but also when it adopts narrow content-based restrictions.

In *Christian Legal Society Chapter of the University of California, Hastings College of the Law v. Martinez,* a student religious organization (CLS) alleged that the law school's "Recognized Student Organization" (RSO) policy violated the organization's First and

---

[1] The Court's decision resolved the consolidated appeals of two separate advertisers whose advertisements were rejected by MBTA. Although the court determined that MBTA had a reasonable and *facially* viewpoint-neutral interest in restricting advertisements that promote illegal activity among juveniles, it found that the restriction constituted viewpoint discrimination, *as applied* by MBTA to the Change the Climate (Marijuana) ads.  Specifically, the court held that the evidence failed to show that the ads were rejected to protect children from messages that promote illegal activity. *Ridley*, 390 F.3d at 86-90.

KING COUNTY'S BRIEF IN OPPOSITION TO SEATTLE
MIDEAST AWARENESS CAMPAIGN'S MOTION FOR
PRELIMINARY INJUNCTION - 13 (11-00094 RAJ)

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-8820  Fax (206) 296-8819

1    Fourteenth Amendment rights to free speech, expressive association, and free exercise of

2    religion.  __U.S.__, 130 S.Ct. 2971(2010).  Hastings had limited RSO status--and the attendant

3    benefits--to those organizations that complied with the school's nondiscrimination policy.

4    Because CLS did not allow non-Christians and "unrepentant homosexuals" to join its

5    organization, it did not qualify as an RSO.

6         The Court utilized forum analysis.  First, it determined that, as a public university,

7    Hastings could limit access of student organizations to school funds and facilities. The Court

8    held that Hastings created a limited public forum by conditioning RSO status on compliance with

9    the University's nondiscrimination policy.  In addition, the Court found that the University's all-

10   comers restriction passed constitutional muster because it was both reasonable--in light of the

11   purpose of the forum--and viewpoint neutral.  Notably, the Court made this finding in

12   circumstances where Hastings had opened the forum to a broad spectrum of speech with no

13   categorical subject-matter prohibitions, but rather applied only a narrow content-based restriction

14   on discriminatory speech.

15        Similarly, in *Cogswell v. City of Seattle*, the Ninth Circuit found that the city's adoption

16   of a narrow, content-based restriction on speech was sufficient to create a limited public forum.

17   347 F.3d 809 (9th Cir. 2003).  A Seattle city council candidate sued the city, contending that his

18   First Amendment rights were violated by a code provision that prohibited references to political

19   opponents in the city voters' pamphlets.  The Court held that the voters' pamphlet constituted a

20   limited public forum and that "the government has substantial leeway in determining the

21   boundaries of limited public fora it creates". *Id*. at 817. The Court then concluded that the

22   candidate self-description limitation was reasonable because it furthered the intended purpose of

23   the pamphlet--to introduce the candidates to the voters  *Id.*

KING COUNTY'S BRIEF IN OPPOSITION TO SEATTLE
MIDEAST AWARENESS CAMPAIGN'S MOTION FOR
PRELIMINARY INJUNCTION - 14 (11-00094 RAJ)

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-8820  Fax (206) 296-8819

As in *Christian Legal Society*, *Cogswell* and the *Lehman* line of cases discussed above, the record is clear that King County created a *limited* public forum, subject to content restrictions that were both reasonable and applied in a viewpoint-neutral manner.

### e.   Metro's advertising space is a limited public forum.

King County's advertising policy makes clear that transit properties, including its buses, are not open public forums by nature or designation. KCC 28.96.020.A.  The policy is more specifically implemented through the County's contract with Titan, which uses a combination of restrictions to maintain control of this forum. First, it employs categorical prohibitions against certain subjects, such as tobacco products and alcoholic beverages.  Second, it simultaneously imposes content restrictions that apply to all advertisements of otherwise permissible subjects. *See* Shinbo Dec. at ¶8, Ex. A at 4-5.

The content restrictions relevant to the present matter are contained in Sections 6.4 D&E of the contract.  In essence, these restrictions, like the civility limitation in *Ridley*, apply civility standards to prevent harm or disruption to the transit system.  Before any ad has been placed on the side of a Metro bus, it has been reviewed for potential violations of the content-restrictions contained in Section 6 of the Titan Contract.  Shinbo Dec. at ¶¶5, 8.

Nevertheless, SeaMAC erroneously contends that King County "transformed the exterior panels of its buses into designated public forums" by allowing a wide variety of political and non-commercial advertising, including ads related to the Israeli-Palestinian conflict.  Plaintiff's Brief at 9.  But King County's contrary intent is clear because the County adopted specific restrictions that allow it to retain control of its advertising forum.  For this same reason, each of the cases on which Plaintiff's relies is distinguishable from the facts presented here.

KING COUNTY'S BRIEF IN OPPOSITION TO SEATTLE
MIDEAST AWARENESS CAMPAIGN'S MOTION FOR
PRELIMINARY INJUNCTION - 15 (11-00094 RAJ)

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-8820  Fax (206) 296-8819

1    In *Christ's Bride Ministries, Inc. v. Southeastern Pennsylvania Transp. Auth,* the transit

2    system expressed its intent to create an open public forum to "promote awareness of social

3    issues" and provide "a catalyst for change". 148 F.3d 242, 249-52(3rd Cir. 1998).  In addition, it

4    had a practice of "permitting unlimited access" and ***no written guidelines or policy*** comparable

5    to King County's express restrictions. *Id* at 252.  In *Planned Parenthood Ass'n/Chicago Area v.*

6    *Chicago Transit Auth.,* the court also found that the transit authority had created a public forum

7    where it had a practice of accepting controversial advertisements and ***no policy*** or written

8    guidelines that prohibited access to the advertising forum. 767 F.2d 1225, 1232-33 (7th Cir.

9    1985).  Finally, in *New York Magazine v. Metro Transp. Auth.,* the court determined that the

10   transit authority had created a public forum by adopting written guidelines that imposed ***no***

11   ***restrictions*** on political speech.  136 F.3d 123, 130 (2nd Cir. 1998).

12   King County does not deny that its advertising policy allowed for a range of speech,

13   including a handful of controversial ads, but this is neither the end of the inquiry, nor dispositive

14   of the forum issue.  Rather, it is the existence of detailed substantive and procedural limitations--

15   including the civility and disruption of service restrictions at issue here--that defined the nature

16   of the forum that King County created.  Thus, while Metro's advertising policy allowed some

17   political speech, it did not allow ***all*** political speech.   All ads, including political ones, were

18   required to pass muster under the civility and disruption of service restrictions found in Sections

19   6.4 D & E of the Titan Contract.

20   In fact, under the Titan Contract, advertisers have always been prohibited from

21   expressing their messages in a manner that is ""so objectionable under community standards" or

22   "so insulting, degrading, or offensive to person or group" as to be reasonable foreseeable that the

23   advertisement will result in the prohibited impacts, such as  "harm to, disruption of, or

KING COUNTY'S BRIEF IN OPPOSITION TO SEATTLE
MIDEAST AWARENESS CAMPAIGN'S MOTION FOR
PRELIMINARY INJUNCTION - 16 (11-00094 RAJ)

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-8820  Fax (206) 296-8819

1   interference with the transportation system," or "imminent lawless action in the form of

2   retaliation, vandalism or other breach of public safety, peace and order."  Shinbo Dec., Ex. A at

3   4-5.

4         These advertising restrictions reflect Metro's intent to use the Transit Advertising

5   Program to make money to support public transportation.  Desmond Dec. at ¶8; Shinbo Dec. at

6   ¶4.  They also support Metro's core responsibilities:  to provide the best possible public

7   transportation in a safe, secure, and reliable manner.  Desmond Dec. at ¶¶3-4.  To run ads that

8   make people angry, scare away riders, and invite disruption is, frankly, bad for business,

9   especially when your business is providing public transportation.

10        The revenue-oriented aspect of the Transit Advertising Program is reflected in the

11   number of unique creatives (proposed ads), the overwhelming majority (84+%) of which were

12   commercial in nature.  Shinbo Dec. ¶9.  In fact, political and public-issue ads, formed only about

13   2.5% of creatives from 2005 through December 22, 2010.  *Id.*

14        Further, the fact that King County has not previously had to apply the prohibitions in

15   Sections 6.4 D&E does not diminish their applicability here.  Rather, this evidences the

16   community standards where, in Metro's experience, prior ads had not singled out any ethnic,

17   national or religious group for specific negative treatment.  Shinbo Dec. at ¶20.  The handful of

18   prior ads concerning issues in the Middle-East have generated only a few complaints and no

19   known threats of disruption.  Shinbo Dec. at ¶¶20-21 ("eight complaints"), Ex. E.  Even the most

20   controversial ad ever to run on Metro buses -- an ad promoting atheism -- was not expressly

21   directed at any particular group and drew complaints that were different in number and content

22   from the ad at issue here.  Shinbo Dec. at ¶21, Ex. F.  Such limited, and comparatively non-

23

KING COUNTY'S BRIEF IN OPPOSITION TO SEATTLE
MIDEAST AWARENESS CAMPAIGN'S MOTION FOR
PRELIMINARY INJUNCTION - 17 (11-00094 RAJ)

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-8820  Fax (206) 296-8819

1    controversial political advertising does not convert Metro's Transit Advertising Program into a

2    wide-open public forum.

3         To accept Plaintiff's claim to the contrary, would lead to absurd results.  In a designated

4    public forum, *all* speakers have *full* First Amendment rights of access, and even hate speech,

5    race-baiting and demagoguery is subject to legal protection.  If this Court endorses Plaintiff's

6    forum analysis, then even more incendiary advertisements would also be protected.  Indeed, if

7    King County is mandated to run the SeaMAC Ad, then the sponsors of the two Counter-Ads may

8    well claim access to the same forum.  Certainly, King County did not *intend* to provide open

9    access to such speech on the sides of its buses.

10        This Court should reject Plaintiff's invitation to convert the advertising space on Metro

11   buses into a designated public forum.  Such a holding would require the Court to ignore the

12   County's express intent set forth in the King County Code, the Titan Contract and its past

13   practice of requiring all advertisement to pass muster under its content-restrictions.

                    **2.    King County's Advertising Restrictions are Reasonable and Facially**
14                           **Viewpoint-Neutral.**

15         Speech regulation in a limited public forum must be reasonable [rational] in light of the

16   purposes served by the forum.  *Pleasant Grove City,* 129 S. Ct. at 1132; *see also, Rosenberger v.*

17   *Rector and Visitors of University of Virginia,* 515 U.S. 819, 829 (1995); *Lamb's Chapel v. Center*

18   *Moriches Union School Dist.,* 508 U.S. 384, 392-93 (1993); *Cornelius,* 473 U.S. at 806; *Perry,*

19   460 U.S. at 49.  Additionally, the Supreme Court has stated that the "decision to restrict access to

20   a nonpublic forum *need only be reasonable;* it need not be the most reasonable or the only

21   reasonable limitation...[A] finding of strict incompatibility between the nature of the speech or

22   the identity of the speaker and the functioning of the nonpublic forum is not mandated."

23

KING COUNTY'S BRIEF IN OPPOSITION TO SEATTLE
MIDEAST AWARENESS CAMPAIGN'S MOTION FOR
PRELIMINARY INJUNCTION - 18 (11-00094 RAJ)

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-8820  Fax (206) 296-8819

1   *Cornelius,* 473 U.S. at 808 (1985).    King County's civility and disruption of service advertising

2   restrictions are not only reasonable -- they are prudent.

3       The primary purpose of Metro's Transit Advertising Program is to raise revenue to

4   support the operation of the public transit system.  Shinbo Dec. at ¶5; Desmond Dec. at ¶8.  But

5   the program is also designed to ensure that advertisements do not have the unintended

6   consequence of undermining Metro's core mission:  to provide secure, safe, comfortable, and

7   convenient service without reducing ridership.  KCC 28.96.210.

8       Courts have consistently held that it is reasonable for a public transportation system to

9   utilize advertising restrictions in order to serve these purposes.  The *Lehman* court affirmed the

10   reasonableness of a transit advertising restriction that banned all political ads, stating:

11       The city consciously has limited access to its transit advertising space in order to
       minimize chances of abuse, the appearance of favoritism, and the risk of

12       imposing upon a captive audience.  These are reasonable legislative objectives
       advanced by the city in a proprietary capacity.

13   *Lehman*, 418 U.S. at 304, 94 S.Ct. 2714.

14       Similarly, in *Children of the Rosary*, , the Ninth Circuit held that the city's transit

15   advertising ban on noncommercial speech was not only reasonable, but "especially strong", in

16   light of the city's dual interests of "protecting revenue and maintaining neutrality on political and

17   religious issues".  154 F.3d at 979.  But these cases should not be read to mean that only broad

18   subject-matter prohibitions on speech are reasonable.

19       As explained above, the government may constitutionally define the boundaries of the

20   limited forum it creates, as long as the limits imposed in creating that forum are reasonable and

21   viewpoint-neutral.  For example, in *Ridley*, the court determined that MBTA's regulatory scheme

22   -- which included a civility restriction -- was "eminently reasonable".  390 F.3d at 93.  Thus, it is

23   beyond dispute that the civility and disruptions of service restrictions in the Titan Contract are

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-8820  Fax (206) 296-8819

1   protections reasonably designed to promote the safety and reliability of the public transit system.

2      Moreover, those restrictions will also survive strict scrutiny analysis.  King County has a

3   compelling interest in ensuring the safety of its citizens who rely on the transit system to

4   commute to and from work and in the conduct of their daily affairs.  Because transit systems are

5   spread out and difficult to secure, they have become international targets of choice for

6   individuals and groups intent on disruption and violence.  Constantine Dec. at ¶14; DeCapua

7   Dec. at ¶4; *see also* Rahr Dec. at ¶9.  Moreover, since at least one known terrorist group was

8   aware of the SeaMAC Ad, it is reasonable to infer that this group would also have learned about

9   the Counter-Ads proposed by HFI and AFDI.  *See* DeCapua Dec. at ¶¶6-10; Constantine Dec. at

10  ¶¶15, 20.  Under such circumstances, it was responsible for King County to act to reduce Metro's

11  visibility to terrorist groups and the risk of terrorist violence.  *See* DeCapue Dec. ¶8; Constantine

12  Dec. ¶20.  In the words of the chief federal law enforcement officer in Western Washington:

13  "anything that inches up the dial" and draws the international attention of extremists to the Metro

14  transit system "is not a good idea[.]"

###    3.    King County's Viewpoint-Neutral Advertising Restrictions Were Reasonably Applied to the SeaMAC Ad.

15

16

17      Metro's facially viewpoint-neutral civility and disruption of service standards were

18  reasonably applied to the proposed SeaMAC Ad.  The SeaMAC Ad was initially flagged as

19  controversial, but was not perceived as posing a disruption risk.  Shinbo Dec. at ¶15; Desmond

20  Dec. at ¶11; Constantine Dec. at ¶5.  Information learned later, however, caused a re-assessment.

21   Constantine at ¶5.  After a local television station broadcast a story about the SeaMAC Ad, King

22  County was inundated with complaints.  Brown Dec at ¶¶4-9, Ex. A; Brezonick Dec. at ¶¶6-18,

23  Exs. A-D; Bush Dec. at ¶4, Ex. A; Constantine Dec. at ¶¶6-9.  While some of the complaints

expressed concerns about rider safety or the appropriateness of the Ad, others went so far as to

KING COUNTY'S BRIEF IN OPPOSITION TO SEATTLE
MIDEAST AWARENESS CAMPAIGN'S MOTION FOR
PRELIMINARY INJUNCTION - 20 (11-00094 RAJ)

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-8820  Fax (206) 296-8819

make threats of unspecified violence or more specific threats of vandalism and blocking of

buses.  Brezonick Dec., Exs. A(safety concerns), B(violence), C(civil disobedience), and D

(inappropriateness); Bush Dec., Ex. A (violence, civil disobedience, safety concerns); *see also*

Brown Dec. at ¶¶5-8 (phone call and photos slipped under door); Brezonick Dec. at ¶12 (phone

call).

Moreover, the submission of inflammatory Counter-Ads by other groups, also served to

heighten the potential for disruption.  Shinbo Dec. at ¶¶23-25; Constantine Dec. at ¶¶10, 17-18.

There was a concern that if the SeaMAC Ad were allowed to proceed, then the Counter-Ads

might also have to be allowed on Metro buses.  Constantine Dec. at ¶20.  Thus, while the

SeaMAC Ad had not changed, the context had changed dramatically in a few days.  Constantine

Dec. at ¶17; Desmond Dec. at ¶15.

By December 23, 2010, it had become reasonably foreseeable that SeaMAC's proffered

Ad, which directed insulting, degrading, and offensive material at a specific group, would result

in civil disobedience, vandalism, or other lawless actions.  Constantine Dec. at ¶17; *see also*

Desmond Dec. at ¶¶16, 21.  Similarly, it became reasonably foreseeable that SeaMAC's Ad,

which was offensive under contemporary community standards, would result in imminent harm,

disruption or interference with the transportation system.  Constantine Dec. at ¶17.

Finally, King County's application of this restriction has been viewpoint-neutral.  King

County's viewpoint-neutrality is underscored by the fact that it had:  (1) initially approved the

SeaMAC Ad; (2) previously allowed a handful of comparatively non-controversial ads

concerning the Middle-East conflict; and (3) also rejected the Counter-Ads.  Shinbo Dec. at

¶¶15, 20, 26; Constantine Dec. at ¶¶5, 9, 23.  Moreover, Executive Constantine sought to avoid

offending persons on both sides of the Middel-East debate, and move the debate away from

KING COUNTY'S BRIEF IN OPPOSITION TO SEATTLE
MIDEAST AWARENESS CAMPAIGN'S MOTION FOR
PRELIMINARY INJUNCTION - 21 (11-00094 RAJ)

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-8820  Fax (206) 296-8819

Metro buses and into the public square, where it belongs.  Constantine Dec. at ¶¶10, 11, 21.

Given the foregoing, Plaintiff has failed to submit any persuasive evidence in support of its claim

that King County engaged in viewpoint discrimination.

**C.     SeaMAC Will Not Suffer Any Harm if Injunctive Relief is Denied.**

Plaintiff's assertion of irreparable harm is based on the erroneous claim that King County

violated its First Amendment rights.  As established above, King County constitutionally limited

access to certain speech in the limited public forum it created for advertising on its buses.  King

County does not dispute that SeaMAC's Ad is entitled to First Amendment protection in the

proper forum; it only disputes that SeaMAC may demand access to the County's limited

advertising forum.

Moreover, SeaMAC concedes that the use of the phrase "Stop Funding Israel's War

Crimes" has been "prevalent in Seattle for several years" and prominently displayed during

public demonstrations in traditional public forums.  Declaration of Edward Mast, ¶ 13 and Exs.

D, E.  This fact demonstrates that there are plentiful alternative forums for its message.

Consequently, Plaintiff will not suffer any harm if this Court denies its motion for injunctive

relief.

**D.     King County and the Public Will Suffer Substantial Harm if Injunctive
         Relief is Granted.**

The issuance of an injunction directing King County to run SeaMAC's Ad would harm

Metro and its riders.  The potential for harm to King County can be summarized as follows:  (1)

the threat of harm or disruption in the form of vandalism or blocked buses; (2) riders who are

fearful of being caught in the middle and therefore avoid using Metro buses; (3) transit operators

who refuse to drive buses with controversial ads; (4) the diversion of security resources to

KING COUNTY'S BRIEF IN OPPOSITION TO SEATTLE
MIDEAST AWARENESS CAMPAIGN'S MOTION FOR
PRELIMINARY INJUNCTION - 22 (11-00094 RAJ)

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-8820  Fax (206) 296-8819

1  protect buses with controversial ads; (5) the diversion of staff time; (6) the loss of revenue and

2  (7) the loss of good will.

3      The threat of disruption through vandalism and the blocking of buses has already been

4  discussed above.  *See, infra,* at 21:1-7.  King County responded to the threats of civil

5  disobedience by developing a Bus Ads Operational Response Plan, which would have diverted

6  transit security resources toward protecting buses with the SeaMAC Ad.  Mulligan Dec. at ¶¶13-

7  19; Desmond Dec. at ¶17; O'Rourke Dec. at ¶¶9-10 (bus routing).  Significant King County

8  resources were expended in response to the uproar over the SeaMAC Ad.  Mulligan Dec. at

9  ¶20(Transit Police time); Brown Dec. at ¶¶9-10(KCDOT deputy director time); O'Rourke Dec. at

10  ¶9 (operations manager time); Brezonick Dec. at ¶¶8-11(Metro Call Center disruption);

11  Krecklow Dec. at ¶¶6-9(value of Metro staff time).  Indeed, the over $24,000 of Metro staff-time

12  that was consumed in responding to the SeaMAC Ad controversy, far outweighed the $1794,

13  Metro stood to gain from running the Ad.  Shinbo Dec. at ¶15; Krecklow Dec. at ¶¶6-19;

14  Constantine Dec. at ¶22; Desmond Dec. at ¶22.

15      Moreover, it is appropriate to consider not only the disruption already experienced by

16  King County due to the SeaMAC Ad, but also the disruption that would have occurred if the

17  SeaMAC Ad and the Counter-Ads had run.  In addition to the costs of implementing the Bus Ads

18  Operational Response Plan, King County would have incurred additional costs to address the

19  issue of transit operators who might refuse to drive buses bearing the controversial ads.

20  O'Rourke Dec. at ¶¶11-12 (opt-out plan); Bachtel Dec. at ¶¶5-8, Ex. A (driver concerns).

21      Finally, it is appropriate to consider the damage to Metro's goodwill and the perception

22  that Metro provides safe and reliable public transportation.  Constantine Dec. at ¶21; Desmond

23  Dec. at ¶21.  If the SeaMAC Ad and Counter-Ads had run, many potential riders may have opted

KING COUNTY'S BRIEF IN OPPOSITION TO SEATTLE
MIDEAST AWARENESS CAMPAIGN'S MOTION FOR
PRELIMINARY INJUNCTION - 23 (11-00094 RAJ)

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-8820  Fax (206) 296-8819

to get in their cars.  For a public transportation system established to safely convey large

numbers of people -- not to serve as a debating forum for controversial issues -- such harms are

real.

### IV.    CONCLUSION

King County has created a limited public forum in the advertising space of Metro buses;

that forum selectively excludes certain subjects and imposes narrow content-based restrictions on

all advertisements, including the two limitations relied on here.  King County properly applied

those reasonable, viewpoint restrictions to the unprecedented facts described above and rejected

SeaMAC's proposed advertisement.  This action did not violate Plaintiff's First Amendment

rights.  As a result, Plaintiff cannot demonstrate either a likelihood of success on the merits or

irreparable harm.  Based on the foregoing, Defendant respectfully requests that this court deny

Plaintiff's motion.

DATED this 7th day of February, 2011 at Seattle, Washington.

DANIEL T. SATTERBERG
King County Prosecuting Attorney

By: /s/ Endel R. Kolde
CYNTHIA GANNETT, WSBA #17152
ENDEL R. KOLDE, WSBA #25155
JENNIFER RITCHIE, WSBA#24046
Senior Deputy Prosecuting Attorneys
Attorneys for Defendant
Email: Cynthia.Gannett@kingcounty.gov
Email: Endel.Kolde@kingcounty.gov
Email: Jennifer.Ritchie@kingcounty.gov

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-8820  Fax (206) 296-8819

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on February 7, 2011, I electronically filed the foregoing document(s) with the Clerk of the Court using the CM/ECF system, which will send notification to the following plaintiff's attorneys:

*Jeffrey C. Grant, WSBA #11046*
*SKELLENGER BENDER, PS*
*Email: jgrant@skellengerbender.com*

*Sarah A. Dunne, WSBA #34869*
*Lindsey S. Soffes, WSBA #41506*
*ACLU OF WASHINGTON FOUNDATION*
*Email: dunne@aclu-wa.org*
*Email: lsoffes@aclu-wa.org*

DATED this 7th day of February, 2011 at Seattle, Washington.

By: */s/ Liah Travis*
Liah Travis
Paralegal, Litigation Section
Email: Liah.Travis@kingcounty.gov

KING COUNTY'S BRIEF IN OPPOSITION TO SEATTLE
MIDEAST AWARENESS CAMPAIGN'S MOTION FOR
PRELIMINARY INJUNCTION - 25 (11-00094 RAJ)

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION, Litigation Section
900 King County Administration Building
500 Fourth Avenue
Seattle, Washington  98104
(206) 296-8820  Fax (206) 296-8819