HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SEATTLE MIDEAST AWARENESS
CAMPAIGN,

               Plaintiff,

    v.

KING COUNTY,

              Defendant.

CASE NO. C11-94RAJ

ORDER

## I.    INTRODUCTION

This matter comes before the court on Plaintiff's motion for preliminary injunction (Dkt. # 2). The court has considered the parties' briefing and supporting evidence, and has heard from the parties at oral argument. For the reasons explained below, the court DENIES the motion (Dkt. # 2).

Because this order "grant[s] or den[ies] an interlocutory injunction," the court must make findings and fact and conclusions of law. Fed. R. Civ. P. 52(a)(2). The court includes its findings and conclusions in this order, which serves as a memorandum of the court's decision. Fed. R. Civ. P. 52(a)(1) (permitting findings and conclusions within "an opinion or a memorandum of decision"); *see also FTC v. H. N. Singer, Inc.*, 668 F.2d 1107, 1109 (9th Cir. 1982) (noting that explicit factual findings are unnecessary).

## II.    BACKGROUND

Defendant King County's Department of Transportation operates a public transportation system of buses ("Metro"), consisting of more than 245 routes and serving approximately 350,000 passengers daily.  Metro runs a revenue-based advertising program to generate supplemental financial support, and as a part of that program, Metro sells advertising space on the exterior of its buses.  *See* Desmond Decl. (Dkt. # 25) ¶ 8. Titan Outdoor LLC ("Titan") is Metro's advertising contractor, and its current contract became effective in 2005.  Shinbo Decl. (Dkt. # 31) ¶¶ 2-3.

The Titan contract specifies subject-matter and content-based advertising restrictions, instructing that:

> [Titan] shall not place in or on a transit vehicle any advertising that contains or involves the following:
> . . .
> D.    Any material that is so objectionable under contemporary community standards as to be reasonably foreseeable that it will result in harm to, disruption of, or interference with the transportation system.
> E.    Any material directed at a person or group that is so insulting, degrading or offensive as to be reasonably foreseeable that it will incite or produce imminent lawless action in the form of retaliation, vandalism or other breach of public safety, peace and order.

Shinbo Decl., Ex. A (hereinafter "Contract") at Sec. 6.4.  King County also regulates commercial activity on Metro property:

> As part of its proprietary function as the provider of public transportation, the county seeks to generate revenue from the commercial use of transit vehicles, the tunnel and other passenger facilities to the extent that such commercial activity is consistent with the security, safety, comfort and convenience of its passengers.  Accordingly, all commercial activity is prohibited on transit property except as may be permitted by the county in a written permit, concession contract, license agreement, advertising agreement or other written agreement.

King County Code ("KCC") § 28.96.210.

Plaintiff Seattle Mideast Awareness Campaign ("SeaMAC") is a Washington non-profit corporation whose primary purpose is to educate the public about the Israeli-

Palestinian conflict and its relationship to United States' foreign policy. *See* Complaint ¶ 1. SeaMAC contacted Titan in October 2010 to propose an advertisement that would run on Metro bus exteriors in December 2010 and January 2011, commemorating the two-year anniversary of the Israeli military campaign in Gaza. *See* Complaint ¶ 8. The proposed ad read "Israeli War Crimes: Your Tax Dollars at Work," and featured a picture of children next to a bomb-damaged building. *See* Shinbo Decl., Ex. C.

When Titan initially informed Metro of SeaMAC's proposed advertisement, Metro determined that the advertisement complied with its policy. Constantine Decl. (Dkt. # 23), ¶ 5. Thus, the advertisement was approved and scheduled to run on twelve buses for four weeks, starting on December 27, 2010. *See* Mast Decl. (Dkt. # 4) ¶ 9. But on December 17, 2010, the local news media reported that this advertisement was scheduled to run. *See* Shinbo Decl. ¶ 17. In the days following the news coverage, King County received numerous telephone calls and e-mails from members of the public, the vast majority of which was negative. Desmond Decl. ¶¶ 12-13; Constantine Decl. ¶ 8. Of the communications that were produced by King County in opposition to Plaintiff's motion, four[1] suggest an intention to disrupt or vandalize buses, four[2] communicate violent

---

[1] The messages in this category are: "If you want to see how tough Jews can be, then go ahead and run those despicable ads and we'll see who has the last word on this. If you run these ads, we will work together with our Jewish friends and others to shut Metro down," Bush Decl. (Dkt. # 22), Ex. A at 4; "I am a law-abiding citizen that would have no qualms defacing the message if given the opportunity. I will also be glad to form a peaceful, human blockade of buses that I help pay for that are promoting racist messages," Bush Decl. (Dkt. # 22), Ex. A at 7; "I think I will organize a group to 'riot' at your bus stops," Brezonick Decl. (Dkt. # 20), Ex. C at 22; "I will personally throw paint at any such sign, and stand and wait for prosecution – I want a forum in court!" Brezonick Decl., Ex. C at 23.

[2] The messages in this category are: "AN ATTY WHO SAYS THE SIGNS ARE PERMITTED UNDER THE FIRST AMENDMENT IS FORCING ME TO CONDUCT VIOLENCE JUST TO PROVE THAT I AM REALLY UPSET AT THESE HORRIBLE WORLD WAR2 KINDS OF HATRED SIGNS," Bush Decl., Ex. A at 5; "Maybe you should take note that you just 'incited' ME to anger all the way from Austin, Texas! You want WAR against the Jewish people??? YOU GOT IT!" Brezonick Decl., Ex. B at 13; "YOU ARE

1   intentions, approximately twenty express concern for rider safety, and approximately

2   eight strongly disapprove of the advertisement's message.  *See* Brezonick Decl. (Dkt. #

3   20), Exs. A-D; Bush Decl. (Dkt. # 22), Ex. A.  In total, Metro received approximately

4   6,000 e-mails concerning the SeaMAC advertisement and hundreds of phone calls.  *See*

5   Brezonick Decl. ¶¶ 6-11.  On December 20, a security guard found photographs of

6   severely injured people and buses destroyed by explosives, with "No to bus ads for

7   Muslim terrorists" written across the top, shoved under the door at the Metro Customer

8   Service Center.  *See* Brown Decl. (Dkt. # 21), Ex. A.

9        On December 21, Titan informed Metro that two other groups had submitted

10  counter-advertisements in response to the SeaMAC advertisement.  *See* Desmond Decl. ¶

11  14.  One advertisement read "Palestinian War Crimes – Your Tax Dollars at Work,"

12  featuring images of either a burning bus or injured passengers in a damaged bus.  *See*

13  Shinbo Decl., Ex. E.  The other counter-advertisement read "In Any War Between the

14  Civilized Man and the Savage, Support the Civilized Man," with seven accompanying

15  graphics, including images of Adolf Hitler with a Palestinian youth and Muslim people

16  with Nazi Swastika flags.  *See* Shinbo Decl., Ex. F.  News of the SeaMAC advertisement

17  and the counter-advertisements continued to be reported in the media, including the

18  Jerusalem Post and other international press.  Constantine Decl. ¶ 15.  King County also

19  became aware that the story was posted on the website of a known terrorist organization,

20  Ezzedeen Al-Qassam Brigades.  *See* DeCapua Decl., Ex. A; Constantine Decl. ¶ 15.

21

22

---

23  TRULLY (sic) DISGUSTING AND DESPICABLE……..AND JUST REMEMBER 'KARMA'
    what comes around goes around!!! Oh, and by the way, if you dumb asses at the King County
24  Metro pull more shit!! We will be on you like stink on a monkey!!! CAUSE GUESS WHAT,
    WE JEWS ARE NOT THE SAME AS THE JEWS OF EUROPE DURING THE SECOND
25  WORLD WAR!! WE GET PISSED OFF, WE TAKE ACTION!!!" Brezonick Decl., Ex. B at
    15-16; "SO HELP ME GOD I BETTER NOT SEE ONE OF THOSE ADS ON A BUS.  I
26  MIGHT NOT BE ABLE TO CONTROL MYSELF. IM NOT SURE.  SEATTLE = NAZI'S,"
    Brezonick Decl., Ex. B at 19.

27

1    King County Sheriff Sue Rahr contacted King County Executive Dow Constantine

2    on December 22 to recommend that the SeaMAC advertisement should not be run, in the

3    interest of public safety.  That same day, Mr. Constantine also spoke with Jenny Durkan,

4    the United States Attorney for the Western District of Washington, who advised that

5    public transportation systems are often targeted by terrorists and that attracting the

6    attention of terrorists to the Metro bus system "is not a good idea."  Constantine Decl. ¶

7    14.  Also on December 22, Mr. Constantine learned that approximately twenty Metro bus

8    drivers expressed fears about their safety and some stated they refused to drive buses with

9    the SeaMAC ad.  *See* Bachtel Decl. ¶¶ 5-8, Ex. A; Constantine Decl. ¶ 12; Desmond

10   Decl. ¶ 19.  In response, Metro developed contingency plans to address safety concerns

11   and prepare for possible service disruptions based on the SeaMAC advertisement.  *See,*

12   *e.g.*, Brown Decl. ¶¶ 9-11.

13        On December 23, 2010, Mr. Constantine decided that because service disruptions,

14   civil disobedience, and lawless and violent actions had become reasonably foreseeable,

15   neither the SeaMAC ad nor the counter-advertisements would be displayed on Metro

16   buses.  *See* Constantine Decl. ¶ 17.  King County simultaneously modified its advertising

17   policy to limit advertising content to commercial and government speech.  *See* Shinbo

18   Decl. ¶ 27.  The Plaintiff filed this lawsuit on January 19, 2011, and now requests a

19   preliminary injunction requiring Metro to publish its advertisement.

20                                   **III.    ANALYSIS**

21   **A.    Legal Standards.**

22        The Ninth Circuit has retooled its long-enduring standard for preliminary

23   injunctive relief in the wake of *Winter v. Natural Resources Defense Council, Inc.*, 129 S.

24   Ct. 365 (2008).  The former Ninth Circuit standard included a sliding scale on which a

25   moving party could compensate for a lesser showing of harm by showing a

26   correspondingly greater chance of success on the merits, and vice versa:

27

1

2

3

4

5

> Under the "traditional" criteria, a plaintiff must show (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases). Alternatively, a court may grant the injunction if the plaintiff demonstrates either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor.

6

7

8

9

10

11

12

13

14

15

*NRDC v. Winter*, 518 F.3d 658, 677 (9th Cir. 2008) (citation omitted).  In *Winter*, the Supreme Court rejected the Ninth Circuit standard to the extent that it made injunctive relief available on a showing of a mere possibility of irreparable harm.  129 S. Ct. at 375. Some subsequent Ninth Circuit panels used broad language about the effect of *Winter* on the alternative standard for injunctive relief.  *See*, *e.g.*, *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1126-27 (9th Cir. 2009) (noting that "[t]o the extent that our cases have suggested a lesser standard [than the one established in *Winter*], they are no longer controlling, or even viable.") (quoting *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009)).

16

17

18

19

20

21

22

23

24

25

26

27

The panel in *Alliance for the Wild Rockies ("Alliance") v. Cottrell* took a narrow view of *Winter*.  2011 WL 208360 (9th Cir. Jan. 25, 2011), *withdrawing op. at* 613 F.3d 960 (9th Cir. 2010) *and amended at* 622 F.3d 1045 (9th Cir. 2010).  After reviewing the post-*Winter* landscape in the Ninth Circuit and in other circuits with sliding-scale injunction standards, *id.* at *3-7, the *Alliance* panel "conclude[d] that the 'serious questions' version of the sliding scale test for preliminary injunctions remains viable after the Supreme Court's decision in *Winter*."  *Id.* at *7.  The "serious questions version of the sliding scale test" requires the movant to demonstrate that "serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor."  *Id.* (quoting *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc)).  The *Alliance* panel explained that the serious questions test survives, so long as the plaintiff "make[s] a showing on all four prongs" of the *Winter* test.  *Id.*

ORDER- 6

This court accordingly applies the following test for a preliminary injunction, consistent with *Winter* and *Alliance*.  The court may issue a preliminary injunction where a party establishes (1) a likelihood of success on the merits, that (2) it is likely to suffer irreparable harm in the absence of preliminary relief, that (3) the balance of hardships tips in its favor, and (4) that the public interest favors an injunction.  *Id.* at *10, *Winter*, 129 S. Ct. at 374.  A party can also satisfy the first and third elements of the test by raising serious questions going to the merits of its case and a balance of hardships that tips sharply in its favor.  *Alliance*, 2011 WL 208360 at *20-21.

**B.     The Merits of the Plaintiff's Case.**

The Plaintiff alleges that King County violated the First Amendment when it decided not to publish the SeaMAC advertisement on Metro property.  In order to determine whether Plaintiff established a likelihood of success on the merits of that claim, or at least serious questions going to the merits, the court must analyze the First Amendment protection afforded to the forum at issue: the advertising space on the exterior of Metro buses.  The Plaintiff contends that the space is a designated public forum, and King County contends it is a limited public forum.[3]  After the court determines which type of forum is present in this case, then the court will consider whether King County's decision is consistent with the constitutional protections applicable to that type of forum.

**1.     The Advertising Space on the Exterior of Metro Buses is a Limited Public Forum.**

When considering a First Amendment claim regarding free speech on government-owned property, the court must first "identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or

---

[3] Though King County Code states that transit properties are not "open public forums either by nature or by designation," that provision is not particularly relevant to a consideration of the advertising space as a forum in the First Amendment sense, because the code provision refers to all transit property generally.  *See* KCC § 28.96.020.

ORDER- 7

1  nonpublic." *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 797 (1985).
2  If the forum is public, then a speech exclusion must be "necessary to serve a compelling
3  state interest and the exclusion [must be] narrowly drawn to achieve that interest."
4  *Cornelius*, 473 U.S. at 800.  If the forum is non-public, then the government may restrict
5  speech "as long as the restrictions are 'reasonable and [are] not an effort to suppress
6  expression merely because public officials oppose the speaker's view.'" *Cornelius*, 473
7  U.S. at 800 (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46
8  (1983)).  A forum that would be traditionally non-public may be converted into a public
9  forum, however, and this type of forum is called a designated public forum: If the
10 "government intentionally opens up a nontraditional forum for public discourse," then
11 "[r]estrictions on expressive activity in designated public for a are subject to the same
12 limitations that govern a traditional public forum." *DiLoreto v. Downey Unified Sch. Dis.*
13 *Bd. of Educ.*, 196 F.3d 958, 964-65 (9th Cir. 1999).

14      The Ninth Circuit has also recognized an additional type of forum that shares
15 features of both public and non-public spaces: the limited public forum, which is "a
16 subcategory of a designated public forum that 'refer[s] to a type of nonpublic forum that
17 the government has intentionally opened to certain groups or to certain topics.'" *Hopper*
18 *v. City of Pasco*, 241 F.3d 1067, 1074 (9th Cir. 2001) (quoting *DiLoreto*, 196 F.3d at
19 965).  Speech restrictions in a limited public forum must be "viewpoint neutral and
20 reasonable in light of the purpose served by the forum[.]" *DiLoreto*, 196 F.3d at 965.

21      When attempting to distinguish between a designated public forum and a limited
22 public forum, courts look to "the policy and practice of the government to ascertain
23 whether it intended to designate a place not traditionally open to assembly and debate as
24 a public forum." *Cornelius*, 473 U.S. at 802.  That intention is consistent with a
25 designated public forum, but government restrictions (via policy and practice) on access
26 to a forum based on objective standards indicate a limited public forum. *See Hopper*, 241
27 F.3d at 1077-78.  Both a policy and a consistent application thereof must be present in

1  order to establish that a government intended to create a limited public forum.  *Hopper*,

2  241 F.3d at 1076.

3       Many courts have applied these principles to transit-related advertising, resulting

4  in some courts finding a designated public forum and others finding a limited public

5  forum.  In *Lehman v. City of Shaker Heights*, the Supreme Court examined a city's policy

6  of excluding political advertising from the space inside its transit vehicles.  418 U.S. 298

7  (1974).  The Court found that, in current First Amendment parlance, a designated public

8  forum had not been created:

9
10       Here, we have no open spaces, no meeting hall, park, street corner, or other
     public thoroughfare.  Instead, the city is engaged in commerce.  It must
11       provide rapid, convenient, pleasant, and inexpensive service to the
     commuters of Shaker Heights.  The car card space, although incidental to
12       the provision of public transportation, is a part of the commercial venture.
     In much the same way that a newspaper or periodical, or even a radio or
13       television station, need not accept every proffer of advertising from the
     general public, a city transit system has discretion to develop and make
14       reasonable choices concerning the type of advertising that may be displayed
     in its vehicles. . . .
15

16       No First Amendment forum is here to be found.  The city consciously has
17       limited access to its transit system advertising space in order to minimize
     chances of abuse, the appearance of favoritism, and the risk of imposing
18       upon a captive audience.  These are reasonable legislative objectives
     advanced by the city in a proprietary capacity.
19
20  *Lehman*, 418 U.S. at 303-04.  Likewise, the Ninth Circuit has found exterior advertising

21  space on buses to be a limited public forum where a city "consistently promulgates and

22  enforces policies restricting advertising on its buses to commercial advertising."

23  *Children of the Rosary v. City of Phoenix*, 154 F.3d 972, 978 (9th Cir. 1998).  Based on

24  that policy, the court held that "The city has not designated the advertising space on the

25  exterior of its buses as a place for general discourse."  *Id.*

26       But other courts have held that transit advertising space constitutes a designated

27  public forum.  In *Christ's Bride Ministries, Inc. v. SEPTA*, 148 F.3d 242 (3d Cir. 1998),

1   *cert. denied*, 525 U.S. 1068 (1999), a regional transit authority posted an advertisement in

2   transit stations stating that women who have had an abortion suffer an increased risk of

3   deadlier breast cancer, and removed the advertisement after receiving a letter from the

4   assistant secretary of health in the United States Department of Health and Human

5   Services, who opined that the advertisement's claims were inaccurate and misleading.

6   The Third Circuit held that the transit authority had created a designated public forum

7   because its long-established practice of publishing virtually any advertisement (both

8   controversial and non-controversial) evinced intent to designate its advertising space as a

9   forum for public debate:

> [T]here is no evidence that [the transit authority] rejected the ad pursuant to
> a new or previously existing policy to close the forum to debatable or
> misleading speech generally, or closed it to such speech on any particular
> topic of health.  To the contrary, [the transit authority] simply argues that
> the forum was closed, and will be closed, to any speech that [the transit
> authority] wishes to exclude for any reason.  In other words, [the transit
> authority] does not argue that the forum is closed to this particular type of
> speech because [the transit authority] views it differently from the speech it
> has permitted in the past.  Instead, [the transit authority] claims the forum is
> closed to all speech, and that short of viewpoint discrimination, [the transit
> authority] can make any content-based restrictions it chooses.  [The transit
> authority's] prior acceptance of a broad range of advertisements cuts
> particularly strong against this claim.  As Justice Kennedy reasoned in
> *Denver Area Consortium*, "[t]he power to limit or redefine forums for a
> legitimate purpose does not allow the government to exclude certain speech
> or speakers from them for any reason at all."  116 S.Ct. at 2414 (Kennedy,
> J.) (concurring and dissenting).

21   *Christ's Bride*, 148 F.3d at 253 (internal citations omitted).  *See also United Food &*

22   *Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.*, 163 F.3d

23   341 (6th Cir. 1998) (finding a designated public forum where a policy of accepting

24   political and public-issue advertisements demonstrated an intent to "open the property to

25   controversial speech").

26

27

Likewise, the Seventh Circuit found that a transit authority had designated its advertising space inside buses and train cars as a public forum by publishing virtually any advertisement proposed:

> [The transit authority] advertising system has become a public forum. . . . [The transit authority] maintains no system of control over the advertisements it accepts for posting on its system other than the general contractual directive . . . to refuse vulgar, immoral, or disreputable advertising. Access to [the transit authority's] advertising system, then, is virtually guaranteed to anyone willing to pay the fee. In accordance with this laissez-faire policy, [the transit authority] has allowed its advertising space to be used for a wide variety of commercial, public-service, public-issue, and political ads. Moreover, since [the transit authority] already permits its facilities to be used for public-issue and political advertising, it cannot argue that such use is incompatible with the primary use of the facilities.

*Planned Parenthood Ass'n/Chicago Area v. Chicago Transit Auth.*, 767 F.2d 1225, 1232 (7th Cir. 1985). Thus, the *Planned Parenthood* court's holding focused on the transit authority's practice of loosely applying its own policy prohibiting vulgar, immoral, or disreputable advertising, which demonstrated that the transit authority intended to designate the forum as a public forum.

The Second Circuit revisited principles underlying *Lehman* when evaluating a challenge to restrictions on advertising space on the exterior of buses: a transit authority published an advertisement that used a public official's name, and when the public official threatened to sue the transit authority for publishing an advertisement that he had not approved, the transit authority removed the advertisement under a transit policy forbidding advertisements that violate state laws requiring prior approval of a person's name used in advertising. *See New York Magazine v. Metro. Transp. Auth.*, 136 F.3d 123 (2d Cir. 1998). The court found that the advertising space was a designated public forum because of the transit authority's policies permitted commercial and non-commercial speech:

> Disallowing political speech, and allowing commercial speech only,
> indicates that making money is the main goal.  Allowing political speech,
> conversely, evidences a general intent to open a space for discourse, and a
> deliberate acceptance of the possibility of clashes of opinion and
> controversy that the Court in *Lehman* recognized as inconsistent with sound
> commercial practice.  The district court thus correctly found that the
> advertising space on the outside of MTA buses is a designated public
> forum, because the MTA accepts both political and commercial advertising.

*New York Magazine*, 136 F.3d at 130.  Because the transit authority's policy prohibiting

unlawful advertisements evinced merely an intent to uphold the law, and not a proprietary

intent such as generating revenue or conducting its own internal business, the court found

that the policy demonstrated an intent to create a designated public forum.  *Id.*

   With these considerations in mind, the court now turns to consider the policy and

practice of King County.  The County has a written advertising policy that permits

commercial and non-commercial advertisements, with specific exceptions for, *inter alia*,

tobacco or alcohol advertisements, or advertisements promoting illegal activity or

products, certain films and video games, or depicting sexual or excretory organs or

activity.  *See* Contract Secs. 6.2-6.4.   The Contract also prohibits "material that is so

objectionable under contemporary community standards as to be reasonably foreseeable

that it will result in harm to, disruption of, or interference with the transportation system,"

and "material directed at a person or group that is so insulting, degrading or offensive as

to be reasonably foreseeable that it will incite or produce imminent lawless action in the

form of retaliation, vandalism or other breach of public safety, peace and order."

Contract Sec. 6.4(D) & (E).  The terms of the Contract evince a governmental intent to

prohibit speech on certain specific topics and to avoid controversy to the extent that it

threatens transit operations or public safety, which suggests that the forum is not a

designated public forum.

   The court's inquiry does not stop there, however: the court must also examine

King County's practice in enforcing its policy, in light of the forum at issue.  King

County has submitted evidence that it has previously rejected an advertisement under the

ORDER- 12

Contract sections at issue here (Contract Sec. 6.4(D) & (E)) only once before: in 2009, Metro directed Titan to reject an advertisement reading "Hate Crimes Committed by Cults are Destroying the USA: State Hate Committed by Politicians Against Navy Family." 2d Shinbo Decl. (Dkt. # 32), Ex. 1. The advertisement was actually withdrawn before it could be rejected, but Metro did apply the Contract's prohibition under Section D ("objectionable under contemporary community standards") to the advertisement. 2d Shinbo Decl. ¶¶ 4-5. Metro did not apply that restriction, however, to other advertisements published in 2009 related to conflict in the Middle East: the Arab American Community Coalition sponsored advertisements reading "Save Gaza!" and "End Siege of Gaza!", and the Jewish Federation of Greater Seattle sponsored an advertisement reading "Thousands Have Fallen in Pursuit of Peace: Remember Israel's Soldiers and Victims of Terror." *See* Shinbo Decl. ¶ 20.

King County distinguishes SeaMAC's advertisement from previous Middle East-related advertisements on the basis of the threats generated by the SeaMAC advertisement: the previous Middle East-related advertisements generated a handful of complaints and no threats. *See* Shinbo Decl. ¶ 18. Though Metro also received a large number of complaints about a pro-atheism advertisement published in November 2009, it did not receive threats of violence or disruption related to that advertisement. Shinbo Decl. ¶ 21. Thus, the fact that King County has not excluded other advertisements under Contract Sec. 6.4(D) or (E) does not imply that King County has failed to consistently apply its policy, because there is no evidence that King County had previously received threats of disruption or violence in response to an advertisement. *See* Shinbo Decl. ¶ 22.

The rarity of these circumstances does not suggest that King County's enforcement of the Contract is haphazard or inconsistent, which is why the court finds the forum to be a limited public forum. All proposed advertising must be evaluated under the Contract, which demonstrates King County's intention to limit access to the forum. *See Perry*, 460 U.S. at 47 (stating that allowing access to those who obtain prior permission

1  does not transform government property into a public forum).  There is no suggestion in

2  the record that some advertisements bypass evaluation under the Contract, or that other

3  advertisements generated threats to disrupt orderly transit operations but were

4  nonetheless published.  *See* Shinbo Decl. ¶ 5.  King County's is not a "laissez faire"

5  advertising policy as in *Planned Parenthood*, nor was King County's decision untethered

6  from a specific policy provision a la *Christ's Bride*.  The restrictions imposed in the

7  Contract are consistent with the purpose of allowing advertisement on Metro property (to

8  supplement its financial resources as a provider of public transportation, as stated in KCC

9  § 28.96.210): Publishing material so objectionable that it would result in disrupted

10  operations or threats to public safety would weaken King County's ability to provide

11  public transportation services.

12        Thus, this case is also distinguishable from *New York Magazine*, because the

13  restrictions at issue in this case reveal King County's intent to act as proprietor of an

14  orderly transportation system.  Whereas the restriction in *New York Magazine* upheld the

15  law and avoided litigation, it did not relate to the transit authority's position as a

16  commercial proprietor.  Because King County's policy and practice indicates that it

17  consistently applied content restrictions on advertising to further its purpose of using its

18  property to provide orderly and safe public transportation, the forum at issue is a limited

19  public forum.

20      **2.**    **King County's Decision to Reject Plaintiff's Advertisement Under**
              **Contract Sec. 6.4(D) and (E) was Reasonable.**

21        As stated previously, courts uphold speech restrictions in limited public forums so

22  long as they are reasonable and viewpoint neutral.  *See DiLoreto*, 196 F.3d at 965.

23  Reasonableness is evaluated "in light of the purpose of the forum and all the surrounding

24  circumstances."  *Cornelius*, 473 U.S. at 809.  A reasonable restriction "need not be the

25  most reasonable or the only reasonable limitation," it must simply be reasonable.  *Int'l*

26  *Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 683 (1992).  Content

27

1  restrictions are not viewpoint neutral if "the government targets not subject matter, but

2  particular views taken by speakers on a subject." *Rosenberger v. Rector and Visitors of*

3  *Univ. of Va.*, 515 U.S. 819, 829 (1995).

4          Plaintiff's motion does not challenge King County's policy as either facially

5  unreasonable or non-viewpoint neutral; Plaintiff argues that King County's application of

6  the policy in this case was not reasonable because there was no "credible basis" to

7  believe that transit operations would be disrupted or that public safety would be

8  threatened as a result of publishing the SeaMAC advertisement.  *See* Pltf.'s Reply (Dkt. #

9  33) at 4:1.

10          The Contract provides that advertisements shall be rejected if it is reasonably

11  foreseeable that they "will result in harm to, disruption of, or interference with the

12  transportation system," and "will incite or produce imminent lawless action in the form of

13  retaliation, vandalism or other breach of public safety, peace and order," and King

14  County cites six categories of evidence to show that the SeaMAC advertisement violated

15  these provisions: (1) Threats of violence or disruption from the public; (2) Threatening

16  photographs of attacked buses left anonymously at Metro offices; (3) Safety concerns

17  raised by twenty bus drivers; (4) Inflammatory counter-advertisements proposed; (5)

18  Advice of law-enforcement officials; and (6) A report of the advertisement on a terrorist-

19  related website.

20          Plaintiff generally contends that the "public response" does not justify King

21  County's finding that the advertisement violates Section 6.4(D) and (E) because it was

22  "based on fear, not fact." Pltf.'s Reply at 3:23.  Plaintiff argues that King County's belief

23  that violence or disruption would ensue was not credible because (1) the public threats of

24  violence or disruption were not particularly voluminous or vitriolic (and none of those

25  communications were referred to law enforcement for further investigation), (2) the news

26  posted on the terrorist website was simply a summary of news stories reported in

27  American mainstream media, and (3) the fact that inflammatory counter-advertisements

1  had been proposed was not relevant to whether the SeaMAC advertisement alone would

2  violate Contract Sec. 6.4(D) or (E).

3        The court agrees with Plaintiff that it was not reasonable for King County to base

4  its decision to refuse the SeaMAC advertisement on concerns related to the counter-

5  advertisements or the fact that this controversy was reported widely (including on a

6  terrorist website), but rejects Plaintiff's remaining argument because the other categories

7  of evidence — particularly when considered together — form a reasonable basis for the

8  County's decision.  The threats[4] of violence and disruption from members of the public

9  (in the form of e-mails, phone calls and anonymous photographs) led bus drivers and

10  law-enforcement officials to express safety concerns, and the court finds that it was

11  reasonable for King County to rely on that evidence to apply the Contract exceptions in

12  Section 6.4(D) and (E) to SeaMAC's advertisement on December 23, 2010.

13        This finding is not undermined by the fact that the message of the SeaMAC

14  advertisement has been displayed in alternative forums without inciting violence or

15  disruption (see Mast Decl. ¶ 13), nor the fact that there have been no incidents of violence

16  or disruption as a result of the public debate about the facts underlying this lawsuit (see

17  Pltf.'s Reply at 4:3-4).  The Contract does not require that King County wait until

18  disruption or violence actually occurs before rejecting an advertisement, and it is

19  irrelevant that the Plaintiff's message has been peacefully received in other forums: the

20  issue before the court is whether King County's rejection of the SeaMAC advertisement

21  from the advertising space on the exterior of Metro buses was reasonable at the time the

22  decision was made.

23

24  _____

25        [4] That none of the threatening communications were referred to law enforcement does not
   necessarily imply that the threats were not credible.  The Contract does not require that
26  application of Sec. 6.4(D) and (E) be based on prosecutable threats, but only that it be reasonably
   foreseeable that harm, interference or lawless action will occur.  In other words, the focus of the
27  provisions is on the threatened action, not whether the threat itself would be prosecutable.

1    Furthermore, that King County had previously approved the advertisement in

2  October is irrelevant: the Contract does not provide that its restrictions apply only at the

3  time a proposal is first evaluated, nor does it prohibit reevaluation under changed

4  circumstances.  The Contract provides that advertisements shall be rejected if it is

5  reasonably foreseeable that they "will result in harm to, disruption of, or interference with

6  the transportation system," and "will incite or produce imminent lawless action in the

7  form of retaliation, vandalism or other breach of public safety, peace and order."

8  Contract Sec. 6.4(D) and (E).  At the time that King County pulled the advertisement, it

9  was reasonably foreseeable that those outcomes would occur and the rejection of

10  SeaMAC's advertisement was therefore consistent with the Contract.  The finding that

11  King County's decision was reasonable does not foreclose the reasonableness of other

12  alternatives, and that is not the issue before the court.  *See Lee*, 505 U.S. at 683 (a

13  reasonable restriction need not be "the only reasonable limitation").  For these reasons,

14  the Plaintiff has neither shown that it is likely to prevail on the merits of its case nor

15  raised sufficiently serious questions going to the merits of its case.

16  **C.    The Other Elements of the *Winter* Test.**

17    The Plaintiff's arguments as to the other elements necessary for injunctive relief

18  all assumed that the court would find the Plaintiff likely to prevail on the merits.  For

19  example, the Plaintiff argued that it would suffer irreparable harm without an injunction

20  due to the violation of its constitutional rights.  *See* Pltf.'s Reply at 7-8.  But because the

21  court has concluded that the Plaintiff has not shown it is likely that it will prevail on its

22  First Amendment claim nor has it raised serious questions, the Plaintiff has failed to show

23  any irreparable harm otherwise resulting from King County's rejection of the

24  advertisement.  Presumably, there are many other forums available for displaying

25  Plaintiff's message, as the Plaintiff noted itself.  *See* Zawaideh Decl. ¶ 3.

26    Likewise, the Plaintiff's argument that the public interest is served by upholding

27  First Amendment principles is undercut by the court's conclusion that the Plaintiff has

not established that King County violated First Amendment principles. *See* Pltf.'s Reply at 8. Neither has the Plaintiff attempted to argue that the balance of the hardships tips sharply in its favor without a finding that the Plaintiff's First Amendment rights had likely been violated.

Therefore, because Plaintiff has failed to make a showing on all four prongs of the *Winter* test, the court will deny Plaintiff's motion.

## IV.   CONCLUSION

For the reasons stated above, the court DENIES Plaintiff's motion (Dkt. # 2).

Dated this 18th day of February, 2011.

The Honorable Richard A. Jones
United States District Judge

ORDER- 18