# EXHIBIT A

Captain Lisa Mulligan                                               June 9, 2011

Page 27

```
 1        Q.   -- of the JTTF?
 2        A.   No.
 3             MR. KOLDE:  Do you have a list, Jeff?
 4             MR. GRANT:  I'm going to work on that, yeah, but
 5   I'll save it.
 6        Q.   Do you know if the Metro Transit Police is part of
 7   the JTTF?
 8        A.   We do not have a representative in the JTTF.
 9        Q.   Do you know if the King County Sheriff's Office has
10   a representative that is a member of the JTTF?
11        A.   I'm not aware of a representative who's specifically
12   assigned to the JTTF.
13        Q.   Do you know if there's any overlap between the JTTF
14   and the JTAT in terms of membership?
15        A.   There is no overlap.
16        Q.   Do you know if there's an overlap in function?
17        A.   There is no overlap in function.
18        Q.   All right.  What does the JTAT do that JTTF does
19   not, as you understand it?
20        A.   The JTAT, those are transit officers assigned to
21   that unit, and they do operational anti-terrorism and
22   awareness related things.  Their function is not
23   intelligence gathering information, gathering or sharing.
24   It's not their job to do those things.
25        Q.   Is it your understanding that the JTTF doesn't have
```

1    Q.  Was the meeting before you received the message from
2    Kevin Desmond that you needed to come up with a deployment
3    plan?
4    A.  It was.
5    Q.  As best you can, why don't you tell us what was
6    discussed between you and Detective Hoyle at this meeting
7    that the two of you had.
8    A.  We discussed what he had -- he summarized for me his
9    perception of the photographs and what they meant; and in
10   this discussion paraphrased that the people in the JTTF as
11   well as Fusion Center peers had similar thoughts about it,
12   about what that meant.
13   Q.  What were their similar thoughts?
14       MR. KOLDE:  I'm going to object to speculation about
15   thoughts.  Please testify.
16   Q.  I mean what did he say their thoughts were?
17   A.  Well, the same as his had been early in the morning,
18   that there was an agreement among the groups -- among those,
19   among his peers -- that this was a message, a strong message
20   to not run the bus ads as opposed to a specific threat
21   against the transit system.
22   Q.  Did Detective Hoyle say what he thought should be
23   done in light of this information that he had?
24   A.  No, but I wouldn't ask him that and I didn't ask him
25   that.

1    Q.  Did he say what the others that he had spoken with
2    -- that is his peers at the Fusion Center or his colleagues
3    at the JTTF -- about what should be done in light of what
4    they knew then?
5    A.  No.
6    Q.  Did he say that he was aware that anybody either
7    from the Fusion Center or the JTTF would take any action?
8    A.  Not that I remember, no.
9    Q.  How was the meeting with him left?
10   A.  You're not looking for salutations, right?  I assume
11   -- I'm not sure I understand what you mean.  I felt like I
12   was briefed and given the information that I was looking for
13   and that's where it was left.
14   Q.  Did you take any action in response to the
15   information you received from Detective Hoyle during this
16   meeting?
17   A.  I passed the information along to Kevin Desmond.
18   Q.  Was that in person or some other way?
19   A.  It was a phone contact.
20   Q.  All right.  And what did you tell Kevin Desmond?
21   A.  I told him what the agreement amongst the group was
22   that -- what their thought was about what this meant.
23   Q.  That it was a message not to run the ad?
24   A.  That it was a strong message to not run the ad,
25   right.

 1   was necessarily a request of both of them.  I think one of
 2   them they were looking for some feedback, and I don't
 3   believe was that.  The other was embedded in another series
 4   of messages.
 5       Q.  But in any event, there were two e-mails messages
 6   that had come to you in your capacity as the acting major of
 7   the Metro Transit Police?
 8       A.  At least two, maybe three.
 9       Q.  All right.  Less than ten?
10       A.  Yes.
11       Q.  And these e-mails, what was your understanding of
12   why these particular e-mail messages had been forwarded to
13   you?
14       A.  I think there were only two that were forwarded to
15   me.  There were others that were just imbedded in the
16   messages that I was cc'd on.  So I wouldn't want to guess
17   the reason I was cc'd.
18       Q.  Let's talk about the one that came to you directly.
19       A.  The one that I remember specifically that came to me
20   around -- with a request for feedback, was one that had
21   contained full case letters as if screaming.  It was an
22   angry message from someone who basically described his state
23   as being bound to violence because of Metro's decision to
24   run the bus ads, if they ran the ads.  He would be bound to
25   violence, and we'd be bound to stop it from happening.

 1      Q.  Did you read that message then?
 2      A.  I did.
 3      Q.  What did you do after you read it?
 4      A.  I talked about it with Detective Hoyle.  I told him
 5   my thought about it.  My thought was that it was again not
 6   something that met the elements of the crime of threats.
 7   And that while I was concerned about it, I didn't feel like
 8   we had enough to actually go out and interview the person.
 9   I believe there was a name attached.  I didn't think there
10   was enough for us to track down this guy to figure out where
11   he stood with this thing.  And in fact I thought that it
12   would make it worse, make the situation worse if we did
13   that.
14      Q.  Why is that?
15      A.  In my mind, my perspective, bringing unnecessary
16   attention to something that was already getting an awful lot
17   of attention and the potential for it to even add fuel to
18   the fire.
19      Q.  Are you familiar with the phrase, let sleeping dogs
20   lie?
21      A.  Yes, I've heard it.
22      Q.  Do you have any understanding of what that means?
23      A.  I think I do.
24      Q.  I mean is that sort of the attitude you had about
25   this e-mail message when you said it was perhaps better just

1       A.  If I remember correctly, his thought was that it was
2    a threat to the system, the transit system.
3       Q.  In that meeting did he say that he had any
4    information that news or information about the SeaMAC ad or
5    the King County Metro System was being posted on any social
6    media overseas?
7       A.  I don't remember if that was something he knew at
8    that time.
9       Q.  Or more pointedly, did he say anything about the web
10   site called Al-Qassam Brigades which is referenced in the
11   e-mail from Kim Goodrich?
12      A.  During our meeting, I don't believe we ever talked.
13   And I don't remember him talking about any knowledge of that
14   sort of thing.
15      Q.  All right.  Mr. DeCapua's message that was directed
16   directly to you and Mr. Hurley requested "Can you forward to
17   JTTF".  Do you see that?
18      A.  I do.
19      Q.  And you understand that to be the Joint Terrorism
20   Task Force?
21      A.  Yes.
22      Q.  Did you?
23      A.  I did.
24      Q.  And who did you send it to?
25      A.  I sent it to Marlon Hoyle.  That's what I should say

1  is that I sent it to him and basically forwarded this entire
2  stream and asked him -- yeah, I sent it to him.
3      Q.  That's what you did on December 22 at 8:13 a.m.; is
4  that right?
5      A.  Yes.
6      Q.  Okay.
7      A.  That's exactly what I did.
8      Q.  That e-mail that is from you to Marlon Hoyle with a
9  copy to Mike DeCapua that says, "Thank you", "Lisa", was in
10 response to Mr. DeCapua's comment or question, "Can you
11 forward to JTTF"?
12     A.  Yes.
13     Q.  I was wondering what that was about.  And then you
14 get an e-mail back from Mr. DeCapua at 8:22 a.m. on
15 Wednesday, December 22, right?
16     A.  Yes.
17     Q.  If we could look for a moment just on the line in
18 terms of who was getting this e-mail, who is Vicki LaRitz?
19     A.  She is the number two over Metro operations so she
20 direct reports to Jim O'Rourke.
21     Q.  And who is Randy Winders?
22     A.  I believe that's how you say it.  He, as I
23 understand it, is -- the same position as Jim O'Rourke holds
24 over operations, he holds over vehicle maintenance for
25 Metro.

1    Q.  That's also part of Exhibit 111.
2    A.  Yes.
3    Q.  All right.  And when these e-mails came to you, were
4  you reading them?
5    A.  Yes.
6    Q.  All right.  At some point Mr. DeCapua made the
7  argument that at least based in part on what came from Kim
8  Goodrich, that he was of the view that "We", as he put it,
9  "are now way beyond free speech issues when we appear on a
10 Hamas-sponsored web site", right?
11   A.  I see it is written here.
12   Q.  And you, at his request, sent that to Detective
13 Hoyle?
14   A.  Yes.
15   Q.  As you understood him to be the contact for JTTF?
16   A.  Yes.
17   Q.  And would it be an accurate statement to say that
18 Detective Hoyle disagreed with Mr. DeCapua on this issue?
19       MR. KOLDE:  Object insofar as it calls for
20 speculation.  Go ahead and answer.
21   A.  Based on the context of this message stream?
22   Q.  Yes, ma'am.
23       MR. KOLDE:  We're referring to Exhibit --
24       MR. GRANT:  111.
25   A.  You're asking if it appeared to me if there was a