Honorable Richard A. Jones

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SEATTLE MIDEAST AWARENESS
CAMPAIGN, a Washington non-profit
corporation,

                    Plaintiff,

vs.

KING COUNTY, a municipal corporation,

                    Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 2:11-cv-00094-RAJ

**DECLARATION OF ENDEL R. KOLDE IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

*Noted for August 12, 2011*

I, Endel R. Kolde, declare that:

1.     I am a Senior Deputy Prosecuting Attorney representing the defendant in the above-referenced case, am competent to testify and base this declaration on personal knowledge.

2.     Sharon Shinbo was deposed on May 13, 2011. True and correct copies of excerpts from Ms. Shinbo's deposition are attached as Exhibit A.

3.     Pamela Quadros was deposed on June 24, 2011. True and correct copies of excerpts from Ms. Quadros' deposition are attached as Exhibit B.

DECLARATION OF ENDEL R. KOLDE IN
SUPPORT OF DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT (11-00094-RAJ) -1

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION
W400 King County Courthouse
516 Third Avenue
Seattle, Washington 98104
(206) 296-9015/FAX (206) 296-0191

4.      Dow Constantine was deposed on June 16, 2011. True and correct copies of excerpts from Mr. Constantine's deposition are attached as Exhibit C.

5.      Laurie Brown was deposed on June 27, 2011. True and correct copies of excerpts from Ms. Brown's deposition are attached as Exhibit D.

6.      Carri Brezonick was deposed on June 1, 2011. True and correct copies of excerpts from Ms. Brezonick's deposition are attached as Exhibit E.

7.      Kevin Desmond was deposed on May 31, 2011. True and correct copies of excerpts from Mr. Desmond's deposition are attached as Exhibit F.

8.      Captain Lisa Mulligan was deposed on June 9, 2011. True and correct copies of excerpts from Ms. Mulligan's deposition are attached as Exhibit G.

9.      Paul Bachtel was deposed on May 26, 2011. True and correct copies of excerpts from Mr. Bachtel's deposition are attached as Exhibit H.

10.     Jim O'Rourke was deposed on May 6, 2011. True and correct copies of excerpts from Mr. Rourke's deposition are attached as Exhibit I.

11.     Susan Rahr was deposed on June 23, 2011. True and correct copies of excerpts from Ms. Rahr's deposition are attached as Exhibit J.

12.     Edward Mast was deposed on June 7, 2011. True and correct copies of excerpts from Mr. Mast's deposition are attached as Exhibit K.

13.     Robert Mark Eichinger-Wiese was deposed on June 20, 2011. True and correct copies of excerpts from Mr. Eichinger-Wiese's deposition are attached as Exhibit L.

14.     Emily Grosvenor was deposed on June 21, 2011. True and correct copies of excerpts from Ms. Grosvenor's deposition are attached as Exhibit M.

DECLARATION OF ENDEL R. KOLDE IN
SUPPORT OF DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT (11-00094-RAJ) -2

Daniel T. Satterberg, Prosecuting Attorney
CIVIL DIVISION
W400 King County Courthouse
516 Third Avenue
Seattle, Washington 98104
(206) 296-9015/FAX (206) 296-0191

I hereby declare under penalty of perjury of the laws of the United States and the State of Washington that, to the best of my knowledge, the foregoing is true and correct.

SIGNED and DATED at Seattle, WA this 21st day of July, 2011.


Endel R. Kolde

DECLARATION OF ENDEL R. KOLDE IN
SUPPORT OF DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT (11-00094-RAJ) -3

**Daniel T. Satterberg**, Prosecuting Attorney
CIVIL DIVISION
W400 King County Courthouse
516 Third Avenue
Seattle, Washington 98104
(206) 296-9015/FAX (206) 296-0191

# EXHIBIT A

## Exhibit A

A.    Program/project manager.

Q.    What is the program that you manage?

A.    Overall it's revenue generation.

Q.    Revenue generation for the advertising on buses?

A.    Revenue generation to generate revenue for the public transportation system, Metro.

Q.    And what projects or tools are there available to you in that capacity as a revenue generator?

A.    Having and overseeing a transit advertising contract.

Q.    Let's start with Exhibit-25 on that one, then, if we may.

(Discussion off record.)

Q.    Ms. Shinbo, the court reporter has marked a document as Exhibit-25.  Is this the agreement that was between King County and Titan Outdoor, LLC, in the year 2010?

A.    This and the amendments, which I don't believe are here.  Let's see if all of them are here. Amendment No. 1, I only see amendment No. 1.

Q.    How many amendments are there total attached to the agreement between King County and Titan that was in effect for the year 2010?

30(b)(6) - Sharron Shinbo                                    May 13, 2011

Page 15

A.   You've asked me two questions.

Q.   If you are both going to be objecting, this will be a lot harder.

MR. KOLDE:   It is compound.

A.   I'm listening carefully.

Q.   I can see that you are.   I appreciate that. Are you referring to a difference between the practices and policies?

A.   Yes.

Q.   All right.   Let's talk about what's the practice first.   Let's first talk about the practice.

A.   Of reviewing advertising?

Q.   Of reviewing applications for advertising to go on Metro buses.

A.   The practice is Titan Outdoor is supposed to review every proposed ad and compare it to our written advertising policies to see if there's any basis to reject that particular ad.

Q.   All right.

A.   If they have any questions --

Q.   Who?   You said they.

A.   Titan Outdoor has any questions, they will send the proposed ad, including all copy and text to me.   I will then take the proposed ad, print it from my machine, have a color copy of it, and I will also

30(b)(6) - Sharron Shinbo                                   May 13, 2011

Page 16

print out the advertising restrictions as they are in the contract document, and go through line by line to see if there are any reasons to object the ad.

Q.   At that stage, Ms. Shinbo --

MR. KOLDE:  Is your answer complete?

THE WITNESS:  No, it isn't.

A.   May I finish?

Q.   I wish you would.  I thought you were.  My bad.

A.   Then after I have gone through all of the advertising restrictions, I look at the text, and if there is a phone number, I'll call the phone number to see if it's a business and what they do; if there is a website, I will go to the website, and take a look at the website; if it's an organization that I've never heard of or a business that I'm unfamiliar with, I will get on the Internet and see what they do, so that I can see that it's a valid business.

Q.   Are you done with that step?

MR. KOLDE:  She's thinking, counsel.

A.   If I have need for further input or concerns, I might contact an attorney.

Q.   Before you go to that step.

A.   Yes.

Q.   So, the things that you just identified --

# EXHIBIT B

## Exhibit B

Pamela Quadros                                                           June 24, 2011

Page 26

A.   Not that I can think of.

Q.   All right.  Why don't we talk about the could be controversial category?  How does Titan know what that might mean?

A.   Well, we refer to the advertising restrictions.

Q.   All right.  But then how does Titan decide whether a particular ad might be controversial?

A.   If it's borderline, in the advertising restrictions.

Q.   All right.  Is the SeaMAC ad one that Titan had deemed to be potentially controversial such that King County should get a heads-up?

A.   Yes.

Q.   What was it about that ad that Titan made that decision?

A.   Because it was borderline.

Q.   But I mean what was it about the ad that made it borderline?

A.   The content.

Q.   All of it?  Some of it?

A.   All of it.

Q.   I mean, for example, part of the -- I'm going to show you this very helpful copy of the SeaMAC ad.  It's been marked as Exhibit 121 in some earlier deposition.  Does this look like to you what was the SeaMAC ad that was going to go on the King County bus?

Pamela Quadros                                                                    June 24, 2011

Page 34

that right?

A.  Six.

Q.  Oh, okay.  So six years.  Did you see what the final mock-up for the SeaMAC ad was before it was actually sent to King County?

A.  Yes, I would have seen it and, yeah.

Q.  And was it your view that the final that you sent on satisfied the criteria of the advertising policy?

A.  Yes, to our -- to the best of our ability, we felt we met the basic advertising restrictions.

Q.  Including the controversial part?

MR. KOLDE:  Objection, assumes facts not in evidence about the controversial part being part of the written policy.

Q.  You may still answer.

A.  So that day in time, okay.  I'm going to put -- that day in time we felt that the ad met the advertising restrictions that we were proposing.

Q.  Maybe I wasn't clear but that's what I meant.  I mean at the time you passed it onto King County.

A.  We passed it onto King County as here's what we're recommending, a copy for this program, run it up your flag pole.

Q.  And the time you passed it onto King County, did you understand it was King County that actually made the

Pamela Quadros                                                                June 24, 2011

Page 35

decision about whether it qualified under the advertising restrictions?

A.   Can you repeat the question?

Q.   Yes, ma'am.  At the time you passed the SeaMAC ad to King County for its review, you know, run it up the flag pole, heads-up as you described it, was it your understanding that it was King County that was making the decision about whether it satisfied the criteria in the advertising policy?

A.   Yes.

Q.   All right.  So, for example, if Titan said this works and King County said, no, it doesn't, whose decision controlled?

A.   King County's.

Q.   Okay.  But before the SeaMAC ad was sent to King County, the final version -- at least at Titan -- had been looked at, compared to the advertising restrictions in the Metro King County policies and the decision was to pass it on?

A.   Yes.

Q.   Have there been circumstances where Titan looked at a proposed advertising and said this isn't going to work and then sent it to King County?

A.   Have there been, is that what you're asking?

Q.   Yes, ma'am.

Pamela Quadros                                                                June 24, 2011

Page 36

A.   I can't recall any specific instances.

Q.   Okay.  What about the other way around; a situation where Titan said we think this will qualify, you sent it to King County and then King County came back and said, no, it doesn't?

A.   Yes.

Q.   Other than this one -- apparently at some point that changed -- but other than the SeaMAC situation, how many times do you think that's happened?

A.   That's tough to estimate over the last, you know, seven, six years based on 2010.

Q.   Well, let's try this.  Do you think it's been more than 100?

A.   No.

Q.   More than 50?

A.   No.

Q.   Okay.  More than 20?

A.   No.  I would say less than 20 times.

Q.   All right.  In six years?

A.   Yes.

Q.   So Titan has a pretty good idea?

A.   Yes, we have a very good idea.

Q.   Of what King County is going to approve?

A.   Yes.

Q.   That's part of what you're supposed to being doing,

Pamela Quadros                                                          June 24, 2011

Page 39

the SeaMAC ad to King County but before hearing that King County had agreed that the ad satisfied the criteria under the advertising policy. Do you remember any discussions with her other than what might be in e-mails?

A. Well, yes. So when I send that, I get a phone call saying thank you for the ad. I will review confirming. I've reviewed it; yes, I reviewed. And, yes, thank you. We will now review it and I'll get back to you.

Q. Do you remember any discussion with Ms. Shinbo about this ad, the SeaMAC ad, before it was approved by King County other than what you just said?

A. I don't recall.

Q. Something like this is a doozy or oh my goodness?

A. I don't recall.

Q. Anything like that? Great graphic?

A. Well, I mean we had had conversations about the graphic because we were in that -- you know, we were looking at trying to have an appropriate graphic.

Q. Yes, but earlier you described conversations that were internal with Titan?

A. They were internal, yes. But Sharron and I did talk about the graphic in the ad prior to it being approved by King County.

Q. What do you remember about those discussions?

A. Sharron had looked online and found other campaigns

Pamela Quadros                                                      June 24, 2011

that SeaMAC had run or the organization had run across the country and said, you know, here are some other graphics that they could probably use.

Q.   I'm sorry.  Sharron told you?  When you said here are some other graphics, was that Sharron talking to you?

A.   Sharron talking to me.

Q.   What kind of graphics, do you remember?

A.   I don't remember.  I don't remember the various graphics.  There's quite a few of them.

Q.   And this would have been after you had sent the ad to Ms. Shinbo?

A.   This is during the process of that.

Q.   But I mean it's after she'd seen it?

A.   Yes.  She saw it twice.

Q.   Was it different?  Were the two times different?  Did the ad change?

A.   Yes.

Q.   Was it the graphic that changed?

A.   To my recollection, we changed the graphic.

Q.   Do you remember any discussion with Ms. Shinbo about the text of the proposed ad?

A.   No.

Q.   When Titan was working with SeaMAC on its ad in an effort to help it be more acceptable to King County, was -- you talked about the work on the graphic -- was there work

Pamela Quadros                                                      June 24, 2011

Page 50

Q.   Did Titan receive any communications from, other than King County people, about the ad during the week of December 20?

A.   Yes.

Q.   Do you know how many?

A.   Oh, probably 1,400 or so.

Q.   1,400?

A.   Give or take.

Q.   Okay.  What was the form of these communications?

A.   E-mails.

Q.   Were they -- let's see.  Is that an unusual number of comments to receive about a particular ad?

A.   Yes, extremely.

Q.   Were the communications about the SeaMAC ad during the week of December 20 that Titan received limited to e-mails?

A.   There were a few phone calls.

Q.   Do you know who it was that received the phone calls?

A.   The phone calls would come to our receptionist so she would field those.

Q.   As in answer the call and try to figure out what to do about it?

A.   As to answer the call and trying to figure out where to send the person.

# EXHIBIT C

Exhibit C

Dow Constantine

June 16, 2011

Page 13

Q.   Do you remember how long the meeting lasted?

A.   No, I don't.  Generally the longest meetings I would have on any subject would be an hour, and often I'm scheduled in half hour or shorter increments.

Q.   Maybe this is a good time to mention that if you need to take a break at any time, we're likely to be here for more than 60 minutes.

A.   Okay.

Q.   What was it that you were asked to do with respect to the SeaMAC ad at this particular meeting?

A.   I was informed that Metro Transit had received this advertisement through this vendor; that Metro had determined that the ad did not violate the criteria outlined in the section 6 of the advertising contract.  They were concerned about it being potentially highly controversial, and wanted to have me as sort of the senior decision maker review it and determine whether I believed that it would meet the criteria, or not, and I agreed with their assessment that the ad should run.

Q.   Had you been asked to do that task with respect to a proposed ad on a Metro bus before?

A.   No.

Q.   Had you expressed an interest in getting

Dow Constantine                                                    June 16, 2011

Page 15

about attorney-client privileged communications. Please testify about any other communications.

A.    It was presented to me, and I think it was presented so that I might view it and draw my own conclusion about whether it would be, 1, controversial and offensive, and 2, furthermore, violative of the policy that they presented to me, and I recognized that it was potentially offensive to some of the community, but I didn't feel that it rose to the level of violating this policy, which would cause it to be excluded from placement on the bus.

Q.    Were there particular provisions of the advertising policy that you were looking at in terms of making your assessment of whether it should be rejected or not under the policy?

A.    Yes.

Q.    If you could, would you tell us which of those you did, please.

A.    The overall section is 6.0, "Restrictions on Advertising," and the specific subsection is 6.4D and E.  Those are the subsections to which I was directed that day.

Q.    Now, on Exhibit-141, those two subparagraphs that you just mentioned, D and E, are circled.  Do you know who did that?

Dow Constantine                                                    June 16, 2011

Page 16

A.   I don't know who did that.

Q.   But in any event, it certainly helped you to focus your attention on what the discussion was about?

A.   That's correct.

Q.   Very well.  Did you review those particular sections that you've identified during this meeting in November 2010?

A.   I did.

Q.   With respect to the proposed SeaMAC ad?

A.   Yes.

Q.   And what was your conclusion about D?  Did D violate the restrictions that are set forth there?

A.   My conclusion was that it arguably was objectionable under contemporary community standards, but at the time I didn't have information that made me believe that it was reasonably foreseeable that it would result in harm, disruption, interference with the transportation system.

Q.   Did you have any information about the latter part:  the potential harm, disruption, interference?

A.   At that time, I did not.

Q.   Was there any discussion during the meeting, was there any discussion about what could happen if an ad like the SeaMAC ad went on a bus?

A.   I don't recall whether there was any

Dow Constantine

June 16, 2011

Page 17

discussion of that at that meeting.  Clearly it was brought to my attention, because someone had concern that the ad might violate either D or E, and so -- but I don't remember anybody bringing up the specific potential threat of harm, disruption, or interference with the transportation system in connection with the ad.

Q.   Was there any discussion about the capability of Metro to respond to potential harm, disruption, or interference?

A.   I don't remember whether there was a discussion of that at this meeting.

Q.   Do you have, Executive Constantine, some familiarity with the Metro Transit system and its capabilities?

A.   Some.

Q.   Did you have some understanding in November 2010?

A.   Yes.

Q.   Was it your sense back then, November of 2010, that the Metro system was one of the better run Metro Transit systems in the country?

MR. KOLDE:   Object to the form of the question.

Go ahead and answer.

Dow Constantine

June 16, 2011

Page 60

A.   I did.

Q.   How did that come about?

A.   Sometime after the course of that week, I began trying to seek advice from law enforcement officials about their recommendations as I was becoming increasingly concerned due to the threats we received, the potential for violence against our system, disruption of our system, vandalism to our system, and I do not know at this point how our telephone conversation got set up, but I had a telephone call, and Frank Abe of my staff listened in on it with her, with Jenny's permission, and I asked her as the U.S. Attorney for her analysis of that situation, and any recommendations she might have.

Q.   Do you remember when that was?

A.   I think that was towards the end of this process, so probably on the 22nd, which was Wednesday.

Q.   Was it before you made the decision?

A.   Yes.

Q.   Had you spoken with Ms. Durkan before in your position as the King County Executive?

A.   I don't think on any business matters.  She's been a prominent citizen around town as long as I've been involved in elected office, and so when I run into her at a public event, for example, but I don't

Dow Constantine

June 16, 2011

Page 61

think anything of that nature had come up over the course of that year that I had been in office.

Q.    Tell us about that call, please.

A.    I asked her whether they had any information that should be brought to my attention about threats to the transit system, and whether she had a recommendation as to how I should proceed, whether the ads should run or not.  She chose not to make a recommendation.  I think she didn't think that was her place, but she did offer that transit systems are especially vulnerable to attack, and that she cautioned against doing anything that would increase the likelihood that our transit system would draw attention from people who were seeking to carry out some kind of attack or make a statement.

Q.    When you spoke with Ms. Durkan, did she already know about the ad?

MR. KOLDE:  I'm going to object.  It calls for speculation.

Please answer.

A.    I would not be surprised if she did already know about the ad.  I think my staff had been making inquiries of Federal law enforcement about whether they were receiving information about threats, because obviously we were trying to do whatever we could to

Dow Constantine                                                     June 16, 2011

Page 62

make sure we had all the information before us.

Q.    And what feedback did you get in terms of whether the Federal authorities were receiving information about threats concerning the SeaMAC ad or the Metro buses?

A.    She said she didn't have anything specific about that.

Q.    I'm going to show you a couple of documents that I think relate to the discussion with Ms. Durkan.

A.    Okay.

(Exhibits-146-148.)

Q.    Exhibit-146 is an email you sent to Rhonda Berry on December 22, 2010; right?

A.    That's correct.

Q.    This relates to the discussion you had with Jenny Durkan?

A.    That's correct.

Q.    Exhibit-147 is a two-page document of handwritten notes.  Do you know whose handwriting that is?

A.    That's mine.

Q.    Exhibit-147, Executive Constantine, was that prepared by you as part of the phone call you had with Ms. Durkan?

A.    These are the notes from my phone call, at

Dow Constantine

June 16, 2011

Page 65

Q. Had you ever heard of The Fusion Center before this call with Ms. Durkan?

A. No.

Q. And then under category 3, next to the phrases "Transportation systems always vulnerable" and "Do nothing to heighten that," you've written "Jenny's opinion" with arrows written to those. That's what she told you?

A. Yes.

Q. Was that news to you?

A. Not really, but the fact that the U.S. Attorney was highlighting that increased my concern.

Q. How long did this call last?

A. You know, I would think it was less than half an hour.

Q. On the second page, you have some handwritten notes that are mostly names.

A. Um-hum.

Q. How did this document come to be created?

A. That's me writing on a piece of paper.

Q. Why the seven names that are listed here?

A. Well, the three at the bottom -- Joe Schocken, Ken Alhadeff, Randy Abrams -- are people who had through one method or another contacted me, and I know all of them personally, so they were people I

Dow Constantine                                                                                  June 16, 2011

Page 68

concerning the SeaMAC ads running on the Metro buses?

A.    No, I don't recall her having any of the kinds of contacts we were receiving, nor do I recall her having any specific concerns about the SeaMAC organization or anybody associated with it.

Q.    During the discussion with Ms. Durkan, was there any mention of terrorist activity as we've come to learn about that concept in a post 9/11 world?

MR. KOLDE:  Object to the form of the question.

Please answer.

A.    Although it's not reflected in these notes, I'm sure that the context of the conversation was whether she had concerns about terrorist activity associated with our transit system.

Q.    Did she?  Other than -- well, did she?

A.    Only her observation that transit systems are vulnerable, which applies both to vandalism and to more specific acts.

MR. KOLDE:  I'm going to object for the record, calls for speculation, move to strike.

Q.    You mentioned vandalism to Metro buses.  Are you aware of circumstances where Metro bus drivers themselves have vandalized Metro buses?

A.    No.

Dow Constantine                                                    June 16, 2011

Page 77

request?

A.    Yes.

Q.    Tell us about the call please.  What was said?

A.    Well, I asked her for her opinion as a law enforcement officer of whether we should run the ads. I believe that she was reasonably well informed of the volume and character of the communications that were being received by the County.

Q.    How did you come to that view?

A.    I think I asked her, and we discussed for a while the decision that I needed to make about whether I should persist in having the ads run, or whether I should change course.  She quite strongly recommended as a law enforcement officer that -- well, she was quite clear that she thought that the buses were very vulnerable to attack, and that if she were in my position, she would be concerned about the communications that we were receiving and not run the ads.

Q.    Did she have any specific information that she disclosed to you about her concerns about the vulnerability of the buses?

A.    I think she had the same basic information about the threats that were being issued that I was

Page 78

dealing with.  She had in addition to that, her experience of many years as a law enforcement officer and as the sheriff of King County.  She didn't say anything more specific than that, other than buses are very vulnerable.  It's easy to attack them, something as simple as throwing, I believe her words were rocks or bricks.

Q.  In fact, things like that happen on buses frequently; right?

MR. KOLDE:  Object to the form of the question.

Go ahead and answer.

A.  I don't think there's a lot of brick throwing going on on our buses.

Q.  Are you aware that there are situations that occur with Metro buses where people are injured because people are shot or attacked or accosted on the buses?

MR. KOLDE:  Object to the form of the question, compound.

Go ahead and answer.

A.  Certainly incidents happen on the buses, on the sidewalks, on the streets everyday.  They're not necessarily related to bus advertising.

Q.  And what specific information of threats to

disruption of service, vandalism of the buses, or security of the people that either drove them or rode them did Sheriff Rahr share with you on this phone call?

MR. KOLDE:  Object to the form of the question, it's compound, asked and answered.

Go ahead and answer again.

A.    She didn't really share any specifics with me, and the premise of the conversation was she had access to the same information that I had about the threats that the County had received -- threats of vandalism, threats of disruption to the system -- more vague, but also more worrying threats about the commission of violence precipitated by the ad.

Q.    Did Sheriff Rahr talk with you about the planning that Metro Transit Police had been doing for the upcoming week for the display of the ads?

A.    I don't remember if it she or if it was Kevin Desmond who discussed with me that they had been to the extent possible trying to prepare for disruption, trying to prepare to protect the bus fleet, protect the passengers, protect the drivers.

Q.    Did Sheriff Rahr discuss with you the winter holiday deployment plan that was going on with respect to the Metro buses?

Dow Constantine

June 16, 2011

Page 110

the conclusion of this week of meetings and discussions to assess the information as a whole, and, you know, the conclusion I reached was that the circumstances had changed dramatically, and so dramatically, that I had to change course and not accept the ad, because it now clearly violated these sections of the advertising policy.

Q. Was there anybody that you were consulting with at the time that you were making that decision to go from put the ads up to not put them up?

A. I think it was the same cast of staff people who had been involved in all these meetings over the course of the week.

Q. Was the decision made in the context of a meeting?

A. There was, as there had been the previous day, sort of a rolling series of meetings. I think the debrief and discussion about the December 22nd meeting was still going on on the morning of December 23rd -- the December 22nd meeting with the SeaMAC representatives, and there was also a conversation about an offer that, I believe, had been made at that meeting to give SeaMAC time in a moderate forum on County television to present its case, perspective, which I think was not accepted by SeaMAC.

Dow Constantine                                                June 16, 2011

Page 111

Q.    At least in exchange for whether the ads would go up; right?

A.    Right.

Q.    And was that the offer:  A, you take it down, we'll put you on KING TV?

A.    Not --

Q.    King County TV, sorry.

A.    If we controlled King TV, this probably wouldn't be an issue.  I think it was a little more than that.  Personally my desire was to have the controversy and the competing perspectives aired publicly in a way that did not present a danger to our transit systems, our drivers, or our passengers, and I was searching for that opportunity, and they didn't want to take us up on that.

Q.    Were there any other opportunities that you had considered that you thought could be proposed to SeaMAC?

A.    I believe there was conversation about other public facilities, either open public forums, like parks.  There was park advertising, which is a limited public forum, I think.  That is to say, we don't accept all ads in parks, but it turned out the park advertising policy would not accommodate even the controversy, or the discussion that was taking place

Page 112

here, and we really did try to figure out whether there was a way to have this public discussion take place in a way that didn't present the dangers we were seeing.  Unfortunately, we weren't able to come up with one that was acceptable to SeaMAC.

Q.    So, what did you do, then, on December 23? Got up, came to work?

A.    I was in here.

Q.    Okay.  Here in your office?

A.    Yeah, and I was talking with folks around the office, looking at the documents that I had.  The bus driver memo was one document that sat on my desk for that time and I looked at a number of times, because I was really concerned about the disruption that would be caused by bus drivers refusing to come in, because of their concern for their safety.

Q.    Was this the memo from Mr. Bachtel?

A.    Yes.

Q.    That had been forwarded by Mr. Bachtel?

A.    Yes, and we continued to receive reports about the, you know, ongoing phone calls, emails, et cetera, that were coming in to various parts of the Government, and that day, and I believe it was probably midday, I decided that it was reasonably foreseeable that running the ads was going to result

Dow Constantine                                                    June 16, 2011

Page 113

in harm to our transit system or to our passengers or to our drivers, or a disruption to our transit service, and, you know, reluctantly I made the decision that we were not going to be able to run the ads.

Q.    Was that as part of a meeting with other people?

A.    You know, I think in the end I made that decision myself, and I think then I told Mr. Abe, Mr. Ordoñez, I'm not sure who else, and then they said about telling Metro and trying to figure out how to communicate it.

Q.    Did that decision about the SeaMAC ad happen before your decisions about the so-called counter ads that we looked at earlier?

A.    No.    They happened at the same time.    It was, it was clear to me that the counter ads were at least as offensive, and even though we didn't have the specific information yet, at least as likely to elicit a response that would result in harm to our transit system as the SeaMAC ad.

Q.    Do you think that the counter ads that we talked about earlier could have been rejected based on their content even if you did not think that they would provoke a response from the general public?

# EXHIBIT D

## Exhibit D

getting calls, or, Yeah, we've been getting emails?

A.    No.

MS. RITCHIE:  Objection, asked and answered.  You referred to Ms. Brown.  I assume you mean Ms. Berry.

MR. GRANT:  I do mean Ms. Berry.

Q.    What did she say about what she was going to do or not do with respect to your call?

A.    Make people aware at the Executive Leadership Team meeting.

Q.    Of his call?

A.    Yes.

Q.    Do you remember anything else that you and Ms. Berry talked about during that call?

A.    I don't recall when I told her, I'm forgetting exactly like within that first hour or so exactly when I learned that some very graphic and disturbing images had been left underneath the door of our pass sales office.  I told her at some point that morning.  I don't recall if it was then, or whether I learned about them afterwards, after my initial call to her, but I believe I'm the one who told her that there were some very disturbing images of buses being blown up with dead people on them.

Q.    And were these eight-and-a-half-by-eleven

Laurie Brown                                                    June 27, 2011

Page 40

both the County Council, The Executive's Office, and our department, or anywhere else in the County, and pass those along to the FBI.

Q. Who asked you to do that?

A. Rhonda Berry.

Q. Did you collect those emails?

A. I collected anything that anyone had to give me.

Q. Ms. Brown, what was your role in the collection process of these emails that you described?

A. Could you be more clear?

Q. I'll try to be. For example, were you tasked with the job of finding the emails and making some kind of an evaluation or assessment of whether they qualified for what it is that you were supposed to find, or were you just supposed to get them, or something else?

A. If I could back up. We were receiving thousands of emails, and a very large concern was that we did not have time to read through them all. I mean, I was getting them at the rate of one per 30 seconds. I think I was getting them at the rate of however quickly my Blackberry could take one, so we knew that there wasn't any way to look through all of the emails. There was just physically even if we

June 27, 2011

Page 41

stayed up 24 hours a day, there was physically no way to read through them all, but the ones that we were able to spot check or come across or threatening phone calls that we received, so we for sure knew about them, those were the ones that we were to pass along.

I wasn't to make any kind of assessment. If a receptionist said to me this seemed threatening, I would take it in.  I mean, I think I would have used my brain.  If it was like Hello, good morning, how are you, have a nice day, I would have probably not passed that along, but if there was any possibility, I figured that was for The Fusion Center, which is ultimately where I was sending them, and that my understanding of The Fusion Center was that that's a center where Washington State Patrol, FBI, local police agencies all kind of fuse together, so that it's a team of people looking at potential security risk from many different angles, so that's my understanding of where I was ultimately sending them, was not the FBI, but it was The Fusion Center.

Q.   You said we were getting emails.  Were you getting the emails directly from members of the public about the SeaMAC ad?

A.   Yes, I was.

Q.   At your email address for King County?

Laurie Brown                                                    June 27, 2011

Page 43

sent files, and my received files.

Q.    I mean, were all the emails you received threatening or potentially threatening?

A.    Excuse me?

Q.    All the emails that were coming to you from people outside of King County, were they all threatening or potentially threatening?

A.    All the thousands of them?

Q.    Yes, ma'am.

A.    I wouldn't characterize them that way.

Q.    How were you keeping track of which ones were and which ones weren't?

A.    If one said, I'm going to deface your bus, then I would say that was a potential threat or a disruption of the transit service.  If one said, You are inciting us to violence, then I thought that that was threatening.  If one said, you know, Remember the killings at the Federation, or, you know, whatever, then that I thought probably warranted somebody who had expertise in public safety to look at it.

Q.    All right.  So, that's how you were making the cut.  What I'm wondering is how you were keeping track of them:  this one is threatening or potentially threatening and this one is not.

A.    There were thousands of emails at a time

Laurie Brown                                                    June 27, 2011

Page 44

where I was trying to manage everything else related to this week and this incident: building security, labor relations issues, bus operators who said they wouldn't drive the buses, planned demonstrations. I was trying to manage all of that. There was no, there was no system that I could say proudly that we set up to be able to track everything and have it neatly in columns threatening, nonthreatening, these are all red, these are not red. We were all like reading them as quickly as we could, given everything else that was going on, but my understanding was that by midweek, we had kind of lost confidence that we were going to be able to read even half of them.

Q.    Was anybody helping you in this process?

A.    Oh, yes.

Q.    Who was that?

A.    Carri Brezonick and her group down there, and I know that I personally assigned some people to help her to read through the emails, so I don't know how many people ultimately were looking at them, but her group.

Q.    Is the process of reviewing emails that are coming from members of the public to King County a task that normally you'd perform in your work as the deputy director of the DOT?

A.    Would you say that again?

Q.    Yes, ma'am.  Is the task of going through emails that come from members of the public something that normally you do as part of your duties as a deputy director at DOT?

A.    No.  This situation was entirely the first time in my experience in six years that we've dealt with anything like this, and it was all hands on deck. Everybody had to do everything as quickly as we could to try to get our arms around the situation and manage it.

Q.    Did you yourself ever send any emails that you labelled as either threatening or potentially threatening to any law enforcement agency?

A.    Yes.

Q.    Which agency or agencies?

A.    The best that I can recall it would have been to Rob Hollander from The Fusion Center, who was ultimately was identified to me as my single point of contact.

Q.    And who told you that?

A.    I don't recall.  I think it was when I called the FBI, and then I talked to Rob Hollander, and he said, Yep, I'm the guy.

Q.    Did you do that?  Did you send him the

Laurie Brown                                                           June 27, 2011

Page 74

Q.    Is that how would characterize that?

A.    Yes.

Q.    Do you know if that happened, that is, the check in the next day?

A.    I heard that it happened.

Q.    From whom did you hear that?

A.    I don't recall who I heard it from.

Q.    What did you hear?

A.    That they were going to still run the ad.

Q.    They, SeaMAC?

A.    Um-hum.

      MS. RITCHIE:  Yes?

A.    Yes.  Sorry.

Q.    Do you recall whether there was any discussion about an alternative for the SeaMAC ad other than the Metro buses?

A.    Could you restate that question?

Q.    Yes, ma'am.  When there was the meeting with the SeaMAC personnel and the King County personnel and the question was posed about whether SeaMAC would just withdraw the ad, was there any discussion about what other alternatives might be available for SeaMAC to be able to put its ad on that King County could offer?

A.    Someone talked about a billboard, and SeaMAC said they weren't interested in a billboard.

Laurie Brown

June 27, 2011

Page 75

Q.    Somebody from King County mentioned the billboard?

A.    It must have been.

Q.    All right.  Do you remember anything else about -- pardon me.

Do you remember anything else that was said during this meeting with the SeaMAC people?

A.    Not at this time.

Q.    Did you take notes of that meeting?

A.    I don't recall.

Q.    Did you ever have any other discussions with Ed Mast after that meeting?

A.    Personally, no.

Q.    What do you mean personally?

A.    I did not have any discussions with Ed Mast.

Q.    All right.  Do you know if you had discussions with any SeaMAC representatives after that meeting?

A.    I did not.

Q.    Did you ever have any email communications with people that you understood were from SeaMAC?

A.    I did not.

Q.    I'd like to come back for a moment to the emails that you were trying to send to The Fusion Center that you identified as threatening and

Laurie Brown                                                          June 27, 2011

Page 88

A.    I told you that I met with these people.

Q.    Yes, ma'am.  And then anything else in addition to those two things you've just identified?

A.    I don't know specifically what you are asking.

Q.    Well, I'm just trying to find out if you are aware of any other steps that were taken to address the situation that's being identified in these emails here.

MS. RITCHIE:  Again, objection, calls for speculation.

A.    We met to share information and to make sure all of our safety and security people were aware of what had happened.

Q.    With the photographs or photocopies of the buses?

A.    With the photos and the tone and numbers of emails we were receiving and the voicemails that we were receiving and the phone call that I had from Robert Shay, that we had a potentially volatile situation emerging.

Q.    So, who is sharing that information with Ms. Whitfield and her team?

A.    Me.

Q.    How did you communicate that to her and her

Laurie Brown                                                    June 27, 2011

Page 93

Q.   This email, Ms. Brown, appears to involve your ability to manage the emails that were coming to you; right?

A.   Correct.

Q.   The suggestions that were offered by Mr. Watanabe on Tuesday, late afternoon, did you implement those?

A.   No.  His first suggestion was if they were from the same person, and they obviously were not.

Q.   All right.  What about any of the others, did he suggest it?

A.   You can set email rules that will automatically send emails into other folders.  None of those suggestions turned out to be feasible.

Q.   Were there any other steps you took to try to prevent your computer from crashing?

A.   Yes.  I asked for my, my email, my inbox, or whatever you call it, to be substantially increased, so that I could get them in, and that it wouldn't crash it.

Q.   Did they do that?

A.   They did it once.

Q.   Did your computer crash that week?

A.   I was not able to use it several times for several hours.  I don't know what the definition of

Laurie Brown                                                    June 27, 2011

Page 94

crash means, but my mailbox was full, so I couldn't send anything out, I couldn't receive anything, so the communication that I was trying to have beyond receiving these emails couldn't happen.

Q.    Was there a point in time that week where you were able to have that situation remedied?

A.    Yes.

Q.    What steps were taken to help you do that?

A.    I'm not an IT person.  I called either Mike Berman or Wayne Watanabe, or my assistant called them probably, and said -- I'd gone through at least one evening and all through the nighttime and into the morning where I couldn't use my email, and she basically said she's got to use her email.  You got to do something.

Q.    I'm sorry.  What was that last part?

A.    Laurie needs to use her email.  You've got to do something.

Q.    Did they do something?

A.    Yes.

Q.    All right.  What steps were you involved in trying to catalog phone calls that were coming into King County from nonemployees during the week of December 20 involving the SeaMAC ad?

A.    Catalog?

Laurie Brown                                                          June 27, 2011

that?

A.    Well, I saved all of my emails, and I turned them over to the attorneys, so I'm assuming you got them.  I could determine it by looking through them.

Q.    Would how would you be able to determine that you sent this message involving Mr. Okawa to The Fusion Center?

A.    Well, the emails that I sent, at least from what I recall, was that when I would send an email to Rob Hollander at The Fusion Center, it would have been in my sent box, and I believe I was asked to provide all those to the Prosecuting Attorney's Office.

Q.    As a discreet category?

A.    No.  Any records -- I can't remember what we were asked to produced, but it's basically give it up, whatever you got that has to do with this situation.

Q.    So, you said you might be able to tell what you sent to The Fusion Center by going into your sent box or sent folder; right?

A.    Or looking at what I provided to the Prosecuting Attorney's Office.

Q.    How many emails do you think you got about the bus ad from non-King County personnel during the week of December 20?

A.    Thousands.  I have no idea exactly the right

Laurie Brown                                                June 27, 2011

Page 108

number.

(Exhibit-211 marked.)

A.    Okay.  I've read it.

Q.    Were you involved in discussions about the advertising policy that TriMet has or had at that time?

A.    Was I involved in discussions?

Q.    Yes, ma'am.

A.    No.

Q.    Do you know what the TriMet advertising policy was?

A.    Without being able to see it on this document, I couldn't tell you what it is.

Q.    Do you know who TriMet is?

A.    I'm sure it's another transit agency somewhere.

Q.    Other than that, do you have any recollection?

A.    No.

(Exhibit-212 marked.)

A.    I've read it.

Q.    Ms. Brown, this is an email, Exhibit-212, from you directed to Mr. Taniguchi, with a copy to Mr. Desmond.  Did you attend a meeting with Rhonda Berry and Dow Constantine on Monday, December 20 at

# EXHIBIT E

Exhibit E

Carri Brezonick

June 1, 2011

Page 22

provide them with all of the emails about the SeaMAC ad that came in to your team between December 18 and December 23, 2010, would you be able to deliver that?

A.   Yes.

Q.   Is that because the emails are stored by some sort of name or topic or subject matter?

A.   Well, as I mentioned, the emails are stored numerically.  The number, I believe, is associated with the database, which gives it a number, so the emails are stored separately than the database.

Q.   As you understand it, is the number assigned based on when the emails come in?

A.   No.  They're based on when they're entered into the database.

Q.   Who does that?

A.   Who enters the emails into the database?

Q.   Yes, ma'am.

A.   Mostly it's Bryan Ballestrasse.

Q.   Is there a collection of the emails that were received by King County concerning the SeaMAC ad?

A.   Yes.

Q.   How many of them are there?

A.   I believe there's over 6,000.

Q.   Are those emails categorized any other way than received during a certain window of time about

# EXHIBIT F

Exhibit F

Kevin Desmond

May 31, 2011

Page 66

Q.    Was this before or after the comments by Ms. Thielke and Ms. Brezonick?

A.    After.

Q.    When Ms. Thielke and Ms. Brezonick were talking about the unusually large number of angry calls they received, did Ms. Mulligan say anything during the staff meeting?

A.    With respect to what?

Q.    The SeaMAC ad, or the calls or the picture.

A.    I don't recall any conversation that Captain Mulligan had with me or my senior staff prior to her showing me the photographs.

Q.    Okay.  What did she say when she showed you the photographs?

A.    She wanted to bring it to my attention.  She was concerned with the photographs.  That was very unusual to have received something like that, and she was -- she thought it was something that I needed to know.

Q.    And these were photocopies of photographs; is that right?

A.    Yes.

Q.    What do you remember the photographs depicting?

A.    I believe there were three photographs

Kevin Desmond                                                                May 31, 2011

Page 68

Q.    Did Lisa Mulligan tell you how these had come to her?

A.    She informed me that they had been found, slid underneath the door at one of our customer sales offices.  I don't recall if it was at the King Street Center, or another facility in the tunnel.

Q.    This discussion with her that you've been describing, this happened while the staff meeting was happening, but there was some kind of a break?

A.    She just drew me out of the room.  People do that often.

Q.    Okay.

A.    Again, it happens.

Q.    Yes, sir.  She shows you these pictures.  I mean, what happens?

A.    After the staff meeting, I met --

Q.    Before we get to the end of the staff meeting, you and her are talking.  What happened right there?  She showed them to you.  Did either of you say anything?

A.    We talked about them.

Q.    Okay.  Tell me what was said.

A.    I don't remember exactly.  I asked her where she got them.  We probably discussed because it was in connection with the KING 5 story and it was obviously

Page 69

related in some tangential if not direct way to the large number of phone calls and emails we'd been receiving, that was another piece of information to suggest to me that we had a significant problem brewing.

Q.    Did Lisa Mulligan tell you what she had done with the pictures other than receive them and show them to you?

A.    I don't recall what she said about that, no.

Q.    Do you know if there was any type of law enforcement investigation into where those pictures came from?

MS. RITCHIE:    Objection, calls for speculation.

A.    I don't recall her saying anything about that, and I did not -- I probably didn't ask her, because they were submitted anonymously over the weekend.

Q.    Do you know what Lisa Mulligan did with the pictures after she showed them to you?

MS. RITCHIE:    Objection, calls for speculation.

A.    Not specifically, no.

Q.    Generally?

A.    Well, no.    I would have to speculate on

Kevin Desmond                                                    May 31, 2011

events and who I talked to or when.

Q.    Not so much the sequence.  Right now I'm trying to find out if you can recall any later discussions with Lisa Mulligan about the pictures.

A.    I vaguely recall, yes, talking to her about the pictures.

Q.    All right.  And what do you recall being said?

A.    It was just general follow-up, what she was following up, thoughts about what it all meant as we were -- as the sort of tidal wave of information was coming our way throughout the morning with all of the public inquiries we were getting.

Q.    What did she say was the follow-up that she was going to take?

A.    I do not recall.

Q.    Do you remember what it was that she told you that she thought these pictures meant?

A.    She was extremely concerned that it was a threat against the system.  Any time you would see dead bodies in blown-up public transit bus anywhere in the world slipped under the door of a public transit organization, one must be concerned.  She was concerned legitimately so.  Representing Metro Transit Police, she needed to show it to me, and I was

Kevin Desmond

May 31, 2011

Page 76

concerned, legitimately so. This was very unusual in my entire tenure here. Nothing of that sort had ever happened.

Q. Do you remember anything else that she would have said about that?

A. As I said, we would have been in contact with our law enforcement locally.

Q. Who would that be?

A. We have many different contacts within the law enforcement community here in Seattle.

Q. Who would that have been with respect to the SeaMAC ad, and specifically the pictures that Lisa Mulligan --

A. As a general matter, it would have been with the entities that are part of the Joint Terrorism Task Force.

Q. Do you know if the Metro Transit Police participates in the Joint Terrorism Task Force?

A. Yes. I'm not sure what you mean by participate. That is a question you'd have to ask them. They have got -- they are in communication with the JTTF. In terms of participate, I'm not sure that what that means.

Q. You understand there's some chain of communication between Metro Transit Police and the

# EXHIBIT G

Exhibit G

Captain Lisa Mulligan                                    June 9, 2011

Page 59

know what -- It was just kind of a basic follow up with him to let him know what I was doing with them and where that had led to that point.

Q. And what did he say?

A. I don't remember a specific reaction.

Q. All right.

A. Maybe I'll have you clarify the question, what did he say.

Q. Well, do you remember anything that he said, you know -- he talked. What words did he use?

A. Yeah, I don't remember specifically.

Q. All right. What was your reaction to seeing those photos and having them been found in the way that they were found? What did that mean to you as the acting major of MTP?

A. I was concerned.

Q. About what?

A. My initial concern was that this was a potential threat against our transit system.

Q. At that time, Captain Mulligan, did you make any connection between the photographs and the story that you had seen on KING 5?

A. Yes.

Q. What was the connection you made?

A. I think that the connection was that it was simply

Captain Lisa Mulligan                                         June 9, 2011

"continue", is this what the framework for the deployment plan looked like on December 22, 2010 at 3:14 p.m.?

A.   Yes, with one exception.

Q.   And what's that?

A.   The second to the last page under the category of general, the language about the 358 emphasis continue as scheduled, that is information I added once we knew the ads weren't going to be run.  In the actual plan, the emphasis had to be canceled in order for us to make it happen, make the new deployment plan happen.

Q.   So the addition of the words "stand down" and "continue" and the word general and the text about the 358 emphasis, was that added on Thursday, December 23 that you then sent to Kevin Desmond at 3:20 p.m.?

A.   I believe the word "general" was still in the original plan and that what was written there in the text under general was not.  What's here it was instead we're going to have to cancel this plan with your approval, which he already approved -- the emphasis.  We're going to have to cancel the emphasis, and he had already approved that.

Q.   All right.  Let me try to come back to something just a little bit more basic, I think.

A.   Okay.

Q.   So the framework for the deployment plan was first sent to Kevin Desmond on December 22 at 3:14 p.m., right?

Captain Lisa Mulligan

June 9, 2011

Page 118

A. Yes.

Q. And then you made some modifications as you've earlier described?

A. Yes.

Q. And you did that on December 23, 2010 and sent it to Kevin Desmond at 3:20 p.m.?

A. Yes.

Q. What was the difference between what you sent to Mr. Desmond on December 22 and December 23 under the heading "general"?

A. The difference was that in the original plan, the 358 -- the text said something to the effect of the 358 emphasis will stop so that we have the bodies to actually make this happen. And obviously that's not word for word.

Q. Correct.

A. In this secondary forward to him it contains language around it continuing as normal because that was -- we would be able to continue it as normal.

Q. And is that what actually did happen, that the 350 emphasis program continued after the bus ads were -- the decision was that the bus ads would not be displayed?

A. That's right.

MR. KOLDE: I think you misspoke. You said 350. It's 358.

MR. GRANT: It is 358. And, I'm sorry, I did

Captain Lisa Mulligan                                                June 9, 2011

Page 140

Q. Do you think it's likely that when you wrote that you got the nod of concurrence from ops that you were referring to the MTP deployment plan that you had developed?

A. I really don't want to guess. I don't know. I don't remember what I was referring to there.

(Exhibit 97 marked.)

Q. Captain Mulligan, you have Exhibit 97. It starts with your e-mail to Mr. Desmond on December 22, 2010 on the third page.

A. Okay.

Q. We don't need to revisit that one. I'd like to start first with the e-mail that you sent to Mr. Desmond at 5:39 p.m. on December 22. It's at the bottom of Page 1 and then continues onto Page 2. Do you see that?

A. I have a different time. I'm a little confused. 5:29 p.m. Oh, this one. I'm sorry.

Q. 5:39 p.m.

A. Got it, okay.

Q. And so the second -- the line that starts with "Am I authorized to stop", do you see that?

A. Yes.

Q. What were you talking about there?

A. Because I was talking about the 358 emphasis.

Q. What did you mean, "Am I authorized to stop the emphasis"?

Captain Lisa Mulligan

June 9, 2011

Page 141

A.  He had authorized the emphasis and expected the emphasis.  And therefore it was appropriate for him to authorize the stoppage of it so that we could make this other one happen.

Q.  And the new campaign that is in that line was referring to the campaign that's outlined in your e-mail of December 22?

A.  Right -- yes, a different way of saying to this new emphasis.

Q.  And the 358 emphasis had been in place before December 17?

A.  Yes.

Q.  Did Mr. Desmond get back to you with an answer on your question here about authorized to stop?

A.  Yes.

Q.  He did.  And he said that you were?

A.  Yes.

Q.  And he did that on Wednesday the 22nd at 6:09 p.m., right?

A.  Right.

Q.  And as part of telling you that you were authorized, he also said, "This whole deal is extremely fluid and tomorrow we may have a big change of plans".  For now what you have in place works for me.  Do you see that?

A.  Yes.

# EXHIBIT H

Exhibit H

Paul Bachtel

May 26, 2011

Page 11

A.   I believe, to best of my recollection, it was the week before Christmas I received an email from one of our board officers informing me that the ad was coming.  I believe I was sent a link to a Seattle, either Seattle Times or Seattle PI -- I think it was the Seattle PI, to the best of my recollection -- Seattle PI article informing the public that these ads were going to run.

Q.   Do you remember who the board member was that sent this to you?

A.   I do not.  I just remember receiving it, and I went looking for it here prior to this, and could not find that specific email, but I get hundreds of emails.

Q.   You may have had a hundred since we started.

A.   Yes.

Q.   Do you remember what the email said?

A.   Just an FYI and then a link to the article.

Q.   Did you read the link?

A.   Yes.

Q.   I mean, at the time you got the email, did you open it up and read it?

A.   Yes.

Q.   And what did you think?

A.   I thought the ad was the most inflammatory

Paul Bachtel

May 26, 2011

Page 12

thing I had ever seen proposed to be placed on the side of a Metro bus. I thought it would raise all sorts of hackles. I thought it would put our members in danger. Having driven a bus for 20 years of my 26 years, I know better than most that the reaction from the mentally ill that we transport, some of the more boisterous passengers, what the outcome might be from an ad like that.

Q. And what was it about the ad that made you think that?

A. It was that it touched on one of the world's most controversial issues: the relationship between the Israeli Government and the people of Palestine.

Q. Anything else about the ad that led you to the belief or reaction to the ad that you just described?

A. Yeah. I thought the picture of a bombed-out Palestinian village asking Americans to consider whether their tax dollars are being spent appropriately was inflammatory, to say the least.

Q. Do you know whether it's accurate, or not?

A. Well, that would be an opinion. You want my opinion?

Q. I think the question was do: You know whether the message in the ad was accurate, or not?

Paul Bachtel

May 26, 2011

Page 34

Q.    During, or at least at the time of that call, Mr. Bachtel, were you aware of any specific information that led you to conclude that there might be violence?

A.    That was during the middle of the time when I was receiving phone calls and emails, and some of the phone calls and emails that came to me suggested that there was a high potential for violent acts to occur.

Q.    And how many of those do you think there were?

A.    Out of the dozen emails, I think I cited several of them in my email to the King County Council members, or addressed to Kevin Desmond and copied to the King County Council members.  I heard from a retired state patrolman --

Q.    I think we're just asking about numbers.

A.    Oh.

Q.    Out of the emails and phone calls, how many specific instances were there that led you to conclude that there might be violence?

A.    Twenty to thirty.  I think every one I spoke with was making the same contention:  they were concerned about the potential for violence.

Q.    Is this they were concerned there might be, or that they knew of violence that might happen?

# EXHIBIT I

Exhibit I

Jim O'Rourke

May 6, 2011

Page 47

Q.    Anything else that was discussed at your staff meeting, you know, than that?

A.    Concern from the other base supervisors and the other section supervisors about what all would have to be dealt with in a situation like this.  This was an unusual situation for us.  We've dealt with demonstrations before, we've dealt with threats before, but in most of the cases in which we dealt with demonstrations or threats, they were not threats directly to us and they were not demonstrations about us as an agency, and so it presented a little bit of an unusual situation that we had to, if you will, deal with on more of an ad hoc basis.  It didn't fit neatly in our plans.

Q.    By the time you are having your staff meeting on Wednesday, Mr. O'Rourke, what threats were there?

A.    There were some threats implied in a number of the emails.

Q.    How many?

A.    I don't know.

Q.    I mean, was somebody looking at that?

A.    Yes.  Carri Brezonick.

Q.    And what were the threats?

A.    I do not know.  It was simply generally communicated to me that some of the emails were

Page 49

there was a holiday in which -- Friday, in which a lot of people wouldn't be at work, and so having worked all the way through Christmas last year on snow, not a lot of people wanted to come in on Christmas and work; so...

Q.   What was your understanding of why the Executive's decision at that point in time was to continue to have the ad be displayed?

A.   I didn't know the basis for his decision.  I simply got that that was his decision.

Q.   So, what happened then at the end of this meeting in terms of the follow-up on how to deal with the SeaMAC poster?

A.   At the end of the meeting, we were meeting in Ryerson Base on the second floor, so when the meeting ended, I went downstairs with Abdul Alidina.  Abdul is the supervisor of Ryerson Base.  I had him convene his whole staff in a conference room, and we sat, and I said, Look, here's the situation.  We got to figure this out.  We got to figure out which buses we are going to put these ads on, we are to figure out how we are going to deal with the transit operators, who will drive the buses, and I essentially tasked them with some basic information and said, Let's go forward and make a plan, and here's what I want.  What I want

Jim O'Rourke                                                    May 6, 2011

Page 50

ideally is all buses on the 509 corridor, because we have a lot of service out of Ryerson that goes down SR509. That makes it likely that our police focus could be in Burien and downtown, at both ends of where that service goes, and that we can then take care of whatever other arrangements need to be made to locate the police or to reroute the service if necessary in certain areas.

Then the other factor that came up was how we are going to deal with the operators come Monday morning, and I wanted a base chief to be present in the base and to talk to every individual operator before they went out, so that the same person made a consistent judgment about whether it was a safety issue for the operator, or they're simply refusing on political grounds or whatever to drive the coach, and I also wanted the chief to be there to assess the operator, because normally that would be the job of the base dispatcher, but I did not want to have that set on top of what a base dispatcher normally has to do to get service out of the base on a Monday morning.

Q. How many drivers are we talking about, say, on the Monday morning would that have been?

A. I believe we were talking about 12 buses, so that would have been 12 drivers on Monday morning, and

Page 51

a different 12 drivers on Monday afternoon.

Q.   All out of Ryerson?

A.   Yes.

Q.   When does the ATU become involved in this process?

A.   That's kind of a general question and difficult to answer in that form.

Q.   Well, was there any collaboration with the union in terms of how Metro is going to work with its drivers in this process of dealing with drivers who might object to driving a bus with the ad on it?

A.   So, as I said previously, there was communication with Paul Bachtel after the plan was developed to run out of Ryerson to run on the 509 corridor, et cetera.   I called him up and I said, Look, here's what we are going to do:   If the driver has a safety concern, they won't have to drive the bus.   We're going to have a chief on the base to evaluate that safety concern.   If the driver has a political concern, that's not a valid reason for not driving the bus.   We are going to send them out there anyway.   I wanted to assure him that we had them at that base for a reason, that we had police presence out there to protect the drivers in case there was some sort of incident or a demonstration that they had

Jim O'Rourke                                                    May 6, 2011

Page 52

to go through, or something like that, and I just basically wanted to give him the information on what was happening and where it was going to happen on Monday morning.

Q.    And what was his reaction to that?

A.    Thanks for the information.  You know, you are going forward, you are doing what you are doing, and we'll do what we have to do.

Q.    What did that mean?

A.    I don't know.

Q.    Okay.

A.    That's kind of a normal communication between the two of us.

Q.    And perhaps because of your institutional roles and not so much your personalities, I take it?

A.    Yes.

Q.    All right.  So, you are at the Ryerson Base, you are meeting with the Metro employees, and you are trying to map out the plan.

A.    Yes.

Q.    Twelve buses on Monday, the 27th in the morning and then twelve in the afternoon; right?

A.    Yes.

Q.    And was there discussion at that point in time about the routes or which 12 in the morning and

Jim O'Rourke                                                          May 6, 2011

Page 53

which 12 in the afternoon?

A.    Okay.    So, I laid out the general parameters of the plan.    I said, What we are looking for here is service that goes up and down SR509, and I'd like to locate the police at Burien and the police downtown at a particular location.    The police can decide where they want to be.    That's the general outline.    What I need you guys to do, the staff, is go through all the run cards for all the routes that we are talking about here, and determine a set of routes that, routes that would meet these criteria, that would fit into this, and then tell me what those routes are, so I can tell people where the service will go, and tell me if for some reason you can't get, for instance, all the service on 509 or needs to be a different area of town, stuff like that, and so I basically gave them that general instruction, and ascertained that they had enough information to go forward and do that, and I left, and they worked on it the rest of the afternoon.

Q.    All right.    Why SR509?

A.    Primarily I looked at where the service from Ryerson was concentrated, and that's the one corridor that we had a significant amount of rush-hour service from Ryerson.

Jim O'Rourke                                                    May 6, 2011

Page 54

Q.    And why was that important?

A.    Well, if we have limited police resources, we wanted a location where the police resources could be at both ends of a route, so if there were a disruption or a demonstration or something, we wanted the police to be close to where it occurred.

Q.    Is the SR509 route a limited-stop route?

A.    Some of the routes that go down there are, yes.

Q.    For example, the buses that go to Wallingford or to some of the other neighborhoods seem like they have more stops than SR509, but I'm asking.

A.    That's not universally true.

Q.    Okay.  All right.

A.    For instance, there's a local service all the way from Highline Community College to the Burien Park 'N Ride, and then the bus gets on SR509 and it goes downtown.

Q.    So, the selection of SR509 as the route was because of the resources involving Metro Transit Police?

A.    Essentially, yes, that was my motivating factor in including that corridor.

Q.    What about the volume of ridership?  Was that --

Jim O'Rourke                                                    May 6, 2011

Page 57

(Recess.)

Q.    We're back on the record.

And let's pick up with where we left off. I think that you are walking out of the meeting at Ryerson, and the rest of the team is working on a plan to come up with the details of how Metro will be ready to go Monday morning on December 27th.

A.    Yes.

Q.    What's the next thing that happens that involves you concerning the SeaMAC poster and the Metro buses?

A.    Good question.  I don't recall.

Q.    Do you remember doing anything that day, Wednesday?

A.    I believe by the end of the day they had a list of trippers that they would assign the buses to. I don't know whether I mentioned this previously or not, but I did indicate to them that they needed to work very closely with Lisa Mulligan once they got what service was going to be assigned these buses.

Q.    But the end of the day on Wednesday, your team got back to you with so here's our plan?

A.    Essentially, yes.  At one point in the time in the afternoon, they called and they said, Well, problem, boss, we can't do all SR509 service, because

Jim O'Rourke                                                                    May 6, 2011

we don't have enough service on that corridor to do 12 a.m. and 12 p.m. trips, what shall we do?  And so they presented me with a few alternatives, and one of the alternatives included Magnolia, and I said okay to Magnolia as an additional place that we would run the coaches.

Q.    Why Magnolia?

A.    Once again, it was a decision based on the amount of service that we had in that area, and from my perspective on the location in Magnolia, it was relatively close to downtown, and if we had police resources located downtown, it wouldn't take them very long to get out to Magnolia.

Q.    Was there any consideration about the area or neighborhood that the buses would be going through, that a particular area might be more sensitive in terms of its reaction to this particular message?

A.    Yes.  We had a concern because the buses were going to go down Third Avenue past, I believe, it's the Jewish Federation Building; at any rate, where there was a shooting a number of years ago and somebody was killed, and so we incorporated in the plan of rerouting the buses around the block that contained that building, so that they wouldn't be passing directly in front of the building.

Q.    And rerouting Metro buses because of a particular obstacle is something that happens with some frequency?

A.    Yes.

Q.    So, SR509, Magnolia, tripper routes, and rerouting around the Jewish Federation facility on Third Avenue were three of the components of the plan to operate on Monday?

A.    Yes.

Q.    Were there any others?

A.    Certainly there was the component of having a base chief come in early Monday morning and talk to all the operators; make sure that they felt safe driving the service.  I wanted him to talk to each individual operator, rather than leaving that to the dispatcher.

Q.    All right.  Anything other than those four parts of the plan, and check with the Metro Transit Police, coordinate with them; right?

A.    Well, yes, certainly.  And then, so normally what would happen is in a bus space there are a number of lanes, and what we call a yard pattern.

Q.    Yard pattern?

A.    Yes.  So, this is how you park the buses on the base, and a person called a hostler,

Jim O'Rourke

May 6, 2011

Page 60

H-O-S-T-L-E-R, in vehicle maintenance goes through and maps out where the buses are in the yard, and then makes assignments of those coaches in a certain order to go out on service that day, so that some coaches are out all day, other coaches are out only as tripper coaches, et cetera, et cetera. Because of the nature of this service, what we needed to do is coordinate with vehicle maintenance and get them to segregate the coaches on a couple of lanes, so that these coaches could be taken on this service for sure, so that nobody else would make a mistake and take the wrong coach and have the buses that had the ads on end up somewhere else in the county, so there was a coordination with vehicle maintenance that was necessary, also.

Q.    So, that was the contingency plan, then, what you've just outlined?

A.    Yes, it's part of the plan.

Q.    What other parts were there?

A.    What we just talked about.

Q.    Okay.  Because I've sort of balled it up, let's make sure we have a right.  The contingency plan at the end of day on December 22 --

A.    Wednesday.

Q.    -- Wednesday, was that there would be tripper

Jim O'Rourke

May 6, 2011

Page 61

routes, the routes themselves, to avoid the Jewish Federation facility on Third Avenue, the plan in place to speak with or interview operators that may have had a concern, coordinate with Metro Transit Police, and the assignment of the buses in terms of their parking at the base to make sure the right bus went on the right route?

A.    Yes.    There's one other component that I didn't mention.  I'm sorry.

Q.    That's quite all right.  That's why we go through this.

A.    On Monday morning I authorized the addition of four report operators.  A report operator is a person who sits in the base on the day of service and gets assignment to a route, because another operator cannot operate that route for whatever reason.  So, they call in sick or whatever happens on day of service, a report operator handles that.  If we know about it a day ahead of time, the extra board handles it, but the report operator is specifically for that day.

What we did is we said we're going to put four extra report operators on Monday morning, and if it is the base chief's judgment that an operator has a valid safety concern, we will have the report operator

Jim O'Rourke

May 6, 2011

Page 62

take the route instead of the operator who is assigned to the route.  Presumably what we would do in this situation based on past practices, we would pay the operator anyway as if they had driven the route.  We would just relieve them of duty with pay.

Q.    This is some type of a procedure that Metro Transit has worked with before?

A.    When we need extra operators to do a service, we quite often add extra report operators to handle the extra service.  If we know that there's a possibility of demand for service on a given day, but we're not sure about it up until that day, then we may add some report operators just to make sure that we have enough bodies around to handle the service.

Q.    Anything else that was in the contingency plan?

A.    I don't recall anything else.

Q.    So, on Wednesday at the end of the day, the end of the workday, you are getting a report from who on the contingency plan?

A.    Abdul Alidina.

Q.    Were you satisfied that that was a plan that would work?

A.    Yes.

Q.    I take it you have a lot of confidence in the

Jim O'Rourke                                                    May 6, 2011

Page 68

who think he's not doing his job in protecting them.
So transit operators might have the view, for
instance, you should put a stop to this.  They don't
know whether he has power to, or not.  They just tell
him stop this; so...

Q.   I take it that in your experience in dealing
with Mr. Bachtel, that he responds to a variety of
complaints raised by his operator members about their
job and how it should be made easier and all that kind
of stuff?

A.   Yes, he does.

Q.   Leaving aside the content of the SeaMAC ad
and any potential objection to the content, the types
of things he was expressing to you were similar to
things he had expressed in the past?

MS. GANNETT:  Again, objection, misstates
the testimony.

A.   I don't know.  It's hard to say similar to
me, because it really is a different and unique
situation.

Q.   All right.

A.   I liken this to I looked through our security
plan, and it has checklists for what we do in maybe 15
different security-type situations.  None of them
covered this, so we were really in different territory

Jim O'Rourke                                                                      May 6, 2011

than we've been before.  So to characterize his reaction as similar when it's a totally different situation is like, well, he had the reaction that he had.

Q.    All right.  This situation as it relates to the security plan that you were talking about, I mean, how was the SeaMAC situation being characterized? What was it that you were calling it, and then it wasn't fitting into the security plan?

A.    So in the security plan, we have a plan for what if there's a demonstration and it disrupts service?  Well, that plan does not cover what if there's a demonstration and it's about something that's on the bus, so our checklist became nonfunctional for that situation.  If they're protesting something that's actually on the bus, that's a totally new and different situation that we haven't confronted before.  We have a checklist, for instance, for a bomb threat.

Q.    Excuse me.  Hasn't Metro looked at situations where there would be controversy about what was displayed on the buses?

A.    We have.

Q.    Yeah.

A.    But we didn't have a security plan for

Jim O'Rourke                                                    May 6, 2011

Page 70

dealing with a disruption that had to do with a public demonstration of some sort that had to do with what was on a bus.

Q.    It didn't come up with the Free Gaza ads?

A.    No, it didn't.

Q.    Okay.  I'm sorry.  I think I stopped you. You were starting to talk about a bomb threat?

A.    Yeah.  We had another checklist for a bomb threat.  That clearly wasn't the situation that we were dealing with here either.

Q.    The security plan you mentioned, is this a Metro security plan?

A.    Yes.

Q.    Is that the name of it?

A.    It's called a systems security plan.

Q.    Okay.  And that's in place for what purpose? Why do you have a system security plan?

A.    So that we can have a secure system.

Q.    All right.  Fair enough.

       MS. GANNETT:  I just want to object at this point.  If you look at our response to request for production 14, the system security plan is fine if Mr. O'Rourke testifies generally about it, but the specifics, if you really want to drill down on, not that they're necessarily relevant, and he testified

# EXHIBIT J

Exhibit J

Sheriff Susan Rahr

June 23, 2011

Page 23

Q.   You are half right.  What do you recall about the discussion with Mr. Desmond?

A.   The discussion topic was whether or not there was an opportunity to not run the ads because of the risks.  My recollection was Mr. Desmond said the County Executive had made the decision to run the ads, and that's what my understanding was.

Q.   Do you recall when this discussion occurred?

A.   I don't recall which day.  It would most likely have been Tuesday or Wednesday, but I don't recall which one.

Q.   If it's helpful as a point of reference, I think it's agreed that this was sometime in the mid-to-late afternoon of Thursday, the 23rd, that the decision was announced that the bus ads would not run.

A.   Correct.  I believe I spoke to Mr. Constantine, I believe our discussion was before that.  The day before.

Q.   All right.  Back to Mr. Desmond, then.

A.   Um-hum.

Q.   You said concerns.  Who was it that was expressing the concerns?

A.   I was.

Q.   And what was his reaction to that?

A.   He shared my concerns.

Sheriff Susan Rahr

June 23, 2011

Page 25

specifically.

Q.    Did you have more than the one communication with Mr. Desmond that you just identified?

A.    I believe just one.  I don't think we had any further conversations.

Q.    Was this in person?

A.    On the telephone.

Q.    Do you know if anybody else was participating in the call?

A.    I don't believe so.

Q.    What was your take on his attitude?

MR. KOLDE:  Objection, calls for speculation.

Please testify.

A.    My recollection was that he was very concerned about disruption, about danger to the people riding the bus.

Q.    Did he say anything about where The Executive was in terms of his thinking at that point in time?

A.    The impression I had from Kevin was that The Executive was inclined to run the ads.

Q.    Did you yourself express an opinion about that when you were speaking to Mr. Desmond?

A.    Yes, I did.

Q.    What was it?

Sheriff Susan Rahr                                                    June 23, 2011

Page 26

A.    I told him that I thought that it was an unreasonable risk.

Q.    And what exactly was the risk that you were thinking about?  The risk of what?

A.    A couple of things.  As I said, I was concerned about an emotional, spontaneous type of reaction from people who may be marginally suffering from emotional issues.  During the holidays, we always see an escalation in suicides, fights.  Anything involving emotional stability is going to be on the edge around the holidays to begin with.

Q.    Is there anything else that you can recall that you and Mr. Desmond discussed when you spoke with him during the week of December 20?

A.    No.

Q.    Did you make any notes of the call you had with Mr. Desmond?

A.    I doubt it.  I generally don't take notes.

Q.    Okay.  Do you recall sharing the information you had from Mr. Desmond with anybody within the Sheriff's Office?

A.    I may have.

Q.    All right.  When you were speaking to Mr. Desmond that week, did you make any statement to the effect that you were prepared to speak out

Sheriff Susan Rahr                                          June 23, 2011

Page 27

publicly on this issue yourself?

A.   Yes.

Q.   What did you say about that?

A.   I think I used those very words.

Q.   Okay.  And what was it that you intended to speak out about?

A.   I wanted to convey to Kevin and to Dow that if I was asked, I would speak out and say that I thought it was an unreasonable risk.

Q.   When did you intend to do that?

A.   I said if somebody asked me.  I did not plan to hold a press conference or initiate something.

Q.   When you made the reference to if somebody asked me, were you thinking someone in the media?

A.   Yes.

Q.   What was Mr. Desmond's reaction to that?

A.   I don't recall.

Q.   The Sheriff and The Executive are independently elected by the King County voters; is that right?

A.   That's correct.

Q.   Tell us, please, what you can remember about the discussions you would have had with Executive Constantine during the week of December 20 concerning the SeaMAC events.

Sheriff Susan Rahr                                                June 23, 2011

Page 28

A.    The discussion generally was pretty much the same as what I conveyed to Kevin Desmond:  that I thought it was an unreasonable risk.

Q.    Was the discussion with The Executive before or after Mr. Desmond?

A.    After.

Q.    Was it your sense that at the time you were speaking with The Executive, he had decided what to do in terms of displaying the ad?

MR. KOLDE:  Objection, calls for speculation.

Please answer.

A.    I had the impression that he had not made a final decision.  I also had the impression that he was leaning toward running the ads, but he did not specifically say he had made the decision.

Q.    All right.  Do you know how long after the discussion you had with Mr. Desmond the discussion with The Executive occurred?

A.    I don't recall.  It would have been within a day, but I don't recall if it was the same day or the next day.

Q.    Could you tell whether The Executive had spoken with Mr. Desmond about the call that you and Mr. Desmond had?

Sheriff Susan Rahr                                                      June 23, 2011

Page 29

A.    I don't know.

Q.    How did the contact with The Executive occur?

A.    Either he called me or I called him.  I don't recall specifically.

Q.    But it was on the telephone?

A.    It was on the telephone.

Q.    Do you recall whether anyone else was on the call?

A.    I don't believe so.

Q.    Do you remember how long it lasted?

A.    Very short.

Q.    Do you remember how long the call with Mr. Desmond lasted?

A.    Not specifically.  It wasn't very long.

Q.    Is there anything else that you can recall about your conversation with Executive Constantine other than what you've already said?

A.    Again, just to express my concern about the risk.  I suggested that he talk to Jenny Durkan, the U.S. Attorney, to get her input and perspective.

Q.    Had you spoken with Jenny Durkan by then?

A.    I didn't speak to Jenny Durkan until after I spoke to Executive Constantine.

Q.    All right.  What was your understanding of the role that Jenny Durkan's office had in connection

Sheriff Susan Rahr                                          June 23, 2011

Page 33

A.    In the discussion I conveyed to him my concern about the risks.   I recall him expressing his concern about First Amendment issues, and the necessity of balancing the First Amendment with risk to the public.   I don't remember the specific words. I think there was a conversation about whether or not we had specific terrorist threats from a terrorist group, and my general message to him was my concern was more for local people who were going to overreact; have a bad reaction to the ads.

Q.    Do you recall The Executive giving you any information about specific threats or potential threats that he was aware of?

A.    I don't know if we talked about the specific threats, no.

Q.    Sheriff Rahr, did you repeat to The Executive the comment that you had made to Mr. Desmond about your intent to speak out on this issue if asked?

MR. KOLDE:   Objection, misstates prior testimony.

Go ahead and answer.

A.    I told him that I would speak out publicly about my opinion if I was asked, yes.

Q.    What was his reaction to that?

A.    I don't recall if he had a reaction.

Sheriff Susan Rahr                                                              June 23, 2011

Page 34

Q.    Okay.  Do you remember any other comments that were made about that particular topic, speaking out if asked?

A.    No, I don't.

Q.    Tell us, please, about your phone call with Jenny Durkan, then.

A.    My purpose for calling Jenny was to give her heads up that she may be getting a call from the County Executive, and I shared with her what my concerns were, and she conveyed to me that she agreed with my concerns.

Q.    Did you have any the impression that Ms. Durkan had any information about the details concerning what type of information King County had been receiving about the bus ad and the concerns of vandalism, disruption, or safety?

        MR. KOLDE:  Object to the form of the question, calls for speculation, compound.

        Go ahead and answer.

A.    Could you restate the question?

Q.    Yes, ma'am.  When you were speaking with Ms. Durkan, did you get the sense that she had any specific information about the communications that had been coming in to King County that were objecting to the ad?

Sheriff Susan Rahr

June 23, 2011

Page 40

A.    If I was asked by somebody, I would answer honestly I thought the risk was unreasonable.

Q.    Even if The Executive had decided that the ads should be displayed on the buses?

A.    I would have answered the question honestly if I had been asked, yes.

Q.    All right.  Do you recall that both Mr. Desmond and Mr. Constantine understood that part of your intent, as well?

MR. KOLDE:  Objection, misstates prior testimony about intent.

Please answer.

A.    My intent was to convey my support.

Q.    Right.  But if the ads did run and then you were asked by the media what was your take on it, it sounds like you were going to say you thought it was an unreasonable risk.  Is that right?

A.    That's what I said, yes.

Q.    All right.  And so did you have a sense that The Executive knew that if he made the decision that the display should go up, if you were asked you intended to say that the risk was unreasonable?

MR. KOLDE:  Objection, calls for speculation.

Please answer.

# EXHIBIT K

## Exhibit K

Edward Mast                                                      June 7, 2011

Page 119

I am remembering another point of course that they brought up. The possibility of counter ads was already apparent by that time, so that was also discussed. That might have been discussed also in the morning in my conversation with him.

Q. What was said about the counter ads at the meeting with King County on December 22nd?

A. That counter ads had been and certainly would be proposed; that they would also cause the same kind of disruption.

Q. Were the ads described to you at the meeting on December 22nd?

A. I'm thinking about this, because I certainly have since seen a couple of the counter ads that were proposed. I don't remember if they showed them to us, or not. I don't remember that.

Q. Tell me about the counter ads that you've seen either at that meeting or since then.

A. Two of the counter ads were -- one proposed, I believe, by a local organization that said "Palestinians War Crimes, Your Tax Dollars At Work," and had a picture of a public bus, a bus burning, which we noted would not have met King County's clear standards for advertising under their old policy that ours did meet. There was another one from an

Edward Mast                                                    June 7, 2011

Page 120

organization in New York, I believe, from Pam Geller, saying a slogan very much like "In any battle between civilization and savagery, choose the civilized side, stand by Israel," clearly implying that Arabs are savages and Israel was a civilization. We all concluded that it would be very unlikely that that would have passed the very clear standards that King County Metro had for its advertising. Nonetheless -- and this wasn't a topic of disagreement between us.

Q.    When you say us, are you talking about --

A.    SeaMAC. We felt that they would not have passed that. Nonetheless, they were anticipating a debate, a war of the ads with continued disruptions like that.

Q.    Is it fair to say that you did not discuss your opinion that the counter ads failed to meet Metro's guidelines or policies with the County on the 22nd? Is that fair to say?

A.    I don't remember. We might have discussed that. I actually don't remember that.

Q.    Okay. Why do you believe the counter ads that you've described did not meet King County Metro's advertising restrictions?

A.    The one with the picture of a burning bus would be a picture of violence, and King County was

Edward Mast                                                    June 7, 2011

Page 121

very clear that they didn't want images of weapons or violence. The one that typified Arabs as savages was overtly characterizing an ethnic group in a derogatory way, so, again, we felt those standards were quite clear.

Q.    Do you believe the comment about drawing a connection between Palestinians and savages was racist?

A.    And savages, yes, yes.

Q.    Do you believe that counter ad that you described was racist?

A.    Yes, that one. The other one about Palestinian war crimes is a different thing. I actually think if they had changed the photo on it, they could have found a way to make that one acceptable. I, of course, disagree with the factual basis of the ad, but that was clearly, deliberately mirroring our ad.

Q.    Why would you of course disagree with the factual basis of the ad?

A.    Because that ad was implying that our tax dollars are spent in some sort of equal proportion supporting Palestinians and Palestinian policy, and that's simply not true. We don't spend anything like the number of U.S. Government dollars supporting

Edward Mast

June 7, 2011

Page 129

confused by what you mean.

Q. Tell me what you understand about the offer of an alternate form in the form of public access television for SeaMAC to get its message out.

A. Again, I wasn't present at that conversation, and my understanding from it being reported to me secondhand was the possibility of King County, on a public access TV channel that I guess King County has, to have some sort of forum or debate on the general topic of Israel and Palestinians.

Q. Do you think that that was a good-faith offer by King County to SeaMAC?

A. I don't think it was at all commensurate to what had been denied to us by the cancellation of that contract.

Q. Why?

A. Because I don't think there's any comparison in impressions, in the number of people who would receive our message in the way we intended to publish it.

Q. Do you agree that a person physically blocking a bus carrying the SeaMAC ad could disrupt bus service?

MR. GRANT: Object to the question.

Q. You'll need to answer.

# EXHIBIT L

Exhibit L

Robert M. Eichinger-Wiese                                                June 20, 2011

Page 63

Q.    When I refer to the SeaMAC ad, I'll be referring to the "Stop Israeli War Crimes" ad?

A.    Yes.

Q.    Other than the bus campaign that this lawsuit is about and the billboards that we just talked about, what other methods has SeaMAC used to communicate its message or slogans?

A.    To date, or what we have investigated?  I'm trying to --

Q.    I mean actually used to date.

A.    Those are the primary two.

Q.    When you say primary, that implies there's a secondary or tertiary.

A.    We developed other messages, as I mentioned earlier in this deposition, but they have not been put in place.

Q.    Did SeaMAC utilize any specific criteria in crafting the text and graphics for the SeaMAC ad?

A.    We used the criteria that was outlined in the County's policy.  We looked -- we had an earlier ad that was rejected by Clear Channel, and we looked at their criteria and took and changed the images.  I would say that's basically it.

Q.    So, other than the criteria that you have described, were there any specific criteria utilized

Robert M. Eichinger-Wiese                                    June 20, 2011

Page 77

previously in this lawsuit about offering to do the

"Equal Rights For Palestinians" ad instead.

    A.   Yes.

    Q.   I'm wondering.  Did you consider any other

modifications other than that?

    A.   No.  That was one that was already developed.

    Q.   Okay.  So there weren't any other

alternatives?

    A.   Not at that time.

    Q.   Is it correct that King County raised the

option of alternate forums to SeaMAC other than the

bus advertising forum?

    A.   The only one that I'm aware of that they

offered or that I remember being offered was the King

County television.

    Q.   Tell me about that.

    A.   During the meeting the four of us had on the

22nd, I cannot remember which member or representative

of the County asked if that would be an acceptable

medium to have I think they termed a forum or a

debate, and that was No. 1.  The viewership of that

medium is minimal by, you know, any stretch of

advertising method.  It's not mainstream advertising.

It didn't in any way, shape at all really appeal to

us.

Robert M. Eichinger-Wiese

June 20, 2011

Page 78

Q.    Other than what you've discussed, are there other reasons why SeaMAC did not accept King County's offer of airtime on King County's television station?

A.    We didn't think it was a legitimate alternative.

Q.    And are the reasons for that any different than what you've already testified to?

A.    Not that I can think of.

Q.    Did SeaMAC consider the County's offer of airtime on the County's television station?

A.    We had a meeting following the meeting with County reps, and it was discussed and it was pretty much rejected.

Q.    Did SeaMAC consider whether there might be other alternate forums other than King County television?

MR. GRANT:   That King County could offer?

The questioner nods head affirmatively.

MR. KOLDE:   Yes.

A.    Okay.  There's something that rings a bell, or my memory is something about tunnels, or advertising in the tunnels, and I don't even know what that would refer to.

Q.    Is it correct that the controversy resulting from the decision to initially run the SeaMAC ad

# EXHIBIT M

## Exhibit M

Emily Grosvenor

June 21, 2011

Page 35

Q. So how many times would you think you've met since the inception of the organization?

A. Well, we meet at -- we see each other at, you know -- we're at all the other meetings too. But the last time we had an official steering meeting only, would have been a long time ago; pretty much when we got it established.

Q. So why don't you tell me how often SeaMAC meets.

A. As needed. We do a lot of communication via e-mail. And there's really no need to do a face-to-face meeting.

Q. Okay. So do the subcommittees have any kind of standing meetings?

A. I don't think there's a standing meeting. You'll just get an e-mail where there's a proposed meeting time, and you can accept and say you're going to be there. Or if you're not able to attend, they'll meet without you.

Q. So you were just a member officially of the Art/technical/media pricing subcommittee; is that correct?

A. Yes, that was the only subcommittee that I was a part of that.

Q. How often has that committee met?

A. We probably only met in person face to face twice. All other communications between members of that subcommittee was via e-mail.

Q. And what was your role in that subcommittee?

A. To gather pricing from the bus ad venue, to find out

Emily Grosvenor                                                    June 21, 2011

Page 36

what it was going to cost and, you know, what buses to put our ads on, just dealing with all the arrangements with the vendors that we were going to be putting -- or placing contracts with.

Q. And were you primarily responsible for that?

A. Yes. I just volunteered to look into that.

Q. And when did you start that process?

A. I would have to look at my e-mails.

Q. Generally. Let me ask you, how soon after the organization was formed would you say that you started that process?

A. Maybe like a month later.

Q. And do you remember what companies you contacted?

A. Yes.

Q. Which ones were those?

A. Titan and Clear Channel and CBS Outdoor and Fourpoints Communications.

Q. Any others?

A. No, that's it.

Q. And did you contact all of these around the same time period?

A. Relatively -- Fourpoints -- actually, no. Fourpoints I corresponded with much later than the other three. But those other three communications with those happened right around the same time.

Emily Grosvenor                                                June 21, 2011

Page 48

Q.   Do you know if you had any money at the time that you got these proposals?

A.   I don't think we had any money when Rod got his proposal.  But Rod was prepared to contribute his own money towards this so we had the potential to have money when it was needed.  When I first approached Titan, I didn't know how much money we were going to have to work with; I don't think I did.

Q.   Okay.  So at some point it was determined that you had a certain sum of money and that you were going to purchase an ad or attempt to purchase an ad through Titan; is that correct?

A.   Yes.

Q.   Okay.  And did Jennifer explain the process by which ads are approved for going on buses?

A.   Well, because our ad was -- because they deemed our ad to be political or issue related, it needed to go through approval through Metro, King County Metro.

Q.   And when did she explain that process to you?

A.   I don't remember.

Q.   Was it at the time that she gave you --

A.   It was right around the time when we were doing all this -- you know, running these proposals and such.

Q.   Did she explain that there were certain restrictions on advertising in King County?

Page 49

A. She sent me an attachment that had the restrictions outlined on it. And I believe one of them was weapons and I think anything referencing alcohol is not allowed either.

Q. I'm going to show you Exhibit 25 and see if you recognize these as the restrictions that -- and it was Jennifer, right, that sent you this?

A. Yes -- or it might have been -- well, wait. What are we looking at first?

Q. These are the restrictions on advertising that you said. This is the contract with Titan. But you said she sent you an attachment with restrictions.

A. Okay.

Q. Is that correct?

A. I've never seen -- I stepped out of the process when the contract was formed. I had nothing to do with that; never saw it.

Q. I understand that. I'm just trying to figure out what the attachment was. You said she sent you an attachment that had various restrictions on things that couldn't be displayed on the side of the bus, correct?

A. Yes, and it could have been. It most likely was sent from her. But there was one other person I did receive an e-mail from at one point or maybe two e-mails. Her name was Samantha and I remember that her e-mail came with an attachment, and I can't remember if it was written out in