Honorable Richard A. Jones

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SEATTLE MIDEAST AWARENESS
CAMPAIGN, a Washington non-profit
corporation,

                    Plaintiff,

v.

KING COUNTY, a municipal corporation,

                    Defendant.

NO. 11-cv-00094 RAJ

SEAMAC'S RESPONSE TO
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT

**NOTED FOR HEARING:
AUGUST 12, 2011**

**ORAL ARGUMENT REQUESTED**

## INTRODUCTION

In December 2010, Defendant King County, after approving the political message Plaintiff Seattle Mideast Awareness Campaign (SeaMAC) wished to display on Defendant's Metro buses, reversed course and censored its speech.  Defendant had designated this advertising forum as a public one because it had displayed all varieties of commercial, political, religious, and "cause" advertisements for decades. The decision to censor was made without evidence of any credible threat.

Because a jury could find, based on the record developed in this case, that Defendant created a designated public forum, and that its decision to censor the SeaMAC message was not narrowly tailored to further legitimate security interests, reasonable in light of the

limitations it claims it relied upon, or viewpoint neutral, Defendant's Motion for Summary Judgment must be denied.

## STATEMENT OF FACTS

### A.    *Undisputed Facts Regarding Defendant's Acceptance of SeaMAC's Message*

Metro is a division of Defendant's Department of Transportation (DOT), "which is a multi-modal organization consisting of transit roads, airport, marine, and fleet."  Declaration of Jeffrey Grant, Ex. O (at 9:15-21).  Metro is comprised of various units—including Operations, Sales and Customer Services, Vehicle Maintenance, and Power and Facilities— all overseen by Kevin Desmond, the General Manager of Metro.  Grant Decl., Ex. O (at 10:7-11).  Mr. Desmond, in turn, reports to the Director of the King County DOT, Harold Taniguchi, who, in turn, reports to the King County Executive, Dow Constantine.  Grant Decl., Ex. O (at 9:19-21).

Within Metro, Carri Brezonick supervises the Customer Information Office.  Grant Decl., Ex. K (at 6:20-21).  Ms. Brezonick oversees 26 call center staff (who are responsible for receiving and responding to customer comments communicated via electronic mail, Metro's customer comments website, or by a telephone complaint line), and four administrative staff.  Grant Decl., Ex. K (at 7:13-25; 8:1-4).  When others within Metro or in the Executive's Office receive complaints and comments from the public, "they would normally route them either via [Mr. Desmond] or directly to Ms. Brezonick for handling."  Grant Decl., Ex. P (at 80:22-25; 81:1).

Advertising for Metro is housed within the Sales and Customer Services subdivision and is managed by Sharron Shinbo, who "review[s] transit advertising" and "oversee[s] the administration of the transit advertising contractor," Titan Outdoor, LLC (Titan).  Grant Decl., Ex. U (at 14:4-8).

Responsibility for security issues related to Metro lies with the Metro Transit Police (MTP).  Grant Decl., Ex. O (at 10:11-12).  Metro has a contract through the King County Sheriff's Office—overseen by Sheriff Sue Rahr—which provides MTP's services and which

SEAMAC'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT
CAUSE NO. 11-cv-00094 RAJ
PAGE – 2
12576 00101 nh086132rn

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

are staffed by sheriff deputies and overseen by Major Dave Jutilla, who reports directly to Jim Jacobsen, the Deputy General Manager of Metro.  Grant Decl., Ex. P (at 11:20-25; 12:14-16). Captain Lisa Mulligan fills the role of Administrative Captain within MTP (during the week of December 20, 2010, however, she was the acting Major of Metro, as Major Jutilla was on vacation).  Grant Decl., Ex. Q (at 13:7-10; 14:4-6).

### 2. *Metro's Advertising Policy*

Advertising space has been sold on Metro buses since 1973.  Grant Decl., Ex. A. Between January 2005 and December 23, 2010, Metro's Advertising Contract (which houses its Advertising Policy (AP)) with its agent, Titan, prohibited advertising that contained:

> 6.4(D). Any material that is so objectionable under contemporary community standards as to be reasonably foreseeable that it will result in harm to, disruption of, or interference with the transportation system.

> 6.4(E). Any material directed at a person or group that is so insulting, degrading or  offensive as to be reasonably foreseeable that it will incite or produce imminent lawless action in the form of retaliation, vandalism or other breach of public safety, peace and order.

Dkt. 31-1.

### 3. *Metro's Advertising Practice*

Metro "has always accepted noncommercial advertising, including ads for candidates for elected office, ballot measures, and 'cause' advertising."  Grant Decl., Ex. A.  Metro realizes that, "[h]aving accepted noncommercial advertising generally, Metro is legally constrained in its ability to accept or reject an advertisement based on the identity of the group purchasing the advertising or the message" because "[t]he free speech provisions of our state and federal constitutions limit a government's ability to regulate advertising content."  *Id.* Further, Metro has acknowledged that—even though a majority of the advertisements accepted do not result in controversy—"each of us will occasionally find texts or graphics used in advertising to be offensive or contrary to our own personal beliefs."  *Id.*  In fact, well before SeaMAC approached Titan about displaying its message on Metro buses, Defendant was aware that its advertising practice was neither supported by all members of the

SEAMAC'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT
CAUSE NO. 11-cv-00094 RAJ
PAGE – 3
12576 00101 nh086132rn

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1   community nor even by all Metro employees, *see, e.g.*, Grant Decl., Ex. J (at 53:4-7) (stating

2   that transit operators had previously objected to the display of specific advertisements and

3   caused vandalism to them); but Metro had opted against changing either its policy or practice,

4   despite having considered such action more than once. *See, e.g.*, Grant Decl., Ex. T (at 79:18-

5   21; 80:4-8) (explaining that "every time [Metro] had some push back of complaints" it would

6   consider other possible transit advertising policies).

7       Moreover, despite the general restrictions that Sections 6.4(D) and 6.4(E) place on

8   Metro advertising, these provisions were not generally understood to be particularly limiting,

9   and they were not employed to render such an effect.   To be sure, the "[*advertising*]

10  *restrictions are there to allow the freedom and opportunity for all organizations and*

11  *associations either political or non-profit to benefit from using transit as a form of advertising*

12  *their 'cause.'*"   Grant Decl., Ex. B (emphasis added); Ex. V (at 134:25, 136:1-2) (deeming

13  Metro's practice of accepting a range of advertisements beneficial because it "allows a broad

14  range of messages by many individuals").   Pursuant to this policy, Metro has run

15  advertisements displaying messages about animal cruelty, reproductive health services,

16  environmental issues, union membership, voting, atheism, the war in Iraq, and the Israel-

17  Palestinian conflict.[1]   Tellingly, prior to December 2010, Metro has admitted to *accepting*

18  *many* while *never rejecting any* "free speech political messages."   Grant Decl., Ex. V (at

19  105:9-19) (emphasis added).

20      **4. *Defendant Approved SeaMAC's Message in November 2010***

21      In October 2010, SeaMAC initiated the process of displaying its message on Metro

22  buses by contacting Titan.   Dkt. 2.   Titan, believing that SeaMAC's advertisement was

23  consistent with Defendant's Policy, but also recognizing the message's potential for

24

25

26  _____

[1] This information comes from Defendant's "Spreadsheet" regarding its history of advertising, after 2005.  Due to the size of this document, it has not been included as an Exhibit, but can be.

SEAMAC'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT
CAUSE NO. 11-cv-00094 RAJ
PAGE – 4
12576 00101 nh086132rn

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1    controversy, forwarded SeaMAC's proposed advertisement to Ms. Shinbo for her review.

2    Grant Decl., Ex. T (at 34:7-18; 26:9-20).

3        In late October or early November 2010, Ms. Shinbo, who had been reviewing

4    advertising for over 25 years on Defendant's behalf, Grant Decl., Ex. V (at 7:1-12, 9-21),

5    reviewed SeaMAC's message and considered it in light of each section of Defendant's AP.

6    Grant Decl., Ex. V (at 16:19-25).  Although Ms. Shinbo identified the message's potential for

7    controversy and considered its text to be "negative," Grant Decl., Ex. V (at 68:17; 62:8), she

8    believed it abided by the criteria for acceptable advertisements under Defendant's Policy and

9    was not disqualified by the restrictions. *See* Grant Decl., Ex. V (at 64:5-16).  Based largely on

10    her impression that the SeaMAC message had the potential to spark concern in the

11    community, however, Ms. Shinbo forwarded a mock up of the advertisement (including copy

12    and text) to Mr. Desmond for his review.  *See* Grant Decl., Ex. V (at 49:18-20, 53:10-15;

13    61:5-7) (confirming that Ms. Shinbo had similarly forwarded other ads to Mr. Desmond in the

14    past when she concluded that there "might be concern or reaction" to a particular message's

15    display).  In making a determination to forward the SeaMAC message (or other, previously-

16    proposed messages) to Mr. Desmond for review, Ms. Shinbo did not utilize any "written

17    criteria" or consider past community reactions to gauge the likelihood of controversy; rather,

18    she based her determination on her "personal experience of 25 years in knowing what kinds of

19    ads sometimes generate concern."  Grant Decl., Ex. V (at 61:20-24; 92:3-8).

20        Mr. Desmond reviewed the SeaMAC message and similarly concluded that it did not

21    violate Defendant's AP.  Grant Decl., Ex. P (at 14:22-25; 15:1-5).  Noting the message's

22    potentially controversial nature, however, Mr. Desmond decided to contact Frank Abe, King

23    County's Communications Director, Grant Decl., Ex. V (at 111:4-6), "so that [he and Ms.

24    Shinbo] could brief the Executive on the ad and show him the ad and . . .  our policies."  *Id.*

25    (at 112:18-23) (also observing "that Mr. Abe was really just a conduit to try to get to the

26    Executive").

SEAMAC'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT
CAUSE NO. 11-cv-00094 RAJ
PAGE – 5
12576 00101 nh086132rn

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1       On November 9, 2010, the Executive met with various members of his staff—

2   including members of his Executive Leadership Team, Metro staff, and lawyers from the

3   King County Prosecuting Attorney's Office—and was presented with a copy of SeaMAC's

4   message and a copy of Metro's AP.  Grant Decl., Ex. M (at 8:24-25; 9:1-3; 10:10-16; 11:2-6).

5   Upon reviewing these materials, the Executive concurred with the decisions made by Ms.

6   Shinbo and Mr. Desmond—that there was no basis to censor SeaMAC's message.  *Id.* (at

7   13:12-21; 19:7-10).   In reaching this decision, the Executive recognized both that some

8   members of Metro's staff "were concerned about [the ad] being potentially highly

9   controversial," *Id.* (at 13:16-17; 20:24-25; 21:1-6), and "that [SeaMAC's message] was

10  potentially offensive to some of the community." *Id.* (at 15:3-11).  Like Ms. Shinbo and Mr.

11  Desmond, however, the Executive "didn't feel that it rose to the level of violating

12  [Defendant's] policy." *Id.*

13      **5.  *Defendant's Cancellation of the SeaMAC Message***

14      During the week of December 20, 2010, Defendant claims that it received thousands

15  of complaints and comments, the majority of which were against the display of SeaMAC's

16  message.  Dkt. 77.[2]  On December 23, 2010, the Executive decided that SeaMAC's message

17  would not be displayed on Metro buses as agreed and that Defendant's AP would be

18  amended.  Grant Decl., Ex. D.  As an interim policy, Defendant decided to exclude all "non-

19  commercial" advertisements. *Id.*[3]

20

21      [2] Defendant's other expressed concern that if it was to display the SeaMAC message it would be forced
22  to also display two "counter-ads,"  is not consistent with testimony from its officials who testified that (unlike
    the SeaMAC message) these "counter-ads" ran afoul of Defendant's Advertising Policy. *See, e.g.,* Grant Decl.,
23  Ex. P (at 189:6-16) (explaining that, upon reviewing the counter ads, he quickly concluded that they would
    violate the policy—"[t]he ad copy itself was extremely incendiary"); Grant Decl., Ex. T (at 70:1-25; 71:1-25;
24  72:1-9) (indicating that the photo of a burning bus on the Horowitz ad would have needed to be changed and that
    the American Freedom ad—containing an image of Adolf Hitler and equating a particular ethnic group with the
25  word "savages"—"wouldn't have gone very far"); *see also id.* (at 30:3-7) (stating that Titan has a "very good
    idea" of what Defendant is going to approve, having approved less than 20 ads over a six-year period that
26  Defendant later rejected).

        [3] On April 8, 2011, the County adopted a new policy allowing for Public Service Announcements but
    prohibiting political and public issue advertisements. Grant Decl., Ex. D.

In response to the large volume of communications received by Metro early during the week of December 20, Metro's Operations Division was tasked with developing an operations plan to ensure that the buses displaying the SeaMAC message would be able to operate safely and efficiently. In preparing this plan, Mr. O'Rourke received no information concerning specific threats against Metro. Grant Decl., Ex. S (at 47:23-25; 48:1) (indicating that it was only "generally communicated" to Mr. O'Rourke that "some of the emails were threatening").

Part of the operations plan consisted of steps Metro would take to allay the concerns of transit operators, as conveyed by Mr. Bachtel; following its past practice, Operations decided that a transit operator would be able to avoid driving a bus displaying the SeaMAC message if the concern expressed stemmed from a concern for safety, as judged by the base chief, and organized for four extra report operators on December 27. *Id.* (at 50:11-16; 51:16-22; 61:22-25; 62:1-5). The plan also included a rerouting of the buses around the block that contained the Jewish Federation Building. *Id.* (at 58:18-25).

Not only was Mr. O'Rourke's final plan satisfactory to the ATU 587, Grant Decl. Ex. I; Grant Decl. Ex. J (at 41:5-6) but, more importantly, because he had previously dealt with more problematic issues (such as snow storms), felt confident that the plan would work, Grant Decl., Ex. S (at 63:7-9; 62:22-25), and Captain Mulligan of MTP called the plan "great work."[4] Unfortunately, the Executive—and final decision maker with regard to display of the SeaMAC message—was not given any specific information about the operations plans, including the contingencies for dealing with the refusal of certain transit operators to come to

---

[4] In creating the plan, Operations also had to contend with the fact that many Metro and other County employees planned to take (and did take) vacation during the weeks of December 20 and/or December 27, including Mr. Constantine, Grant Decl., Ex. M (at 33: 9-13); Mr. Taniguchi, Grant Decl., Ex. P (at 73:25-25); Mr. O'Rourke, Grant Decl., Ex. S (at 76:17-22); Ms. Brezonick, Grant Decl., Ex. K (at 36:22-25); Major Jutilla, Grant Decl., Ex. Q (at 14:7-12); Captain Mulligan, Grant Decl., Ex. R (at 51:12-18); and Chief Carol Cummings of the Sheriff's Office, Grant Decl., Ex. W (at 21:22-19). Yet, even knowing that it was short-staffed (and still would be during the week of December 27), Defendant did not consider postponing the display of SeaMAC's message, such that Metro would be fully staffed during the period of display. *See* Grant Decl., Ex. S (at 87:24-25, 88:7-9) (acknowledging that adjusting the date for display of the SeaMAC message would have been "a good idea").

SEAMAC'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT
CAUSE NO. 11-cv-00094 RAJ
PAGE – 7
12576 00101 nh086132rn

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

work and for protecting the buses en route.  Grant Decl. Ex. M (at 97:4-11, 16-19; 98:4-8).
The Executive was not even informed that Operations had put together a plan it was confident
would work.  *Id.* (at 98:13-20).

Mr. Desmond asked Captain Mulligan to develop a deployment plan that would avoid
risk of disruption to Metro buses. Grant Decl., Ex. R (at 123:24-25; 124:1-19).  Tellingly,
Captain Mulligan put together a "mid-range" (as opposed to "high-range") response plan, *id.*
(at 124:20-22), which she believed to be most effective possible at the time, *id.* (at 125:21-25;
126:1-3), and which Mr. Desmond characterized as "a good plan of action."  Grant Decl., Ex.
F.  Additionally,  Mr.  DeCapua,  Roy  Harrington  (Metro's  Emergency  Management
Coordinator), the SPD, TSA, and FTA thought "it was a good plan."  Grant Decl., Ex. N (at
154:7-11).

**B.      *Disputed Facts Regarding Defendant's Decision to Censor SeaMAC's Message***

On Friday, December 17, 2010, a local television news station, KING 5, ran a story
about the SeaMAC message and its scheduled display on Metro buses. Dkt. 18.  The news
coverage included expressions of concern among community members who opposed the
content and display of SeaMAC's message and a brief statement by Linda Thielke, DOT's
Public Information Office, explaining the Defendant's AP.  Grant Decl., Ex. X (at 15:3-11)
("This topic comes up . . .  often enough that I have established some talking points that I've
written up using information provided to me by the subject matter experts in the department,
so that I can give accurate information to the media."), (at 16:15-18).

***1.  The Number and Nature of Comments Relating to the SeaMAC Message***

When Ms. Brezonick arrived at the Customer Information Office on December 20,
2010, she was informed that, over the weekend, Metro had received (and was continuing to
receive) a large number of emails and phone calls concerning SeaMAC's message.  Grant
Decl., Ex. K (at 12:6-9).[5]  Later that day, Ms. Brezonick was charged with compiling and

---

[5] To date, however, there seem to be different impression concerning of the quantity of communications
received.  For example, Ms. Thielke reported that the "phone was ringing off the hook in Mr. Desmond's office,"

SEAMAC'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT
CAUSE NO. 11-cv-00094 RAJ
PAGE – 8
12576 00101 nh086132rn

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

reviewing these communications.  Grant Decl., Ex. P (at 85:18-24; 89: 23-25).  But, despite the Customer Information Office's standard practice of logging (both email and phone call) complaints and comments received into a database, Ms. Brezonick and her team stopped logging email communications on that Monday and never began entering voicemail messages into the database.  As part of the system of responding to public comments and complaints, these communications were generally logged in a customer comment database, *Id.* (at 21:12-24; 29:12-17; 34:6-13).  Ms. Brezonick was not in the office much for the rest of the week of December 20, *id.* (at 37:1-13), but "made some effort" while working from home to try to organize the comments coming in based on their content.  *Id.* (at 24:8-15).

When later asked to estimate the number and nature of comments received during the week of December 20, Ms. Brezonick estimated that there were 6,000 emails.  *Id.* (at 22:19-23).  "[B]ut as far as an analysis of content or other features to it . . .  there was not [an analysis done]," *id.* (at 24:8-15), and Ms. Brezonick did not read all the communications received.  *Id.* (at 24:18-20; 26:22-25; 27:1).[6]  Interestingly, although no comprehensive review was conducted, at least some Metro staff recognized an organized campaign to generate comments opposing the SeaMAC message.  *See, e.g.*, Grant Decl., Ex. P (at 164:11-25; 165:1-3) (asserting that a "flurry of emails . . .  was being generated by one or more pro-Jewish or pro-Israeli websites" and reasoning that, likely in response to the KING 5 story).  Despite this observation, Defendant never took any steps to inquire about whom or what might have been driving the apparent campaign to flood Defendant with comments.  *Id.* (at 164:25; 165:1-3).[7]

---

such that the staff he had available that week "were hard pressed to keep up with the phone calls."  Grant Decl., Ex. X (at 147:14-17).  However, Mr. Desmond, himself, claims never to have received "any information that [his staff was] not able to handle the phone calls and believes that the vast majority of communications arrived via email.  Grant Decl., Ex. P (at 99:1-3, 99:7-9) (asserting also that he was "never given any information that [the County's] email system or [the County's] servers would not be able to handle the incoming traffic").

[6] Ms. Quadros at Titan estimated that they received approximately 1,400 emails in response to the SeaMAC message, which they forwarded to Metro.  Grant Decl., Ex. T (at 55:4-7; 58:8-15).

[7] Mr. Desmond also expressed his impression that many of the complaints regarding the SeaMAC message were coming from outside the state, "out of our region."  Grant Decl., Ex. P (at158:10-14); Ex. G.

---

SEAMAC'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT
CAUSE NO. 11-cv-00094 RAJ
PAGE – 9
12576 00101 nh086132rn

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

Early during the week of December 20, 2010, Rhonda Berry, the Assistant Deputy King County Executive, asked Ms. Brown (who was serving as the acting Director of DOT because Mr. Taniguchi was on vacation) to be "the conduit for any emails that [Defendant] received that appeared threatening, were threatening, or had any flavor of any kind of threat of disruption of the transitive service, destruction of property, harm to individuals . . . and pass those on to the FBI." Grant Decl., Ex. L (at 39:20-25; 40:1-5). In performing this task, Ms. Brown "collected anything that anyone had to give" to her, did not "make any kind of assessment," and ultimately passed communications along to the Washington State Fusion Center, an interagency law enforcement agency (not the FBI). *Id*. (at 40:7-8; 41:6, 18-20). Further, Ms. Brown in no way tracked the emails she received directly or through other employees of Defendant that were being labeled "threatening or potentially threatening," *id*. (at 44:5-7); and, in fact, she did not read the majority of them. *Id*. (at 44:11-13). For Ms. Brezonick's part, even after having been provided with guidelines from MTP concerning how to identify potentially threatening communications, she did not forward a single one to MTP or to Ms. Brown. Grant Decl., Ex. K (at 50:1-8, 15-18); Ex. L (at 39:20-25, 40:1-3).

Further, and in addition to comments from the general public, Metro received complaints from members of the Amalgamated Transit Union Local 587 (ATU 587). Paul Bachtel, President of ATU 578, which represents over 2,800 transit operators, received approximately 12 emails and about 20 or 30 calls from transit operators expressing concern with or objection to the SeaMAC message. Grant Decl., Ex. J (at 24:10-23; 29:12-17); Ex. S (at 41:3-9) (expressing his understanding that some union members did not want the SeaMAC message to run because they believed its display would make their job more difficult, they were politically opposed to the message, and/or they were afraid to drive buses displaying the message). In turn, Mr. Bachtel contacted Mr. Desmond and urged him to cancel the display of SeaMAC's message even though (1) the number of complaints received by Mr. Bachtel was not extraordinary, especially when compared to the five to ten emails or calls Mr. Bachtel

SEAMAC'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT
CAUSE NO. 11-cv-00094 RAJ
PAGE – 10
12576 00101 nh086132rn

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

receives on an average day from disgruntled transit operators, Grant Decl., Ex. J (at 58:17-25); (2) the SeaMAC message was not the first bus ad to "have raised the hackles of union members"; and (3) none of the transit operators expressed anything other than *speculation* that violence *could* result. *Id.* (at 15:10-24; 34:18-25; 35:1-2).[8]

Despite this apparent "flood", Defendant in its public statements consistently explained that SeaMAC's message could not be censored based on the mere fact that certain members of the community would be offended by the message. *See, e.g.*, Dkt. 24-1; Grant Decl., Ex. X (at 62:3-7) (confirming that this quote accurately represents statements she made during the time she was serving as Metro's spokesperson); *see also* Grant Decl., Ex. C ("Our legal counsel advise us the ads meet our established guidelines."); Grant Decl., Ex. X (at 115:3) (stating that she believes the statement she made in Grant Decl., Ex. C "is accurate"). News coverage of Defendant's decision to display SeaMAC's message continued over the weekend; additionally, an online survey was posted on the KING 5 news website, and, by December 18, 70% of those votes logged were in favor of having SeaMAC's message displayed (as opposed to censored).  Grant Decl., Ex. E

### 2. There Were No Credible Threats to Safety or of Terrorism

Sometime over the weekend of December 17, 2010, three photographs of burning buses were placed under the door of the Customer Sales Office.  Grant Decl., Ex. R (at 53:24-25, 54:1-25; 55:1-2).  Beyond passing them along to Captain Mulligan, no law enforcement action was taken, and none of Defendant's officials recall any investigation being conducted into the source of the photographs.  *Id.* (at 56:12-17).

On December 22, 2010, Mr. Desmond received an email from a Washington resident, who indicated that the Al-Qassam Brigade website had reprinted the KING 5 news coverage of the SeaMAC message.  Grant Decl., Ex. N (at 67:24-25; 68:1-4).  Mr. Desmond forwarded

---

[8] In past years, members of the transit operators' union had "responded negatively through work actions to other ads, such as the Rush Limbaugh ads."  Grant Decl., Ex. J (at 15:10-24).  For example, an atheism message that ran on the buses in 2007 prompted discussion among some transit operators of a plan for "printing stickers that said God loves you, and stick[ing] them over the top of the ad."  *Id.* (at 15:10-24).

SEAMAC'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT
CAUSE NO. 11-cv-00094 RAJ
PAGE – 11
12576 00101 nh086132rn

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

this email to Michael DeCapua, the Metro's Homeland Security Program Manager. *Id.* (at 68:15-23). Mr. DeCapua identified this message as one that should be forwarded to the local Joint Terrorism Task Force (JTTF),[9] and it spurred him to advise that displaying the SeaMAC message would render Metro a terrorist target.[10] *Id.* (at 106:19-22; 86:3-7); Grant Decl., Ex. H. The JTTF, however, took a strikingly different view; Detective Marlon Hoyle,[11] the Sheriff Office's JTTF representative in December 2010, determined—and his then-JTTF supervisor confirmed—that Mr. DeCapua's assessment was flatly incorrect and concluded that no credible threat of terrorism existed. Dkt. 75-5. It is worth noting that, despite Mr. DeCapua's (and certain other Metro staff members') desire to involve the Federal Bureau of Investigation (FBI), it declined to perform a threat assessment after reviewing various materials (including copies of communications) forwarded by Metro staff. Grant Decl., Ex. N (at 115:21-23; 116:7-9). In fact, the only assessment performed by a law enforcement agency was a situational assessment performed by the Seattle Police Department (SPD), which recommended that buses displaying the SeaMAC message be routed away from the Jewish Federation Center. *Id.* (at 166:6-13, 24-25; 117:1-25).

Further, of the alleged thousands of other communications received by Defendant during the week of December 20, only a handful were forwarded to law enforcement. *See* Grant Decl., Ex. R (at 182:21-25) (stating that, within MTP, Captain Mulligan was the highest command level person dealing directly with the response to the issues surrounding the SeaMAC message). In reviewing those communications forwarded to MTP, Captain Mulligan determined that none of them required law enforcement follow-up, investigation, or

---

[9] This email was the *only* piece of information Mr. DeCapua asked MTP to forward to the JTTF. Grant Decl., Ex. N (at 106:19-22).

[10] Mr. DeCapua has not been able to articulate a clear basis for this assertion. *See* Grant Decl., Ex. N (at 100:8-25; 101:1-17, 24-25; 102:1) (stating that, after receiving the email from Mr. Desmond, he reviewed an FBI checklist, "jotted down scores on a separate piece of paper," shredded the paper immediately upon completing his review of the checklist, and never told anyone the exact score he had calculated).

[11] During the week of December 20, 2010, the Executive spoke directly with Detective Hoyle, who was then assigned to the Executive's security detail. The Executive asked Detective Hoyle to investigate whether Ed Mast had any known involvement with terrorism, and the Executive himself looked to see if Ed Mast was on Facebook. King County's Answer and Responses to SeaMAC's Interrogatory No. 12.

SEAMAC'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT
CAUSE NO. 11-cv-00094 RAJ
PAGE – 12
12576 00101 nh086132rn

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

additional action (such as efforts to identify the sender of the message).  Grant Decl., Ex. R (at 159:12-25) (stating that none of the communications that fell into the "borderline threatening" category were followed up on by MTP or flagged for follow-up by any other law enforcement agencies; that no case reports were being actively investigated as a result of a communication; and that no staff was actively trying to identify people who were involved in transmitting a communication); 160:1-25; 161:1-6).

On December 23, 2010, the Executive contacted Jenny Durkan, U.S. Attorney for the Western District of Washington.  Grant Decl., Ex. M (at 59:24-25; 60:1-14; 22:2-7).  Ms. Durkan reported that her office did not have any new or different information regarding any specific threats against Metro and declined to make a recommendation or give any specific advice regarding SeaMAC's message. *Id.* (at 67:11-13).  That same day, the Executive spoke with King County Sheriff Sue Rahr, *id.* (at 77:14-25; 78:1), who "recommended" that Metro not run SeaMAC's message. *Id.* (at 77:14-25; 78:1-1).  Sheriff Rahr was clear that she was not making this recommendation based on any new information about threats—or even information specific to the SeaMAC message—but, rather, based largely on the possibility of "an emotional, spontaneous type of reaction from people who may be marginally suffering from emotional issues."  Grant Decl., Ex. W (at 25:20-25; 26:1-11; 33:11-15) (clarifying that she was not concerned about terrorist groups—that her "general message" to the Executive was "concern . . . for local people who were going to overreact; have a bad reaction to the ads").

In sum, then, *no law enforcement officer or agency* in contact with Defendant during the week of December 20, 2010, and familiar with the community response to the SeaMAC message provided support for Defendant's later assertion that the display of the SeaMAC message on its buses would "reasonably foreseeabl[y]" lead to "harm to, disruption of, or interference with" the transit system or incite imminent harm.  The unsupported nature of Metro's position is also confirmed by Richard Conte, a former FBI agent and longtime

SEAMAC'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT
CAUSE NO. 11-cv-00094 RAJ
PAGE – 13
12576 00101 nh086132rn

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1   member of the local JTTF, who determined that none of the communications received by

2   Defendant, either by themselves or in context, made it reasonably foreseeable that actual harm

3   to, disruption of, or interference with the Metro system would result from the display of the

4   SeaMAC message.   Declaration of Richard Conte Regarding King County's Motion for

5   Summary Judgment.

## II. LEGAL ARGUMENT

A.   ***Denial of SeaMAC's Motion for Preliminary Injunction Is Not Grounds for Granting Summary Judgment***

8       Inherent in Defendant's Motion for Summary is the notion that it is entitled to

9   summary judgment because SeaMAC's Motion for Preliminary Injunction was denied.  This

10  assumption is unfounded.

11      It is well established, of course, that findings of fact and conclusions of law made by a

12  court in granting or denying a preliminary injunction are not binding at a trial on the merits.

13  *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *see Firefighters Local Union*

14  *No. 1784 v. Stotts*, 467 U.S. 561, 604 n.7 (1984) ("The time pressure involved in a request for

15  a preliminary injunction requires courts to make determinations without the aid of full

16  briefing or factual development, and make all such determinations necessarily provisional.");

17  *Southern Oregon Borter Fair v. Jackson County, Oregon*, 372 F.3d 1128, 1136 (9th Cir.

18  2004) (noting "the general rule" that "decisions on preliminary injunctions are not binding at

19  trial on the merits and do not constitute the law of the case").

20      The developments in this case are an excellent illustration of the wisdom of this rule.

21  SeaMAC's Motion for Preliminary Injunction (Dkt. No. 2) was filed without the benefit of the

22  more complete evidentiary record which has become available through SeaMAC's discovery

23  efforts.   As documented more fully below, the evidence demonstrates that Defendant's

24  censorship of SeaMAC's message—after it been reviewed and approved—violated

25  SeaMAC's constitutional right of free speech.  Although it is likely that SeaMAC will prevail

26  at trial, the only issue before this Court is whether there are disputed questions of material

SEAMAC'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT
CAUSE NO. 11-cv-00094 RAJ
PAGE – 14
12576 00101 nh086132rn

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1    fact.   As a consequence, Defendant's arguments based on this Court's Oder denying

2    SeaMAC's Motion for Preliminary Injunction, Dkt. 40, must be rejected.

3    **B.        *Summary Judgment Is Not Appropriate in this Case***

4              Summary judgment is proper only when there is no genuine dispute of material fact

5    and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  The

6    initial burden of showing that no genuine issue of material fact exists is on the moving party.

7    *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   In resolving a summary judgment

8    motion, the "evidence of the non-movant is to be believed, and all justifiable inferences are to

9    be drawn in his favor."  *Id.* at 255.  "Credibility determinations, the weighing of the evidence,

10   and the drawing of legitimate inferences from the facts are jury functions, not those of a

11   judge". *Id.*

12            When the question is one of "reasonableness," as many of the critical issues in this

13   case are, requiring resolution of disputed factual contentions and inferences to be drawn from

14   the facts, summary judgment is not proper. *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th

15   Cir. 2005); *Berry v. Baca*, 379 F.3d 764, 769 (9th Cir. 2004).

16            Here, genuine disputes of material fact relating to the nature of the forum, the

17   reasonableness of Defendant's decision to censor SeaMAC's message, or whether Defendant

18   engaged in viewpoint discrimination (among other issues) preclude summary judgment.

19            For example, there is evidence that (a) Defendant created and maintained a

20   "designated public forum" on its Metro Buses; (b) Defendant's censorship of SeaMAC's

21   message was not a narrowly tailored response to further a compelling government interest; (c)

22   Defendant's censorship of SeaMAC's message was not reasonable, either in terms of the

23   limitations Defendant claims apply and how Defendant applied them; (d) Section 6.4D of

24   Defendant's AP was not applied reasonably, either because there was no evidence that it

25   would reasonably foreseeable that harm, disruption, or interference would result if SeaMAC's

26   message was displayed, as promised; (f) Section 6.4E of Defendant's AP was not applied

---

SEAMAC'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT
CAUSE NO. 11-cv-00094 RAJ
PAGE – 15
12576 00101 nh086132rn

reasonably, because SeaMAC's message was not directed at a person or group nor was it so "insulting, degrading or offensive" that it was reasonably foreseeable that displaying SeaMAC's message would incite imminent lawless action; (e) the exclusion of SeaMAC's message was impermissibly based on the viewpoint expressed in the message; (f) SeaMAC is entitled to injunctive relief; and (g) SeaMAC was damaged, and therefore entitled to compensation, because Defendant censored SeaMAC's message.

## C.    The Type of Forum at Issue at Issue in this Case Is a Jury Question

The analysis of the legality of government's efforts to limit speech is a function of the nature of the forum at issue. *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 800 (1985), of which there are three—(1) traditional public forum, (2) designated public forum, or (3) limited public forum.

Speech in the traditional public forum enjoys the greatest level of protection—limitations are allowed only if the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest. *Berger v. City of Seattle*, 569 F.3d 1029, 1083 (9th Cir. 2009).

Government property other than the traditional public fora may be converted into a "designated public forum" if the government intentionally opens it up for public discourse. *DiLoreto v. Downey Unified Sch. Dis. Bd. of Educ.*, 196 F.3d  958, 964-65 (9th Cir. 1999). "Restrictions on expressive activity in designated public fora are subject to the same limitations that govern a traditional public forum." *Id*. That is, the government may restrict speech only if the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest. *Berger v. City of Seattle*, 569 F.3d 1029, 1083 (9th Cir. 2009).

A limited public forum exists where the government has opened its property to expression only on certain topics or only to certain groups. *Hopper v. City of Pasco*, 241 F.3d 1067, 1074 (9th Cir. 2001). In a limited public forum, the government may restrict speech

SEAMAC'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT
CAUSE NO. 11-cv-00094 RAJ
PAGE – 16
12576 00101 nh086132rn

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1   based on its content so long as the restrictions are reasonable in light of the purposes of the

2   forum, and are viewpoint neutral. *Cornelius*, 473 U.S. at 800.

3   **D.   *Whether Metro Buses Are a Designated Public Forum Is a Disputed Question of Fact***

4           To create a designated public forum, the government must intend to make its property

5   "generally available," to a class of speakers or for the discussion of certain subjects. *Widmar*

6   *v. Vincent,* 454 U.S. 263 (1981) (opening university meeting facilities to student groups). A

7   government's *policy* and its *practice* are relevant in determining "whether it intended to

8   designate a place not traditionally open to assembly and debate as a public forum." *Cornelius,*

9   473 U.S. at 802; *Hopper*, 241 F.3d at 1075 ("government intent is the essential question").

10          Despite Defendant's arguments to the contrary, there is substantial evidence from

11  which a jury could find that it intended to designate its Metro buses as a public forum.  As

12  described earlier, Ms. Shinbo has described Defendant's AP as "there to allow the freedom

13  and opportunity for all organizations and associations either political or non-profit to benefit

14  from using transit as a form of advertising their 'cause.'"

15          Defendant's argument that it did not designate its buses as a public forum because of

16  its AP had written restrictions and its practice of reviewing messages before they are

17  displayed is unavailing.  Courts have affirmed advance permit requirements and reasonable

18  safety restrictions, even in traditional public fora, recognizing the valid interests in protecting

19  safety and regulating competing uses. *Berger*, 569 F.3d at 1041 (citing cases). Where

20  government expressly opens its property for public discourse, even while requiring speakers

21  to comply with reasonable content-neutral restrictions, the strict scrutiny analysis still applies.

22  *See, e.g., Hopper*, 241 F.3d at 1076, n.9.[12]

23          In contrast, government imposition of *content-based* restrictions and exclusion of all

24  speech on particular subjects is indicative of an intent to create a "limited public forum."

25
26          [12] *Id.* (citing as examples of fora explicitly opened by government: *Widmar*, supra; *Madison Joint
School Dist. No. 8 v. Wisconsin Empl. Relations Comm'n*, 429 U.S. 167, 174 n. 6 (1976) (open school board
meetings); and *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 555 (1975) (city-leased theater open to
expressive activity)).

SEAMAC'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT
CAUSE NO. 11-cv-00094 RAJ
PAGE – 17
12576 00101 nh086132rn

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

*Lehman v. City of Shaker Heights*, 418 U.S. 298, 299 (1974) (excluding any "paid political advertising on behalf of a candidate for public office.").

Both of the restrictions at issue in this case, Sections 6.4D and 6.4E, apply to advertisements regardless of whether they contain political, commercial, or public issue speech. Both restrictions apply *regardless* of the content or subject-matter of the advertisement.

A forum can be designated as public even when there are restrictions on speech. For example, even in a designated public forum, "non speech" elements of words when they rise to the level of "fighting words" can be restricted.[13] Indeed, the language in Section 6.4E mirrors the standard applied by courts in determining whether a particular message constitutes "fighting words," which may be restricted even in a traditional public forum. *See, e.g., Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942) ("[A] State may punish those words "which by their very utterance inflict injury or tend to incite an immediate breach of the peace.").

Because a reasonable juror will likely find that Defendant intended to create a designated public forum on its buses, one open to political speech and subject only to content-neutral restrictions on disruptive speech or incitement, its Motion for Summary Judgment must be denied.

**E.    *The Jury Will Likely Find that Censorship of SeaMAC's Message Was Not Narrowly Tailored to Further a Compelling Government Interest***

In judging Defendant's decision to censor SeaMAC's message from a designated public forum, Defendant must show that censoring SeaMAC's message was a narrowly tailored response necessary to further a compelling government interest. *Berger*, 569 F.3d at 1083. Even when claiming that it must maintaining public safety, a "governmental body

---

[13] Fighting words are thus "analogous to a noisy sound truck: Each is, as Justice Frankfurter recognized, a '"mode of speech,"' both can be used to convey an idea; but neither has, in and of itself, a claim upon the First Amendment." *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 386 (1992) (quoting *Niemotko v. Maryland*, 340 U.S. 268, 282 (1951)).

SEAMAC'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT
CAUSE NO. 11-cv-00094 RAJ
PAGE – 18
12576 00101 nh086132rn

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

seeking to sustain a restriction must demonstrate that the harms it recites are real." *Berger*, 569 F.3d at 1049 (quotation omitted). The government "is not free to foreclose expressive activity in public areas on mere speculation about danger." *Bay Area Peace Navy v. U.S.*, 914 F.2d 1224, 1228 (9th Cir. 1990).

As established earlier, Defendant's decision to censor was based on "mere speculation about danger", and not threats that were "real".

Almost certainly, there were a number of other reasonable alternatives to total censorship which were available to Defendant.   In fact, the evidence demonstrates that Defendant had developed reasonable alternatives—in its operations and security plans—that would have allowed SeaMAC's message to be displayed without harm, disruption, or vandalism from occurring. As a consequence, the jury will likely find that censoring SeaMAC's message entirely from the Metro buses was not narrowly tailored to further a compelling governmental interest.

## F.   *The Jury Could Find that Censorship Was Not Reasonable*

A speaker may be excluded from a nonpublic forum if he wishes to address a topic *not* encompassed within the purpose of the forum, or if he is *not* a member of the class of speakers for whose benefit the forum. *Cornelius*, 473 U.S. at 806. "Once it has opened a limited forum, however, the State must respect the lawful boundaries it has itself set." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

Defendant chose to open its bus advertising forum to commercial and non-commercial speech, including political, religious and "cause" advertising, whether it might be controversial or not. *See* Grant Decl., Exs. A and B.  This practice is far different than that of the transit agencies in Ohio and Arizona, for example, who banned entire categories of non-commercial or political speech, *see Lehman*, *supra*, and *Children of the Rosary v. City of Phoenix*, 154 F.3d 972, 978 (9th Cir. 1998).   Courts have reasoned, when evaluating Advertising Policies and practices like Defendant's, that "allowing political speech,

SEAMAC'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT
CAUSE NO. 11-cv-00094 RAJ
PAGE – 19
12576 00101 nh086132rn

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

conversely, evidences a general intent to open a space for discourse, and a deliberate acceptance of the possibility of clashes and opinion and controversy." *Children of the Rosary,* 154 F.3d at 978 (quoting *New York Magazine v. MTA,* 136 F.3d 123 (2d Cir.1998)).

Defendant chose not to prohibit all non-commercial or all political and religious speech. Nor did it attempt to restrict all "controversial" speech. *Cf. Hopper*, 241 F.3d at 1070. Instead, as described earlier, Defendant chose to keep its advertising forum open to a wide range of expression, including advertisements supporting or opposing candidates for elected office, religious messages, information about reproductive health services, and views on issues of public concern.[14]   In light of its AP and its years of practice, Defendant approved SeaMAC's message for display on its Metro buses.  Grant Decl., Ex.  V (at  64:11-16); Ex. P (at 14:22-25; 15:1-5); Ex. M (at 15:3-11).

Defendant's AP permitting rejection of an advertisement only if it contained material that is (1) "so objectionable . . . as to be reasonably foreseeable that it will result in harm to, disruption of, or interference with the transportation system" (Section 6.4D) or (2) "directed at a person or group," that is "so insulting, degrading or offensive" it is reasonably forseeable it will incite imminent lawless action.  (Section 6.4E). Dkt. 31-1.  Neither restriction permitted censorship based on what *might* happen; both required that material "will result" in harm or that it "will incite imminent lawless action."

None of the messages about the SeaMAC message Defendant received during the week of December 20, 2011 were treated as though they constituted a credible threat of harm to, disruption of, or interference with the transportation system. As detailed earlier, none were forwarded to law enforcement for investigation; none were considered by Metro MTP to be

---

[14] It bears noting that while other governments decided to restrict their advertising space to those selling wares or services, King County's decision to make space available to speakers expressing views on elections, politics, religion and other matters of public concern was an imminently reasonable one, reflective of the values animating the First Amendment. *See, e.g.*, *Stromberg v. California*, 283 U.S. 359, 369. (opportunity for free political discussion is "an opportunity essential to the security of the Republic, a fundamental principle of our constitutional system."); *New York Times Co. v. Sullivan*, 376 U.S. 254, 269-270, 84 S.Ct. 710, 720 (1964). (it is "'a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions,'").

SEAMAC'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT
CAUSE NO. 11-cv-00094 RAJ
PAGE – 20
12576 00101 nh086132rn

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1   indicative of a credible threat; none was considered by the Puget Sound JTTF to be a credible

2   threat. Further, Richard Conte, a former FBI agent and member of the JTTF in Seattle and

3   New York, also concluded that it was not reasonably foreseeable that displaying SeaMAC's

4   message would result in harm, disruption or interference with the transit system. Conte Decl.

5        On this record, the jury will likely conclude that it was not reasonably foreseeable that

6   harm, disruption or interference would result if SeaMAC's message were displayed on the

7   buses.[15]

8        Similarly, the jury will likely conclude that SeaMAC's message was not directed at a

9   group of persons that was " insulting, degrading and offensive" and that it was not reasonably

10  foreseeable that it will incite imminent lawless action.

11       For example, SeaMAC's message was directed to U.S. Taxpayers.  ("Israeli War

12  Crimes *Your* Tax Dollars at Work").  Like the anti-war message in *Cohen v. California*, a jury

13  could find that SeaMAC's message was neither a direct personal insult, nor aimed at

14  provoking a particular group into hostile reaction likely to incite imminent lawless action.

15  403 U.S. 15, 20 (1971).

16       If Defendant's AP were to allow rejection of SeaMAC's message because it resulted

17  voluminous and even vehement opposition, it would run afoul of the First Amendment's

18  prohibition on viewpoint discrimination. As the U.S. Supreme Court made clear in *Board of*

19  *Regents v. Southworth*, an otherwise valid policy in even a limited public forum is

20  unconstitutional to the extent it allows some speech to be voted out on the basis of a public

21  referendum. 529 U.S. 217, 221 (2000).

22       "The whole theory of viewpoint neutrality is that minority views are treated with the

23  same respect as are majority views . . .." *Id*. at 235.  A lack of definitive standards guiding

24  application of limitations on the forum also creates the risk that advertisements may be

25  rejected if objectionable for any reason. *United Food & Commercial Workers Union, Local*

26

---

[15]  There are also disputed facts regarding the extent to which SeaMAC's message was "objectionable" under "contemporary community standards." *See e.g.*, Grant Decl. Ex. E (survey showing 70% support).

SEAMAC'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT
CAUSE NO. 11-cv-00094 RAJ
PAGE – 21
12576 00101 nh086132rn

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1  *1099 v. Southwest Ohio Regional Transit Auth*, 163 F.3d 341, 354 (6th Cir. 1998). Under the

2  First Amendment, Defendant's decision cannot be upheld if SeaMAC's message was rejected

3  because of the *viewpoint* it expressed, even if it was offensive or objected to by others.[16]

4  The Third Circuit recently affirmed these principles. As the Court noted, "[v]iewpoint

5  discrimination occurs when the government 'targets not subject matter, but particular views

6  taken by speakers on a subject.'" *Pittsburgh League of Young Voters Education Fund v. Port*

7  *Authority of Allegheny County*, Nos. 09-3352 & 09-3563 (3d Cir. August 5, 2011), at 11

8  (quoting *Rosenberger v. Rector, & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (citation

9  omitted). Viewpoint discrimination, as the Court observed is "anathema to free expression

10 and is impermissible in both public and nonpublic fora." *Id.* (citations omitted). When

11 "government allows speech on a certain subject, it must accept all viewpoints on the

12 subject...even those that it disfavors or that are unpopular." *Id.* (citations omitted).

13 Given wide variety of topics which Defendant has allowed to be displayed on its

14 Metro buses, including the Middle East, a jury will likely find that Defendant's censorship of

15 SeaMAC's message was impermissible and unconstitutional viewpoint discrimination.

16 **G.**  **A Jury Could Find that SeaMAC is Entitled to Relief**

17 There is no question that Defendant can be held liable for violating SeaMAC's

18 constitutional rights. Under *Monell v. Department of Social Services*, local governments can

19 be held liable if a constitutional violation is caused by "an official policy, practice, or

20 custom." 436 U.S. 658, 690-91, 98 S. Ct. 2018 (1978). A "decision to adopt [a] particular

21 course of action" in a particular situation, if "made by that government's authorized

22 decisionmakers" constitutes "an act of official government 'policy' as that term is commonly

23 understood." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). There is no real

24
25 [16] SeaMAC's argument on viewpoint discrimination is not defeated by the fact that the County previously accepted messages that expressed similar views, or rejected messages on the same topic that expressed opposing views. As the U.S. Supreme Court has explained, it is "an insupportable assumption that all debate is bipolar . . . [i]f the topic of debate is, for example, racism, then exclusion of several views on that problem is just as offensive to the First Amendment as exclusion of only one." *Rosenberger*, 515 U.S. at 831.

26

SEAMAC'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT
CAUSE NO. 11-cv-00094 RAJ
PAGE – 22
12576 00101 nh086132rn

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1    dispute in this case that the decision to adopt a particular course of action was made pursuant

2    to Defendant's policy, and was made by Defendant's authorized decisionmakers.

3        SeaMAC has asked for two separate forms of relief (1) an injunction, directing

4    Defendant to display the SeaMAC message on its Metro buses, as it had earlier promised and

5    planned to do; and (2) compensatory damages.

6        Injunctive relief—in the form of a directive that Defendant display SeaMAC's message, as

7    promised—is appropriate.

8        A finding that Defendant violated SeaMAC's First Amendment rights would result in

9    an award nominal damages, in recognition of the fact that of the injury to SeaMAC's

10   constitutional freedom. *Cummings v. Connell*, 402 F.3d 936, 944 (9th Cir. 2005).  This is not

11   the only form of compensatory damages SeaMAC is entitled to.

12       In order to have its message displayed on Defendant's Metro buses, SeaMAC had to

13   pay for the printing and related production costs of the posters and for the fee charged by

14   Defendant for the display.  Defendant refunded the display fee, but has not refunded the

15   production costs ($436.91).  Declaration of R. Mark Eichinger-Wiese Regarding Defendant's

16   Motion for Summary Judgment.

17       Moreover, by censoring SeaMAC's message, Defendant deprived SeaMAC of the

18   opportunity to express its message to individuals who would have seen the Metro buses.  The

19   process of valuing this lost opportunity begins with the process of determining the marketing,

20   advertising viewership, or "eyes-on impressions", the number of persons who are expected to

21   see a particular advertisement.  Eichinger-Wiese Decl.  According to Titan, Defendant's

22   transit advertising agent, the dollar price for 14 king-size exterior ad buses, which is what

23   SeaMAC paid for, was tied to the 1.5 million "eyes-on impressions" SeaMAC's message

24   could expect to garner.  SeaMAC's message was only going to be displayed on 12 king-size

25   exterior bus ads, however, which would have garnered 1.3 million "eyes-on impressions."

26

SEAMAC'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT
CAUSE NO. 11-cv-00094 RAJ
PAGE – 23
12576 00101 nh086132rn

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

Since being deprived of this opportunity, SeaMAC has looked to other advertising venues—such as billboards, television, or print media.  Billboard advertising, however, is approximately four times the price of the exterior Metro bus panels—the cost is double and the anticipated number of "eyes-on impressions" is half.  The cost of advertising in the Seattle Times or in television ads is much higher.  For example, an advertisement placed in the Seattle Times, with a similar amount of "eyes-on impressions" would cost $34,148.40, a cost far outside SeaMAC's budget.  Decl. Eichinger-Wiese.

There is sufficient evidence upon which a jury will likely conclude that SeaMAC's constitutional right has been violated and that, as a consequence, it is entitled to both injunctive relief and monetary damages.

## CONCLUSION

SeaMAC respectfully requests that this Court deny Defendant's Motion for Summary Judgment, and allow the jury to resolve the disputed questions of material fact.

DATED this 8th day of August 2011, at Seattle, Washington.

SKELLENGER BENDER, P.S.

By      s/ Jeffrey C. Grant
Jeffrey C. Grant, WSBA #11046
Cooperating Attorneys for the
ACLU of Washington Foundation
ACLU OF WASHINGTON FOUNDATION
Sarah A. Dunne, WSBA # 34869
M. Rose Spidell, WSBA # 36038
Lindsey Soffes, WSBA # 41506
901 5th Avenue, Suite 630
Seattle, WA 98164-2008
Telephone: (206) 624-2184

Attorneys for Plaintiff Seattle
Mideast Awareness Campaign

SEAMAC'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT
CAUSE NO. 11-cv-00094 RAJ
PAGE – 24
12576 00101 nh086132rn

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1

**CERTIFICATE OF SERVICE**

2       I certify that on August 8, 2011, I electronically filed SeaMAC's Response to

3   Defendant's Motion for Summary Judgment and this Certificate of Service with the Clerk of

4   the Court using the CM/ECF system, which will send notification of such filing to Cynthia

5   Gannett, Endel R. Kolde, and Jennifer Ritchie, counsel for Defendant King County.

6                                               By _____s/ Jule Sprenger_____
                                                Jule Sprenger
7                                               Paralegal
                                                SKELLENGER BENDER, P.S.
8                                               1301 Fifth Avenue, Suite 3401
                                                Seattle, WA 98101
9                                               Tel:  (206) 623-6501
                                                Fax:  (206) 447-1973
10                                              Email:  jsprenger@skellengerbender.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

SEAMAC'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT
CAUSE NO. 11-cv-00094 RAJ
PAGE – 25
12576 00101 nh086132rn

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501