# EXHIBIT A

To:        'smontgomeryus@aol.com'[smontgomeryus@aol.com]
Cc:        Doornbos, JoAnne[JoAnne.Doornbos@kingcounty.gov]
From:      Shinbo, Sharron
Sent:      Mon 3/23/2009 11:15:29 AM
Importance: Normal
Sensitivity: None
Subject:   re: "END THE SIEGE OF GAZA"  advertisement on Metro buses

Dear Mr. Montgomery,

Thank you for the March 12,2009 email you sent to King County. The webmaster forwarded your message to me and I just left a voicemail message for you with my phone number.

Advertising space has been sold on Metro buses since 1973 through a contract with an outside firm. Our current contractor is Titan Outdoor. The revenue generated from this contract varies from year to year, but it has provided as much as $7.25 million in one year to help fund transportation services throughout King County. In a great majority of the cases the advertising does not result in controversy. It is acknowledged, however, that each of us will occasionally find text or graphics used in advertising to be offensive or contrary to our own personal beliefs.

Metro has always accepted noncommercial advertising, including candidates for elected office, ballot measures, and "cause" advertising. Having accepted noncommercial advertising generally, Metro is legally constrained in its ability to accept or reject an advertisement based on the identity of the group purchasing the advertising or the message. As part of King County government Metro is less free than a private party, like a newspaper or TV station, to reject a particular advertisement. The free speech provisions of our state and federal constitutions limit a government's ability to regulate advertising content.

Given these legal constraints, the appearance of any advertisement on a bus should not be construed as a County endorsement for, or value judgment on, the message being advertised. That is not to say Metro accepts any advertisement. Below, I've included Metro's current advertising restrictions for your reference. Before accepting an ad for posting on Metro buses our contractor must review the face of the ad to see if the specific graphics or text would cause the ad to be denied posting based on the advertising restrictions. I've underlined subsection 6.6 that applied to the ad you referenced.

Again, I want to assure you that the placement of an advertisement on Metro buses does not, in any way, imply the Department of Transportation or the County endorse the product, services, person, or belief that is the subject of the advertisement. Thank you for taking the time to express your concerns to King County. If you have any questions, please feel free to call me, at 206-684-1547.

Sincerely,

Sharron Shinbo.

Program Project Manager

++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++
++++++++++++++++++++++++++++++++++++++++++
6.0   Restrictions on Advertising

6.1   The Consultant agrees that it will strictly comply with the restrictions set forth in this Section and any other restrictions imposed by the County during the term of this Agreement. In no event, however, shall the Consultant be entitled as a result of complying with this Section to any additional compensation or to a



KC_0056062

654961

reduction in the guaranteed amounts owed to the County under Section 16. In the event a proposed advertisement contains non-English language words or symbols, the Consultant shall be responsible for obtaining an interpretation from a qualified interpreter in order to determine whether the proposed advertisement complies with this Section. The Consultant also agrees to exercise its best efforts to encourage advertisers to use good taste in creating their displays. The Consultant shall immediately remove, at the Consultant's sole expense, any advertisement which the County has directed be removed.

6.2   The Consultant shall not place in or on a transit vehicle any advertising that (i.) promotes or depicts the sale, rental, or use of, or participation in, the following products, services or activities; or (ii) that uses brand names, trademarks, slogans or other material which are identifiable with such products, services or activities.

A. tobacco products

B. beer, wine, distilled spirits or any alcoholic beverage licensed and regulated under Washington law

C. films rated "X" or "NC-17" or video games rated "A" or "M"

D. adult book stores, adult video stores, nude dance clubs and other adult entertainment establishments

E. adult telephone services, adult Internet sites and escort services

6.3   The Consultant shall not place in or on a transit vehicle any advertising that promotes any activity or product that is illegal under federal, state or local law.

6.4   The Consultant shall not place in or on a transit vehicle any advertising that contains or involves the following:

A. Any material that describes, depicts or represents sexual or excretory organs or activities in a way:

(1) which the average adult person, applying contemporary community standards, would find, when considered as a whole, appeals to the prurient interest of minors in sex; and

(2) which is patently offensive to contemporary standards in the adult community as a whole with respect to what is suitable material for minors to see; and

(3) which, when considered as a whole in the context in which it is used, lacks serious literary, artistic, political, medical, health or scientific value.

   For purposes of this subsection, "sexual or excretory organs" shall mean and include the male or female pubic area, anus, buttocks, genitalia, or any portion of the areola or nipple of the female breast and "sexual or excretory activities" shall mean and include actual or simulated sex acts of every nature (including but not limited to touching of one's own or another's clothed or unclothed sexual or excretory organs), urination and defecation.

B. Any material that depicts, or reasonably appears to depict, a person under the age of eighteen (18) exhibiting his or her sexual or excretory organs or engaging in sexual or excretory activities.

C. Any material that the Consultant knows or reasonably should have known is false, fraudulent, misleading, deceptive or would constitute a tort of defamation or invasion of privacy.

D.    Any material that is so objectionable under contemporary community standards as to be reasonably foreseeable that it will result in harm to, disruption of, or interference with the transportation system.

E.    Any material directed at a person or group that is so insulting, degrading or offensive as to be reasonably foreseeable that it will incite or produce imminent lawless action in the form of retaliation,

vandalism or other breach of public safety, peace and order.

F.     Flashing lights, sound makers, mirrors or other special effects that interfere with the safer operation of the bus or the safety of bus riders, drivers of other vehicles or the public at large.

6.5     Prior to giving notice to an advertiser that a proposed advertisement has been rejected pursuant to Subsections 6.2, 6.3 or 6.4 the Consultant shall inform the County.

6.6     The Consultant is permitted to sell political and other noncommercial advertising but shall ensure that any advertising which does not relate to a clearly-identifiable commercial product, service or business must include the following phrase in clearly visible letters (in letters no smaller than 72 point type for exteriors and 24 point type for interiors):

"Advertisement paid for by _____"

6.7     The County shall refer complaints received about an advertisement to the Consultant who shall respond to the complainant in writing within three business days and send a copy to the County.  In the event a complaint is received, the Consultant agrees to obtain and keep on file a phone number for referral of complainants to the advertiser who created the advertising.

6.8     Any advertising undertaken to promote transit advertising or County transit programs shall be approved in writing by the County prior to being posted.

-----Original Message-----
From: Doornbos, JoAnne
Sent: Sunday, March 22, 2009 9:43 PM
To: Shinbo, Sharron
Subject: FW: "Stop The Seige of Gaza" metro buses
-----Original Message-----
From: Web, Master
Sent: Friday, March 13, 2009 5:08 PM
To: smontgomeryus@aol.com
Cc: Comments, Customer
Subject: RE: "Stop The Seige of Gaza" metro buses


I am forwarding your message to appropriate King County staff, cc'ed above.

Thanks for using the King County Web site! - Tom Braman, King County Web Team


-----Original Message-----
From: smontgomeryus@aol.com [mailto:smontgomeryus@aol.com]
Sent: Thursday, March 12, 2009 9:04 PM
To: Web, Master
Subject: "Stop The Seige of Gaza" metro buses


Path: http://www.kingcounty.gov/
Sent: 3/12/2009 9:04:16 PM
From: Scott Montgomery @ smontgomeryus@aol.com

Subject: "Stop The Seige of Gaza" metro buses

    The ads on metro buses that have huge letters saying &quot;STOP THE SEIGE OF GAZA&quot; are sickening.  This hate message, being dispensed by my taxes, by you, is anti-semetic, anti-Israel and

racist.  King County appears to be allies of the terrorists.  I am ashamed to live here.

ZIP : 98005
Phone: 425-445-9661

E-mail response requested: Yes

KC_0056065

654961

# EXHIBIT B

**To:**       jeff@silesky.net[jeff@silesky.net]
**Cc:**       Shinbo, Sharron[Sharron.Shinbo@kingcounty.gov]
**From:**     Pamela Quadros
**Sent:**     Thur 2/26/2009 4:31:07 PM
**Importance:** Normal
**Sensitivity:** None
**Categories:** urn:content-classes:message
Arab American Community Coalition (Kings).pdf
DSCF1369.JPG
KCMTransit Advertising Restrictions.pdf

**Jeff,**

**As requested here are copies of the bus ads that the non-profit civil rights organization, Arab American Community Coalition is running. Below is a link to their website which is indicated on the ad, as discussed, as a way to contact the civil rights group.**
**http://www.theaacc.org/index.php**


**You will also find attached the King County Metro (KCM) Advertising Restrictions. Titan does review every ad and compare the creative content of the advertisements to the restrictions as part of our contract with KCM. The restrictions are there to allow the freedom and opportunity for all organizations and associations either political or non-profit to benefit from using transit as a form of advertising their "cause". We hope you will understand and appreciate, that as a representative of a government entity, we are limited as is the county in our abilities to regulate advertising content because of free speech provisions of the state and federal constitution. In an ideal situation we would want to ensure all advertising is embraced by its viewers but that is not always possible because there is freedom of thought and opinion in the USA. The Arab American Community Coalition ads meet the advertising requirements we have of non-profit organizations and they abide by the restrictions outlined for non-commercial advertising.**


**Sharron Shinbo is the King County Metro contact person. I have included her in this email and her phone number is as follows: 206-684-1547.**


**If you have any further questions Sharron will be available to assist you as I will be out until March 9th.**


**Regards,**



KC_0056140

654991



Pamela Quadros
Vice President, General Manager
Titan Worldwide
4636 East Marginal Way South

Suite B-100
Seattle, WA 98134
P:206.762.2531
F:206.762.2532
www.titanoutdoor.com

KC_0056141

654991

# EXHIBIT C

**To:**           'ALLAN GRAFMAN'[AllanGrafman@AllMediaVentures.com]
**From:**         Thielke, Linda
**Sent:**         Thur 12/23/2010 7:59:42 AM
**Importance:**   Normal
**Sensitivity:**  None
**Subject:**      RE: Your call
**Categories:**   True

Our legal counsel advise us the ads meet our established guidelines. I've included those below.

Agreement No: 04-TR01

Between King County and Titan Outdoor LLC Transit Advertising Sales and Related Support Services
January 2005

6.0 Restrictions on Advertising

6.1 The Consultant agrees that it will strictly comply with the

restrictions set forth in this Section and any other restrictions imposed by the County during the term of
this Agreement. In no event, however, shall the Consultant be entitled as a result of complying with this
Section to any additional compensation or to a reduction in the guaranteed amounts owed to the County
under Section 16. In the event a proposed advertisement contains non-English language words or
symbols, the Consultant shall be responsible for obtaining an interpretation from a qualified interpreter in
order to determine whether the proposed advertisement complies with this Section. The Consultant also
agrees to exercise its best efforts to encourage advertisers to use good taste in creating their displays.
The Consultant shall immediately remove, at the Consultant's sole expense, any advertisement which the
County has directed be removed.

6.2 The Consultant shall not place in or on a transit vehicle any

advertising that (i.) promotes or depicts the sale, rental, or use of, or participation in, the following
products, services or activities; or

(ii) that uses brand names, trademarks, slogans or other material which are identifiable with such
products, services or activities.

A. tobacco products

B. beer, wine, distilled spirits or any alcoholic beverage licensed and regulated under Washington law

C. films rated "X" or "NC-17" or video games rated "A" or "M"

D. adult book stores, adult video stores, nude dance clubs and other adult entertainment establishments

E. adult telephone services, adult Internet sites and escort services

6.3 The Consultant shall not place in or on a transit vehicle any

*Thielke*

EXHIBIT NO. 59
5-20-11   P. HAMILTON, RPR

KC_0060105

advertising that promotes any activity or product that is illegal under federal, state or local law.

6.4 The Consultant shall not place in or on a transit vehicle any

advertising that contains or involves the following:

A. Any material that describes, depicts or represents sexual or excretory organs or activities in a way:

(1) which the average adult person, applying contemporary community standards, would find, when considered as a whole, appeals to the prurient interest of minors in sex; and

(2) which is patently offensive to contemporary standards in the adult community as a whole with respect to what is suitable material for minors to see; and

(3) which, when considered as a whole in the context in which it is used, lacks serious literary, artistic, political, medical, health or scientific value.

For purposes of this subsection, "sexual or excretory organs" shall mean and include the male or female pubic area, anus, buttocks, genitalia, or any portion of the areola or nipple of the female breast and "sexual or excretory activities" shall mean and include actual or simulated sex acts of every nature (including but not limited to touching of one's own or another's clothed or unclothed sexual or excretory organs), urination and defecation.

B. Any material that depicts, or reasonably appears to depict, a person under the age of eighteen (18) exhibiting his or her sexual or excretory organs or engaging in sexual or excretory activities.

C. Any material that the Consultant knows or reasonably should have known is false, fraudulent, misleading, deceptive or would constitute a tort of defamation or invasion of privacy.

D. Any material that is so objectionable under contemporary

community standards as to be reasonably foreseeable that it will result in harm to, disruption of, or interference with the transportation system.

E. Any material directed at a person or group that is so insulting,

degrading or offensive as to be reasonably foreseeable that it will incite or produce imminent lawless action in the form of retaliation, vandalism or other breach of public safety, peace and order.

F. Flashing lights, sound makers, mirrors or other special effects

that interfere with the safer operation of the bus or the safety of bus riders, drivers of other vehicles or the public at large.

6.5 Prior to giving notice to an advertiser that a proposed

advertisement has been rejected pursuant to Subsections 6.2, 6.3 or 6.4 the Consultant shall inform the County.

6.6 The Consultant is permitted to sell political and other

noncommercial advertising but shall ensure that any advertising which does not relate to a clearly-identifiable commercial product, service or business must include the following phrase in clearly visible letters (in letters no smaller than 72 point type for exteriors and 24 point type for interiors):

"Advertisement paid for by _____"

KC_0060106

6.7 The County shall refer complaints received about an advertisement

to the Consultant who shall respond to the complainant in writing within three business days and send a copy to the County. In the event a complaint is received, the Consultant agrees to obtain and keep on file a phone number for referral of complainants to the advertiser who created the advertising.

6.8 Any advertising undertaken to promote transit advertising or

County transit programs shall be approved in writing by the County prior to being posted.

——Original Message——
From: ALLAN GRAFMAN [mailto:AllanGrafman@AllMediaVentures.com]
Sent: Thursday, December 23, 2010 7:57 AM
To: Thielke@smtp2.suw.hosting-ops.com; Thielke, Linda
Subject: RE: Your call

Thanks for response, though surprised to hear. Can any person, group or country be accused of crimes in such an unsupported fashion?  Can you please forward your guidelines for accepting these types of 'attack' ads.  Thank you.

Best,
Allan
917-806-6373
Sent from my Windows Mobile® phone.

——Original Message——
From: Thielke, Linda <Linda.Thielke@kingcounty.gov>
Sent: Thursday, December 23, 2010 10:47 AM
To: ALLAN GRAFMAN <AllanGrafman@AllMediaVentures.com>
Subject: RE: Your call

The ads are scheduled to be installed the week of Dec. 27. The organization placing the ad buy purchased signage for 12 buses to run 4 weeks.

——Original Message——
From: ALLAN GRAFMAN [mailto:AllanGrafman@AllMediaVentures.com]
Sent: Thursday, December 23, 2010 7:46 AM
To: Thielke@smtp2.suw.hosting-ops.com; Thielke, Linda
Subject: RE: Your call

Thank you linda for your excellent follow up, as I did not get all that I need.

Can you please advise status of inflammatory , inaccurate and anti -Israel bus ads placed by muslim group on your public service buses?   Thank you for your courtesy.

Best,
Allan
917-806-6373
Sent from my Windows Mobile(r) phone.

-----Original Message-----
From: Thielke, Linda <Linda.Thielke@kingcounty.gov>
Sent: Thursday, December 23, 2010 10:25 AM
To: 'AllanGrafman@AllMediaVentures.com' <AllanGrafman@AllMediaVentures.com>
Subject: Your call

Allan:

I believe you left me a message last night, but the return number you gave me is for your fax machine.

Did you still need to talk, or did you get what you needed last night?

Let me know.

--Linda


Linda Thielke, communications specialist King County Department of Transportation
Phone: 206-684-1414

# EXHIBIT D



**King County**

**Dow Constantine**
King County Executive

# News Release

Date: December 23, 2010       Executive Contacts: Frank Abe, 206-263-9609
Christine Lange, 206-263-9752
Metro Transit contact: Linda Thielke, 206-684-1414

## Citing potential for disruption to transit service, Executive implements interim Metro policy restricting new non-commercial advertising on buses
### Escalation of global interest in ad critical of Israel raises risk of service disruption; Metro rejects ad and response ads

Citing the potential for disruption to transit service, King County Executive Dow Constantine today approved an interim policy from Metro Transit that calls for a halt to the acceptance of any new non-commercial advertising on King County buses. Under provisions of the previous policy, Metro officials today also rejected a proposed ad from the Seattle Mideast Awareness Campaign and the proposed response ads from two other groups.

"The escalation of this issue from one of 12 local bus placards to a widespread and often vitriolic international debate introduces new and significant security concerns that compel reassessment," said Executive Constantine.

"My job is to deliver essential services to the people of King County, including transit service," he added. "I have consulted with federal and local law enforcement authorities who have expressed concern, in the context of this international debate, that our public transportation system could be vulnerable to disruption.

"Metro sells advertising to raise revenues to provide transit service. Metro's existing policy restricts advertising that can be reasonably foreseen to result in harm to, disruption of, or interference with the transportation system. Given the dramatic escalation of debate in the past few days over these proposed ads, and the submission of inflammatory response ads, there is now an unacceptable risk of harm to or disruption of service to our customers should these ads run."

In light of the recent escalation of events, Metro Transit General Manager Kevin Desmond today asked his advertising consultant to notify the Seattle Mideast Awareness Campaign that Metro is rejecting its proposed ad, and for the consultant to notify the David Horowitz Freedom Center and the American Freedom Defense Initiative that Metro will not accept their proposed ads, as posing an unacceptable risk of harm to, disruption of, or interference with bus service, as defined under current policies.

In response to the Executive's directive on Monday to review current policies, Desmond today also recommended an interim transit advertising policy that adds

*Thielke*

EXHIBIT NO. _H1_
*5-20-11*   P. HAMILTON, RPR

KC_0000003

non-commercial ads to the list of current restrictions, with an exception for governmental entities that advance specific government purposes. Non-commercial ads that met the previous policy and for which contracts have already been signed are not affected, and ads already in place will remain.

"We cannot and would not favor one point of view over another, so the entire category of non-commercial advertising will be eliminated until a permanent policy can be completed that I can propose to the King County Council for adoption," said the Executive. "Further work during the coming weeks will help determine what constitutionally-valid policy is best for the safety and well-being of the transit-riding public, our drivers and personnel, and the community at large.

"I thank everyone who has reached out to us to express their interests on this matter."

Metro expects to complete work on a permanent transit advertising policy by the end of January, for the Executive to transmit to the County Council for adoption.

**_Read the Interim Transit Advertising Policy at:_**
**_www.kingcounty.gov/exec_**

**# # #**

KC_0000004

# EXHIBIT E

**To:**     Titan - Pamela Quadros[pquadros@titanoutdoor.com]; Titan - Bruce. Krivosha
(bruce.krivosha@titanoutdoor.com)[bruce.krivosha@titanoutdoor.com]; Titan - Gail
Worthen[gail.worthen@titanoutdoor.com]; Titan - Donald R. Allman[dallman@titanoutdoor.com]; Titan -
Scott E. Goldsmith[sgoldsmith@titanoutdoor.com]
**Cc:**     Desmond, Kevin[Kevin.Desmond@kingcounty.gov]
**From:**      Shinbo, Sharron
**Sent:**      Sat 12/18/2010 1:36:36 PM
**Importance:**      Normal
**Sensitivity:**     None
**Subject:**     'Israeli War Crimes' signs to go on Metro buses | KING5.com | Seattle Area Local
News
**Categories:**     en-US

http://www.king5.com/news/local/Israeli-War-Crimes-signs-to-go-on-Metro-buses-112108154.html

Greetings,

Interesting, and good, that over 70% of the people who voted thought the ads should be allowed on the
bus.

Desmond

EXHIBIT NO. 28

5-31-11   P. HAMILTON, RPR

KC_0056308

655054

# EXHIBIT F

| | |
|---|---|
| **To:** | Mulligan, Lisa K (Pepin)[LisaKPepin.Mulligan@kingcounty.gov] |
| **From:** | Desmond, Kevin |
| **Sent:** | Wed 12/22/2010 6:09:02 PM |
| **Importance:** | Normal |
| **Sensitivity:** | None |
| **Subject:** | Re: need quick clarification |
| **Categories:** | True |

Yes, you are authorized.

However, this whole deal is extremely fluid and tomorrow we may have a big change in plans. For now what you have in place works for me. Thanks

**From:** Mulligan, Lisa K (Pepin)
**Sent:** Wednesday, December 22, 2010 05:39 PM
**To:** Desmond, Kevin
**Subject:** need quick clarification

Quick Clarification please –

The last line of the Security Plan message says "Heads up that we may need to drastically change the 2 week old 358 emphasis in order to have the bodies to make this happen, regardless of the cost".

Am I authorized to stop the 358 emphasis to adjust resources to the new campaign?

As we progress into the new plan, we can intermittently and lightly staff the 358 again.

Thank you

Lisa

*Desmond*
EXHIBIT NO. _105_
_5-31-11_   P. HAMILTON, RPR

KC_0048925

649839

Captain Lisa Mulligan

**Metro Transit Police**

King County Sheriff's Office

*"Every Call Counts"*

Desk 206-263-5140  Cell 206-391-7931

*Lisa.Mulligan@kingcounty.gov*

---

**From:** Desmond, Kevin
**Sent:** Wednesday, December 22, 2010 4:26 PM
**To:** Mulligan, Lisa K (Pepin)
**Cc:** O'Rourke, Jim; Thielke, Linda; Jolly, Dave; Alidina, Abdul; Winders, Randy
**Subject:** RE: Security Plan Basics
**Importance:** High

Lisa: thanks.  I think this looks like a good plan of action.  I understand you are still waiting on Operations and other decisions as to which routes.  I think that will be pinned down tomorrow.

Please give me the names and contact numbers for the people taking over in your absence.

Thanks

---

**From:** Mulligan, Lisa K (Pepin)
**Sent:** Wednesday, December 22, 2010 3:14 PM

KC_0048926

649839

**To:** Desmond, Kevin
**Subject:** Security Plan Basics

Kevin,

We're still waiting for specifics but I can tell you that our immediate recommendation would be for the mid-range MTP response plan that will include:

  **MTP:**

   Staff (6) mobile Deputies, during the designated peak hours (4 -5 hours in the morning; 4-5 hours in the evening) for the selected routes to follow, escort and respond to calls for assistance

   Variety of marked and unmarked cars

   Variety of uniforms and plain clothes some unmarked cars

   (retain flexibility to react to changing conditions)

   Once route is clearly defined, work with affected agencies to garner support/partnership. (this work has begun in the City of Burien)

   Place Rapid Ride Fare Enforcement Officers in "Conductor Mode" as outlined by Mark Norton.  This will free up MTP resources from their current responsibilities to assist in the directed patrols

   Increased random patrols of all bases 24/7 by marked patrol cars

   Advise neighboring police agencies of changing status, as circumstances could affect them

   DSTT coverage is already increased, including **EOD** dogs through January 2nd.  We'll monitor the activity and lengthen the duration of that mission if it's deemed necessary

We will build a basic response plan for attempts to shut down the E-3 around Ryerson

We will provide written guidelines for Metro Employees to follow in the even that they perceive that they receive a threat (email, voice, in-person)

**Demonstration Management**

Known demonstrations within the City of Seattle will be staffed by Seattle PD

Currently:        SPD will have (1) Bike Squad, 5-6 at the 12/27 Pro Israel Rally at 2nd/Jackson from 1000-1400

SPD will have (1) Bike Squad, 5-6 at the Westlake Pro Palestine Rally at Westlake and walking with them from 1700-1900 hours

Neither of these events have been given permits.  SPD will shadow them and not intervene unless they have to (standard practice)

Spontaneous demonstrations will be handled by the local jurisdiction, as appropriate. MTP will assist if available to do so.

**Ryerson Base Buses with Ads**

MTP requests that all of the selected buses have cameras installed

KC_0048928

649839

MTP requests that all of the selected buses be parked, together if possible, in the center aisles of the lot or at least not visible to passersby.

**All Bases**

Increased presence by Security Guards at Base gates  (plan has been established by Mark Norton through LaRitz and DeCapua).  This plan could be extended if funding is authorized.

MTP requests an Operator Bulletin at all of the bases to include:

Above mentioned guidelines about identifying and reporting threats

Reminders of vigilance

Reminder to ask for a police response if they perceive a problem, preferably before the problem gets out of hand

Please make yea or nay notes and return it to me or we can talk about each point and add/subtract as you prefer.

If you agree with this basic plan, I will move forward with projecting associated costs once I have specifics.  Clearly, those specifics are really important for us to get all of this implemented by Monday.

Heads up that we may need to drastically change the 2 week old 356 emphasis in order to have the bodies to make this happen, regardless of the cost.

More to follow.  I'm at my desk.

Lisa

Captain Lisa Mulligan

KC_0048929

649839

Metro Transit Police

King County Sheriff's Office

**"Every Call Counts"**

**Desk** 206-263-5140  **Cell** 206-391-7931

*Lisa.Mulligan@kingcounty.gov*

KC_0048930

649839

# EXHIBIT G

**To:** Berry, Rhonda[Rhonda.Berry@kingcounty.gov]; Abe, Frank[Frank.Abe@kingcounty.gov]; Brown, Laurie[Laurie.Brown@kingcounty.gov]
**Cc:** Brezonick, Carri[Carri.Brezonick@kingcounty.gov]; Shinbo, Sharron[Sharron.Shinbo@kingcounty.gov]
**From:** Desmond, Kevin
**Sent:** Mon 12/20/2010 1:37:12 PM
**Importance:** Normal
**Sensitivity:** None
**Subject:** Ad
**Categories:** True

As you've heard, it appears that a lot of the correspondence coming in on the ad is from out of state.  Our customer services office is seeing the same patter as well.

As we consider how to respond, we should be cognizant of where the complaints are coming from and try our best to evaluate local interests and opinions.

EXHIBIT NO. 68
05/31/11   P. HAMILTON, RPR

KC_0008261

616115

# EXHIBIT H

**To:**      Carson, Kendall[Kendall.Carson@kingcounty.gov]
**From:**    DeCapua, Mike
**Sent:**    Wed 12/22/2010 4:15:52 PM
**Importance:** High
**Sensitivity:** None
**Subject:** FW: Seattle Metro Bus ad
**Categories:** True

---

**From:** DeCapua, Mike
**Sent:** Wednesday, December 22, 2010 8:16 AM
**To:** Jones, Tom; Avery, Michael; Lewis, Dale
**Subject:** FW: Seattle Metro Bus ad
**Importance:** High

Gents,

Please review your security postures, augment where needed, and ensure staffs are briefed to report all suspicious activity and packages to TCC/LCC and 9-1-1.

Thanks,

Mike

---

**From:** DeCapua, Mike
**Sent:** Wednesday, December 22, 2010 7:48 AM
**To:** 'Tony Tisdale'; 'james.spinden@dhs.gov'
**Cc:** 'WSFC'; Raines, Doyle; 'Wise, Ginny '; 'Doug Larm'; 'Mark.Soper@wsp.wa.gov'; 'Bill Henkel-WSP'; 'Woodward, Bill'; Calder, Gregg; 'Cordova, Charles'; Mulligan, Lisa K (Pepin); Hurley, William; Harrington, Roy; 'Cummins, Kenneth'; Sherry, Keith; DeCapua, Mike
**Subject:** FW: Seattle Metro Bus ad
**Importance:** High

EXHIBIT NO. _161_

P. HAMILTON, RPR

Good morning Jim and Tony,

The Metro bus ad controversy has far outreached the First Amendment issues from where it began last week when the media revealed that a Pro-Palestinian group has purchased outside ad space on 12 of our downtown buses reading "Israeli War Crimes, Your Tax Dollars At Work". Hamas has seized on the controversy as the writer of the email below has indicated, raising Metro's profile in the murky world of terrorist groups. As a result, we have taken additional security measures using the TSA Holiday Surge program and our TSGP grants.

Please do not disseminate outside of DOT and TSA. More to follow as this unfolds.

WSFC/SFD/SPD/WSP, same.

Regards,

Mike

**From:** Desmond, Kevin
**Sent:** Wednesday, December 22, 2010 7:29 AM
**To:** DeCapua, Mike
**Subject:** FW: Seattle Metro Bus ad

fyi

KC_0016144

622434

**From:** Kim Goodrich [mailto:kim_goodrich@hotmail.com]
**Sent:** Wednesday, December 22, 2010 4:10 AM
**To:** Desmond, Kevin
**Subject:** Seattle Metro Bus ad

Greetings,

I've come to understand that King County Metro has approved new bus ads starting next week that read "Israeli War Crimes", "Your Tax Dollars at Work". I assume, as the General Manager of Seattle Metro, you either have some authority over the the ad department or could possibly forward my email to the respective person or department head. While I strongly disagree with the decision to run the ads, I will not argue the point of whether they should be allowed run or not. The reason I am writing is to inform you of some of the consequences of the current policies and poor decision making of that department.

I happened across a message and link on twitter tonight concerning the bus ad controversy from a very troubling website, the website called the Al-Qassam Brigades is an information and news site of the military wing of Hamas (Hamas is designated as a terrorist organization by the State Department). This website and I'm very sure, many others like it, will be using the message of the bus ads and the tacit agreement of the State of Washington as propaganda fodder against the State of Israel as well as our troops currently in the Middle East and around the world. While these kinds of extremists don't need any real reason to lay blame and conspiracy theories at our ally Israel's door, I would like to think that the State Government to which I've paid taxes, does not HELP the cause of terrorists by handing them prime propaganda and blood libel on a silver platter. To wit I've already spoken to two friends in Seattle that will no longer be using the Metro in protest, I don't normally ride Metro but I will also be abstaining even should the need arise. I've include below a few links in reference to the website I described above.

Thank you for your time,

Kimberly Goodrich, Sammamish WA

The Wikipedia page with some information about the Al-Qassam Brigades:

http://en.wikipedia.org/wiki/Al-Qassam_Brigades

The website itself including the story about the Washington bus ads:

http://www.qassam.ps/news-3950-Israeli_War_Crimes_signs_to_go_on_Metro_buses.html

KC_0016145

622434

As well as the original twitter message where I saw the link to the website:

http://twitter.com/AlqassamBrigade/statuses/17527529816461312

KC_0016146

622434

# EXHIBIT I

**To:**      Cole-Tindall, Patti[Patti.Cole-Tindall@kingcounty.gov]; Brown,
Laurie[Laurie.Brown@kingcounty.gov]; Johnson, Jim[Jim.Johnson@kingcounty.gov]
**From:**       Levin, David
**Sent:**       Thur 12/23/2010 10:20:26 AM
**Importance:**    Normal
**Sensitivity:**    None
**Subject:**      Update from Transit
**Categories:**    True

Patti—

I just spoke with Dave Jolly.  Dave is a Supervisor.  He is acting for Jim O'Rourke, the
manager, who has the day off.

Dave tells me that there has not been a formal announcement or written statement to
employees about opting out of taking a particular bus.  In fact, it's unlikely that anything
would be written.  The rules would be communicated orally to employees who are
assigned on the route with the buses with the ads by their Chiefs on Monday.  Note that
Dave said they're not expecting the buses with the ads to be in service until after the PM
rush hour Monday.  Note that this may have been communicated informally already to a
few Operators who have asked how things will be handled.

I was on the phone call with Paul Bachtel yesterday.  Jim O'Rourke communicated to
Paul "what we were thinking" as the best way to handle employees who don't want to
drive the buses (i.e. you can't opt out because you disagree with the message; you can
opt out if you express safety concerns).  Paul said this sounded like a good plan.  That's
the extent of our "agreement" with the union.

Note that the reason Metro likes this approach is it is consistent with how they normally
run business.  You have to take the coach that's assigned to you, unless you express
safety concerns about it (which normally relate to the breaks, the lights, etc.).

dsl

David S. Levin

*O'Rourke*

EXHIBIT NO. *10*

*5-6-11*   P. HAMILTON, RPR

KC_0008666

Labor Negotiator

King County Office of Labor Relations

500 Fourth Avenue, Room 450, Seattle, WA 98104

Phone: (206) 296-8585, Fax: (206) 205-1395

david.levin@kingcounty.gov


P Please consider the environment before printing this e-mail.

# EXHIBIT J

Paul Bachtel                                                    May 26, 2011

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

--------------------------------------------------------

SEATTLE MIDEAST AWARENESS          )   No.

CAMPAIGN, a Washington             )   2:11-cv-00094-RAJ

non-profit corporation,            )

                Plaintiffs,      )

     vs.                          )

KING COUNTY, a municipal           )

corporation,                       )

             Defendants.      )


--------------------------------------------------

Deposition Upon Oral Examination Of

PAUL BACHTEL

--------------------------------------------------

May 26, 2011

500 Fourth Avenue, Floor 9

Seattle, Washington




REPORTED BY:  PEGGY FRITSCHY HAMILTON, RPR, CSR, CLR,

29906/No. 2704

Paul Bachtel                                                    May 26, 2011

1        Q.    And when you say we, who do you mean?

2        A.    We, members of the union.  There were a

3    number of -- I received a number of calls over that

4    ad, as well, that people were not pleased with having

5    to drive a bus with that type of a sign on the side.

6        Q.    Was the union proposing that responsive ads

7    or counter ads to the atheist ad be put on Metro

8    buses?

9        A.    No.

10        Q.    What did you mean about what they were going

11    to do?

12        A.    Oh.  I had people ask me at base visits,

13    Print stickers that said God loves you, and stick them

14    over the top of the ad.  The union has responded

15    before by defacing Metro's ads.  Members of the union

16    has.  The union hasn't officially.  Members of the

17    union have responded negatively through work actions

18    to other ads, such as the Rush Limbaugh ads.  The ones

19    from the year prior.  There have been different ads

20    over the years that have raised the hackles of union

21    members.

22        Q.    In some of those instances, the union members

23    have defaced the ads that were on the buses?

24        A.    Yes.

25        Q.    And does that result in any kind of

Paul Bachtel                                                    May 26, 2011

Page 24

 1   phone call?

 2       A.    No.

 3       Q.    What was the next thing, then, that you did

 4   when it came to the SeaMAC ad?

 5       A.    Next thing I did was I began to receive

 6   emails and phone calls.  I just answered the emails

 7   and phone calls that came in.

 8       Q.    Concerning the SeaMAC ad?

 9       A.    Correct.

10       Q.    How many emails do you think you received?

11       A.    Maybe from members, King County Council

12   members that I contacted that responded back, I mean,

13   it depends on how you look at that, but --

14       Q.    How about if we do this --

15       A.    Maybe a dozen.

16       Q.    All right.  Let's talk about emails that you

17   received to you for the first time, so not in response

18   to something you had sent.

19       A.    Yes.

20       Q.    Not in response to a call you may have made,

21   or anything like that.  Just an email that came to

22   you, as lawyers like to say, sua sponte?

23       A.    Maybe about 10 or 12.

24       Q.    Over what period of time did this happen?

25       A.    Several days.

Paul Bachtel                                                May 26, 2011

 1    members gather together and direct me to call a

 2    meeting.

 3         Q.   Half of the members of the board?

 4         A.   Yes.

 5         Q.   All right.

 6         A.   That's never happened, but it's in our bylaws

 7    that they could do that.

 8         Q.   Was any effort made to do that here in this

 9    case, that is, have an additional or extra executive

10    board meeting to talk about the SeaMAC ad?

11         A.   No.

12         Q.   Mr. Bachtel, did you have telephone calls

13    with members?

14         A.   Yes.

15         Q.   And that's included within the 20 or 30

16    telephone calls?

17         A.   Yes.

18         Q.   Did you have telephone calls about this ad

19    with folks that were not either a member of the

20    executive board or of the ATU?

21         A.   Yes.

22         Q.   Do you remember who they were?

23         A.   Random citizens calling the union to express

24    their opinions.

25         Q.   Did you receive any opinion from the outside

Paul Bachtel                                           May 26, 2011

 1      Q.    During, or at least at the time of that call,
 2   Mr. Bachtel, were you aware of any specific
 3   information that led you to conclude that there might
 4   be violence?
 5      A.    That was during the middle of the time when I
 6   was receiving phone calls and emails, and some of the
 7   phone calls and emails that came to me suggested that
 8   there was a high potential for violent acts to occur.
 9      Q.    And how many of those do you think there
10   were?
11      A.    Out of the dozen emails, I think I cited
12   several of them in my email to the King County Council
13   members, or addressed to Kevin Desmond and copied to
14   the King County Council members.  I heard from a
15   retired state patrolman --
16      Q.    I think we're just asking about numbers.
17      A.    Oh.
18      Q.    Out of the emails and phone calls, how many
19   specific instances were there that led you to conclude
20   that there might be violence?
21      A.    Twenty to thirty.  I think every one I spoke
22   with was making the same contention:  they were
23   concerned about the potential for violence.
24      Q.    Is this they were concerned there might be,
25   or that they knew of violence that might happen?

Paul Bachtel                                              May 26, 2011

Page 35

1      A.    No.   They were concerned there might be.

2    It's all speculation.

3      Q.    Indeed.   Did you ever forward to any type of

4    law enforcement agency information about a specific

5    communication that you received that you believed

6    indicated there might be violence?

7      A.    Yeah.   I clicked reply all on one email from

8    one gentleman who sent in an email, and in the copy

9    reply all section, he had copied the Seattle office of

10   the FBI, and so when I clicked reply all, I think it

11   went back to the FBI, as well.

12     Q.    Assuming he had the right email address?

13     A.    Assuming, yeah.   Beats me.

14     Q.    Other than that one instance, were there any

15   times that you recall referring a specific

16   communication to any law enforcement agency about the

17   SeaMAC ad that led you to believe that there was

18   something about what was said concerning violence?

19     A.    I do not recall whether I cc'd Dave Jutilla.

20   If I did, I would have cc'd Dave Jutilla, who was

21   chief of the transit police.   I don't recall whether I

22   included him in the email copy, or not.

23     Q.    You are talking about the same reply all

24   click that you just referred to?

25     A.    Yes, or any of the other -- yeah, that would

Paul Bachtel                                                    May 26, 2011

 1      A.    No.   I don't think there's a policy that

 2   governs it.   I believe that plan was an ad hoc plan

 3   put together just to deal with the situation that was

 4   in hand.

 5      Q.    Did you agree with that plan?

 6      A.    I did.

 7      Q.    What was your understanding of how Metro

 8   would divine what the operators' potential objection

 9   was?

10      A.    I don't know.   I have no idea how they would

11   divine that.

12      Q.    I take it that the details of that particular

13   part either were not said or you don't remember?

14      A.    I don't know.

15      Q.    Did Mr. O'Rourke describe to you any other

16   features of Metro's operation plan concerning the

17   SeaMAC ad?

18      A.    No.

19      Q.    So, there was the security plan, which was

20   the facilities and the buses and the employees, and

21   then there was a plan for working with operators who

22   may have objections to driving a bus with the ad on

23   it, and some information about Metro Transit Police in

24   separate cars being around the buses as they were

25   driving.

Paul Bachtel                                        May 26, 2011

 1   between Metro and the ATU?

 2        A.   Yes.

 3        Q.   In what respect?

 4        A.   Numerous disagreements over the years over

 5   different ads on the buses.  ATU has objected to them.

 6        Q.   To specific ads; right?

 7        A.   To specific ads, yes.

 8        Q.   I think by my question I was more interested

 9   in the issue of the advertising policy itself, rather

10   than specific ads.

11        A.   I think that's the first time we'd ever

12   addressed the advertising policy.

13        Q.   All right.

14             (Discussion off record.)

15             THE WITNESS:  No, that doesn't -- no.

16   That's a different issue.

17        Q.   Just for the record, what you just said,

18   Mr. Bachtel, was in response to something that you and

19   Mr. Freed had discussed?

20             MR. FREED:  Actually, it would be really

21   helpful if we just strike that, if you are okay with

22   that.

23             MR. GRANT:  Noted.

24             MR. FREED:  Fair enough.

25

Paul Bachtel                                        May 26, 2011

Page 58

1   open -- nothing like that, no.  We intentionally do

2   not do that.

3       Q.   Are there other blogs like Mr. Welch's that

4   you are aware of; individual members who may have a

5   blog and then invite comment and conversation among

6   the membership?

7       A.   I'm not aware of any -- I'm not aware that

8   any of them are currently up and running, but there

9   have been a number of them like Yahoo groups and

10  different of those group things you can set up through

11  ISPs that have come and gone throughout the years.

12      Q.   Facebook?

13      A.   I believe there is a Facebook page running

14  now.

15      Q.   What's the name of that one?

16      A.   I don't recall.  I don't visit it.

17      Q.   I take it, Mr. Bachtel, in your position as

18  the president that you get a variety of communications

19  from your members who are raising issues that they're

20  not happy with?

21      A.   Yes, that's a good job description for me.

22      Q.   Over the course of a year, how many of these

23  kinds of communication do you think you get?

24      A.   Unhappy members, maybe five or ten a day,

25  emails or phone calls.

# EXHIBIT K

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

-------------------------------------------------------

SEATTLE MIDEAST AWARENESS          )  No.

CAMPAIGN, a Washington             )  2:11-cv-00094-RAJ

non-profit corporation,            )

                Plaintiffs,       )

    vs.                            )

KING COUNTY, a municipal           )

corporation,                       )

                Defendants.       )

----------------------------------------------------

Deposition Upon Oral Examination Of

CARRI BREZONICK

----------------------------------------------------

June 1, 2011

500 Fourth Avenue, Suite 900

Seattle, Washington

REPORTED BY:  PEGGY FRITSCHY HAMILTON, RPR, CSR, CLR,

29906/No. 2704

Carri Brezonick                                          June 1, 2011

Page 6

1    December 2010.

2        A.    Okay.

3        Q.    It's designed to be a reasonably

4    straightforward process.  We do it by question and

5    answer, so I'll ask a question, and then you answer as

6    best you can.  If at any time the questions are not

7    clear, if you did not understand the question or for

8    any reason need it to be repeated or asked a different

9    way, let me know, and we'll do that.  All right?

10       A.    Yes.

11       Q.    Your testimony and my questions and any

12   comments of anybody unless we otherwise agree will be

13   on the record.  Were you aware of that?

14       A.    Yes.

15       Q.    Did you know that what you were saying today

16   could be used in court as though you were testifying

17   in person?

18       A.    Yes.

19       Q.    All right.  What is your current position?

20       A.    I am the supervisor of Metro Transit's

21   customer information office.

22       Q.    Do you work for King County?

23       A.    Yes, I do.

24       Q.    Are you assigned to any particular

25   department?

Carri Brezonick                                           June 1, 2011

                                                              Page 7

 1      A.   Yes.

 2      Q.   What is it?

 3      A.   Sales and customer service.

 4      Q.   And is that within --

 5      A.   I'm sorry.  Department?

 6      Q.   Yes, ma'am.

 7      A.   That would be the King County Department of

 8   Transportation.

 9      Q.   Okay.  How long have you had that position?

10      A.   Nearly three years.

11      Q.   What are the duties that you have in that

12   position?

13      A.   I manage a call center for Metro Transit, I

14   respond to customer inquiries and complaints, I

15   respond on behalf of the Metro Transit general manager

16   to customer inquiries, and prepare replies for

17   contacts made to the County Exec and County Council

18   members and other elected officials, I guess.

19      Q.   Are the customer information office and the

20   call center different?

21      A.   No.

22      Q.   How many people work for you?

23      A.   I have approximately 26 call center staff and

24   four administrative staff.

25      Q.   Generally, what's the difference between a

Carri Brezonick                                              June 1, 2011

Page 8

 1   call center person and an administrative person?

 2        A.   Call center staff answer the phones or

 3   respond to emails, and the four administrative staff

 4   supervise the activities of the call center staff.

 5        Q.   Do you know how it is that emails would get

 6   routed to your team if they were not specifically

 7   directed, say, to the call center or the customer

 8   information office?

 9             MS. GANNETT:   Objection, calls for

10   speculation.

11             Answer, if you can.

12        Q.   Do you know how that happens?

13        A.   It depends.

14        Q.   All right.  What does it depend on?

15        A.   Well, it depends on who the -- who received

16   the original email.

17        Q.   Okay.  Hypothetically, let's say I wanted to

18   complain about an ad that was going to be on a bus I

19   heard about, but I didn't really know who to call or

20   send an email to, so I went to the King County website

21   and clicked on KingCounty.gov and complained about it.

22   How does that end up to you?

23             MS. GANNETT:   Again, objection,

24   speculation.

25             But go ahead.

Carri Brezonick                                            June 1, 2011

Page 12

1   for you?

2        A.   No, I don't remember.

3        Q.   Very well.  What's the next thing you

4   remember, I guess, either seeing or hearing concerning

5   the SeaMAC ad?

6        A.   A member of my staff when I came in on the

7   morning of the 20th, the individual that processes the

8   email alerted me to the fact that we'd received a

9   large number of emails over the weekend.

10       Q.   Do you remember how many?

11       A.   I don't.

12       Q.   Was it more than 100?

13       A.   I don't remember if he told me a number, or

14   not.  It was just a lot.

15       Q.   Very well.  Do you remember who that was that

16   told you that?

17       A.   Yes.

18       Q.   Who?

19       A.   Bryan Ballestrasse.

20       Q.   You are going to have to help us with both

21   first and last on that one.

22       A.   I was afraid you were going to ask me that.

23       Q.   You are under oath.

24       A.   Yeah.  I'll do my best.  B-R-Y-A-N,

25   B-A-L-L-E-S-T-R-A-S-S-E, I believe.  I think that's

Carri Brezonick                                    June 1, 2011

Page 21

 1  kept?

 2      A.   They're stored electronically.

 3      Q.   How is it that they're stored?  Do they have

 4  a particular file?  How are they categorized?

 5           MS. GANNETT:  Objection, calls for

 6  speculation.

 7      Q.   In terms of how they're kept.

 8      A.   Well, I'm not a real wizard with technology,

 9  so I'll do my best to describe what I -- how I

10  understand they're kept.

11      Q.   All right.

12      A.   Each individual email as it's received is

13  given a number, and then they're stored in that

14  fashion.

15      Q.   Do you know if there's a process to store

16  emails that come to your team in any other fashion?

17      A.   Yes.

18      Q.   What's that?

19      A.   They are entered into a database that we use,

20  and then they are stored in there, as well.

21      Q.   Do you know if they're stored by topic in any

22  way?

23      A.   They're stored by number.  They can be

24  queried by topic.

25      Q.   For example, let's say somebody wanted you to

Carri Brezonick                                                    June 1, 2011

Page 22

 1    provide them with all of the emails about the SeaMAC
 2    ad that came in to your team between December 18 and
 3    December 23, 2010, would you be able to deliver that?
 4        A.    Yes.
 5        Q.    Is that because the emails are stored by some
 6    sort of name or topic or subject matter?
 7        A.    Well, as I mentioned, the emails are stored
 8    numerically.  The number, I believe, is associated
 9    with the database, which gives it a number, so the
10    emails are stored separately than the database.
11        Q.    As you understand it, is the number assigned
12    based on when the emails come in?
13        A.    No.  They're based on when they're entered
14    into the database.
15        Q.    Who does that?
16        A.    Who enters the emails into the database?
17        Q.    Yes, ma'am.
18        A.    Mostly it's Bryan Ballestrasse.
19        Q.    Is there a collection of the emails that were
20    received by King County concerning the SeaMAC ad?
21        A.    Yes.
22        Q.    How many of them are there?
23        A.    I believe there's over 6,000.
24        Q.    Are those emails categorized any other way
25    than received during a certain window of time about

Carri Brezonick                                        June 1, 2011

1    Q.    I think I am.  Maybe I should break it down.

2    A.    Sure.

3    Q.    Is there any sort of quantitative analysis of

4    the emails; for example, how many came in a particular

5    day?  How many were, say, for the ad?  Against the ad?

6    How many were threatening?  How many were not

7    threatening?  Things of that nature.

8    A.    Somewhat, I guess.  As I said, they were all

9    sent to me, and so I made an effort to try and divide

10   them up by not by date, because quite honestly, an

11   email, that's easy to determine based on how you sort

12   them within the email file, so by content I made some

13   effort to categorize some of them and read them for

14   content, but as far as an analysis of content or other

15   features to it, no, there was not.

16   Q.    Did you complete your reading of the emails?

17         MS. GANNETT:  Objection --

18   A.    I read the majority of them.

19   Q.    Have you read all of them?

20   A.    I can't say that.

21   Q.    All right.  Have you ever created a written

22   document concerning your read or review of the emails?

23   A.    Yes.

24   Q.    When did you do that?

25   A.    I believe it was either toward the end of

Carri Brezonick                                          June 1, 2011

Page 29

1    number that is calling whether they give it or not?

2        A.    No.

3        Q.    Like caller ID?

4        A.    I don't believe so.  It comes in through an

5    ACD, so I'm not certain it does.

6        Q.    You are already way over my head on that one.

7        A.    Okay.

8        Q.    The date, is that recorded?

9        A.    Yes.

10       Q.    The length of the call?

11       A.    No.

12       Q.    Is there a database for this type of

13   information concerning telephone calls that came in

14   about the SeaMAC ad?

15       A.    There's only one database.

16       Q.    Are the telephone calls in that database?

17       A.    Some of them.

18       Q.    Do you know what the criteria was for

19   including some and not including others?

20            MS. GANNETT:   Objection, misstates

21   testimony.

22            Go ahead.

23       A.    Can you ask me the question again?

24       Q.    Yes, ma'am.

25       A.    Okay.

Carri Brezonick                                          June 1, 2011

Page 34

1        Q.     February, I think.

2        A.     February, I believe we got a couple in

3    relationship to the news articles about that, yeah.

4        Q.     Did those go into the database?

5        A.     No.

6        Q.     Do you know at what point in time your team

7    quit entering or logging the emails about the SeaMAC

8    ad into the database?

9        A.     Emails, on that Monday.

10       Q.     December 27th?

11       A.     No.   The first Monday, the 20th.

12       Q.     Yes.

13       A.     Would be that day.

14       Q.     And why is that?

15       A.     Because of the sheer volume.

16       Q.     Have the emails been kept anywhere?

17       A.     Yes.

18       Q.     Where are they?

19       A.     Well, I have them on my computer, and they've

20   been stored on a CD.

21       Q.     And these would be all of the emails that you

22   or your team received about the SeaMAC ad?

23       A.     Or were forwarded to me.

24       Q.     Yes, I guess I was including that.   Either

25   sent directly to your team or sent by others who had

Carri Brezonick                                        June 1, 2011

Page 37

1        Q.    Did you take off Wednesday, Thursday, and
2   Friday of the week of the 20th?

3        A.    I wasn't in the office.

4        Q.    Where were you?

5        A.    Where was I?

6        Q.    Yes, ma'am.

7        A.    Home.

8        Q.    Were you working at home?

9        A.    Yes.

10       Q.    Did you work full time?

11       A.    No.

12       Q.    All right.

13       A.    No, not full time.

14       Q.    All right.  Did that auto reply message stay
15   on active, I guess is the word, until you came back on
16   the 27th?

17       A.    Yes.

18       Q.    Did you have a similar type message on your
19   voicemail greeting?

20       A.    Yes.

21             (Exhibit-78 marked.)

22       Q.    Exhibit-78, is this the email that came to
23   you from Sharron Shinbo that you mentioned earlier?  I
24   think you called it the for your information.

25       A.    Yes.

Carri Brezonick                                              June 1, 2011

                                                              Page 50

1      A.   As I mentioned, all emails and phone calls

2   regarding the SeaMAC ad were forwarded to me, and I

3   was reading the emails.

4      Q.   Were there any messages that you either read

5   or listened to where you contacted Sergeant Bill

6   Hurley of the Metro Transit Police Joint Transit

7   Antiterrorism Team?

8      A.   No.

9           (Exhibit-82 marked.)

10     Q.   Exhibit-82 is a string of emails.  It's the

11  one in the middle on the first page, Ms. Brezonick,

12  that I think I'm most interested in asking you about.

13  It came to you from Laurie Brown.

14     A.   Okay.

15     Q.   Did you ever send Laurie Brown any messages

16  that you considered to be threatening or potentially

17  threatening?

18     A.   No, I don't believe so.

19     Q.   Do you know why messages of that nature were

20  to be rerouted to Laurie Brown, at least as of that

21  time?

22          MS. GANNETT:  Objection.

23     A.   No, I do not.

24          MS. GANNETT:  Calls for speculation.

25     A.   No, I don't.

# EXHIBIT L

Page 1

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

--------------------------------------------------------

SEATTLE MIDEAST AWARENESS          )   No.

CAMPAIGN, a Washington             )   2:11-cv-00094-RAJ

non-profit corporation,            )

               Plaintiffs,     )

      vs.                          )

KING COUNTY, a municipal           )

corporation,                       )

             Defendants.      )


--------------------------------------------------------

Deposition Upon Oral Examination Of

LAURIE BROWN

--------------------------------------------------------

June 27, 2011

500 Fourth Avenue, Suite 900

Seattle, Washington




REPORTED BY:  PEGGY FRITSCHY HAMILTON, RPR, CSR, CLR,

29906/No. 2704

Laurie Brown                                                    June 27, 2011

1    about with what.  I talked with Rhonda Berry at

2    different times, Gail Stone at different times, and

3    Dylan Ordoñez at different times, and I also talked

4    with The Executive at different times, but not about

5    arranging this meeting.

6        Q.   The Executive, Dow Constantine?

7        A.   Correct.

8        Q.   In terms of arranging the meeting, though, in

9    terms of The Executive's Office and your contacts, was

10   it primarily Ms. Berry, Ms. Stone, and Mr. Ordoñez?

11       A.   Yes.  I would say it was primarily Ms. Berry.

12       Q.   And you passed on the request to have Seattle

13   Police Department or King County Sheriff's personnel

14   present at that meeting?

15       A.   Right.

16       Q.   And you were later told that they would not

17   be showing?

18       A.   Right.

19       Q.   What were your contacts with the FBI?

20       A.   I was given -- I was asked to be the conduit

21   for any emails that we received that appeared

22   threatening, were threatening, had any flavor of any

23   kind of threat of disruption of the transit service,

24   destruction of property, harm to individuals, and I

25   was asked to be the person who collected those from

Laurie Brown                                              June 27, 2011

1   both the County Council, The Executive's Office, and

2   our department, or anywhere else in the County, and

3   pass those along to the FBI.

4        Q.   Who asked you to do that?

5        A.   Rhonda Berry.

6        Q.   Did you collect those emails?

7        A.   I collected anything that anyone had to give

8   me.

9        Q.   Ms. Brown, what was your role in the

10  collection process of these emails that you described?

11       A.   Could you be more clear?

12       Q.   I'll try to be.  For example, were you tasked

13  with the job of finding the emails and making some

14  kind of an evaluation or assessment of whether they

15  qualified for what it is that you were supposed to

16  find, or were you just supposed to get them, or

17  something else?

18       A.   If I could back up.  We were receiving

19  thousands of emails, and a very large concern was that

20  we did not have time to read through them all.  I

21  mean, I was getting them at the rate of one per 30

22  seconds.  I think I was getting them at the rate of

23  however quickly my Blackberry could take one, so we

24  knew that there wasn't any way to look through all of

25  the emails.  There was just physically even if we

Laurie Brown                                    June 27, 2011

1    stayed up 24 hours a day, there was physically no way

2    to read through them all, but the ones that we were

3    able to spot check or come across or threatening phone

4    calls that we received, so we for sure knew about

5    them, those were the ones that we were to pass along.

6              I wasn't to make any kind of assessment.

7    If a receptionist said to me this seemed threatening,

8    I would take it in.  I mean, I think I would have used

9    my brain.  If it was like Hello, good morning, how are

10   you, have a nice day, I would have probably not passed

11   that along, but if there was any possibility, I

12   figured that was for The Fusion Center, which is

13   ultimately where I was sending them, and that my

14   understanding of The Fusion Center was that that's a

15   center where Washington State Patrol, FBI, local

16   police agencies all kind of fuse together, so that

17   it's a team of people looking at potential security

18   risk from many different angles, so that's my

19   understanding of where I was ultimately sending them,

20   was not the FBI, but it was The Fusion Center.

21       Q.   You said we were getting emails.  Were you

22   getting the emails directly from members of the public

23   about the SeaMAC ad?

24       A.   Yes, I was.

25       Q.   At your email address for King County?

Laurie Brown                                          June 27, 2011

 1    where I was trying to manage everything else related

 2    to this week and this incident:  building security,

 3    labor relations issues, bus operators who said they

 4    wouldn't drive the buses, planned demonstrations.  I

 5    was trying to manage all of that.  There was no, there

 6    was no system that I could say proudly that we set up

 7    to be able to track everything and have it neatly in

 8    columns threatening, nonthreatening, these are all

 9    red, these are not red.  We were all like reading them

10    as quickly as we could, given everything else that was

11    going on, but my understanding was that by midweek, we

12    had kind of lost confidence that we were going to be

13    able to read even half of them.

14         Q.   Was anybody helping you in this process?

15         A.   Oh, yes.

16         Q.   Who was that?

17         A.   Carri Brezonick and her group down there, and

18    I know that I personally assigned some people to help

19    her to read through the emails, so I don't know how

20    many people ultimately were looking at them, but her

21    group.

22         Q.   Is the process of reviewing emails that are

23    coming from members of the public to King County a

24    task that normally you'd perform in your work as the

25    deputy director of the DOT?

# EXHIBIT M

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

--------------------------------------------------------

SEATTLE MIDEAST AWARENESS          )   No.

CAMPAIGN, a Washington             )   2:11-cv-00094-RAJ

non-profit corporation,            )

                Plaintiffs,     )

     vs.                           )

KING COUNTY, a municipal           )

corporation,                       )

               Defendants.     )


-----------------------------------------------------

Deposition Upon Oral Examination Of

DOW CONSTANTINE

-----------------------------------------------------

June 16, 2011

401 Fifth Avenue, Floor 8

Seattle, Washington




REPORTED BY:  PEGGY FRITSCHY HAMILTON, RPR, CSR, CLR,

29906/No. 2704

Dow Constantine                                    June 16, 2011

 1   Executive Constantine," and it's dated November 9,

 2   2010.  Was there a meeting where you were briefed on

 3   the transit advertising?

 4        A.   Yes.  I don't recognize this cover sheet.

 5        Q.   Yes, sir.  It's probably most likely that the

 6   cover sheet you saw looks a little bit different than

 7   the one we are looking at today.

 8             At that particular meeting in November,

 9   2009, were there also discussions concerning the ad

10   that the Seattle Mideast Awareness Campaign was

11   proposing to be placed on Metro buses?

12             MR. KOLDE:  Just caution the witness not

13   to divulge attorney-client communications, but please

14   testify about nonattorney-client communications.

15        A.   Yes.  I'm not certain of the date.  This

16   cover page states November 9th, and that is

17   approximately correct, and yes, there were discussions

18   about a proposed ad from SeaMAC.

19        Q.   I'm glad you brought that up.  It would be a

20   lot easier for certainly me and probably both of us if

21   we could refer to the Seattle Mideast Awareness

22   Campaign as SeaMAC.  All right?

23        A.   Yes.

24        Q.   If you take a look at the last page, using

25   that, I guess, as a prompt, do you recall that you

Dow Constantine                                                June 16, 2011

1    looked at the graphic for the proposed ad that was to

2    be placed on the Metro buses?

3        A.    I do recall being shown a graphic, and I

4    don't recall the image here.  I recall an image that

5    had a demolished building with a number of children

6    looking on.  That's the image I remember.  There may

7    have been multiple images presented.

8        Q.    All right.  Did it have the same text of the

9    ad that we're looking at here in Exhibit-141?

10       A.    To the best of my recollection, it was the

11   same or similar text.

12       Q.    Let me show you what has already been marked

13   in this case as Exhibit-121, and I apologize for the

14   somewhat poor quality of the photocopy.

15       A.    Understood.

16       Q.    Do you think that you could look at that and

17   tell whether that might be the ad that you were

18   referring to just a few moments ago?

19       A.    That image in the ad looks more familiar to

20   me.

21       Q.    All right.  And then in terms of the text, I

22   think the text is the same in both 121 and 141; right?

23       A.    Making allowances for the photocopy quality,

24   it appears to be the same words.

25       Q.    All right.  How many different pictures do

Dow Constantine                                          June 16, 2011

1   you think you looked at of the proposed SeaMAC ad at

2   the November meeting?

3       A.   I do not recall whether there was a single or

4   multiple set of proposed ads presented at that

5   meeting.

6       Q.   Maybe to help us out a little bit, there are

7   probably a lot of questions that we may ask about that

8   particular meeting.

9       A.   Um-hum.

10       Q.   I understand there were lawyers from the King

11   County Prosecuting Attorney's Office present.  When I

12   ask questions about what was said and things of that

13   nature, please do not tell me what you said to the

14   lawyers or what the lawyers said to you, or what

15   others may have said to the attorneys.

16       A.   Okay.

17       Q.   We are more interested at the moment, quite

18   frankly, about what you were thinking and what you

19   were doing.

20       A.   Um-hum.

21       Q.   Did you review the text of the Metro Transit

22   advertising restrictions that are also part of

23   Exhibit-141 during that meeting?

24       A.   I did.

25       Q.   Do you know how that meeting came about to be

Dow Constantine                                          June 16, 2011

 1   scheduled?

 2       A.    I'm not certain.  I do know that Frank Abe,

 3   my communications director, was there, and that Metro

 4   Transit staff were there, and it's likely, then, that

 5   Metro Transit staff had asked for a meeting with me

 6   regarding these ads.

 7       Q.    Before the meeting started, did you know you

 8   were going to be talking about this particular ad?

 9       A.    No, I don't remember knowing that ahead of

10   time.

11       Q.    Were there ads from any other person or any

12   other entity besides SeaMAC that were discussed at

13   that meeting?

14       A.    I don't think there were.

15       Q.    Do you remember who was present?

16       A.    As I've said before, I know that Frank Abe,

17   who's my communications director -- there's several

18   people who work on communications, but he was

19   certainly present.  I believe that senior Metro staff

20   was present, but I am not certain which of the

21   collection of Metro staff were present.  What I would

22   categorize as senior Metro staff would be Kevin

23   Desmond, the transit director, his deputy, Laurie

24   Brown, as well as their boss, Harold Taniguchi, who

25   runs the Department of Transportation.  At least one

Dow Constantine                                              June 16, 2011

1      Q.    Do you remember how long the meeting lasted?

2      A.    No, I don't.  Generally the longest meetings

3    I would have on any subject would be an hour, and

4    often I'm scheduled in half hour or shorter

5    increments.

6      Q.    Maybe this is a good time to mention that if

7    you need to take a break at any time, we're likely to

8    be here for more than 60 minutes.

9      A.    Okay.

10     Q.    What was it that you were asked to do with

11   respect to the SeaMAC ad at this particular meeting?

12     A.    I was informed that Metro Transit had

13   received this advertisement through this vendor; that

14   Metro had determined that the ad did not violate the

15   criteria outlined in the section 6 of the advertising

16   contract.  They were concerned about it being

17   potentially highly controversial, and wanted to have

18   me as sort of the senior decision maker review it and

19   determine whether I believed that it would meet the

20   criteria, or not, and I agreed with their assessment

21   that the ad should run.

22     Q.    Had you been asked to do that task with

23   respect to a proposed ad on a Metro bus before?

24     A.    No.

25     Q.    Had you expressed an interest in getting

Dow Constantine                                              June 16, 2011

1    about attorney-client privileged communications.

2    Please testify about any other communications.

3         A.   It was presented to me, and I think it was

4    presented so that I might view it and draw my own

5    conclusion about whether it would be, 1, controversial

6    and offensive, and 2, furthermore, violative of the

7    policy that they presented to me, and I recognized

8    that it was potentially offensive to some of the

9    community, but I didn't feel that it rose to the level

10   of violating this policy, which would cause it to be

11   excluded from placement on the bus.

12        Q.   Were there particular provisions of the

13   advertising policy that you were looking at in terms

14   of making your assessment of whether it should be

15   rejected or not under the policy?

16        A.   Yes.

17        Q.   If you could, would you tell us which of

18   those you did, please.

19        A.   The overall section is 6.0, "Restrictions on

20   Advertising," and the specific subsection is 6.4D and

21   E.  Those are the subsections to which I was directed

22   that day.

23        Q.   Now, on Exhibit-141, those two subparagraphs

24   that you just mentioned, D and E, are circled.  Do you

25   know who did that?

Dow Constantine                                           June 16, 2011

Page 19

1    was brought to me was a decision to allow the ad to
2    run.
3         Q.   All right.  At some point during the meeting,
4    did you make the decision that the SeaMAC ad should be
5    allowed to run based on the criteria or restrictions
6    in the Metro advertising policy?
7         A.   I concurred with the decision from Metro that
8    had been brought to me that the ad should run, and I
9    concurred based on my reading of this advertising
10   policy.
11        Q.   Do you recall whether there was conversation
12   or discussion about the capability of Metro Transit to
13   respond to particular problems that might be
14   associated with running this ad?
15        A.   I think you brought that up a second ago, and
16   I don't recall any discussion about that.  That does
17   not mean that discussion didn't happen, but at this
18   point, I don't remember it happening.
19        Q.   You retained your lawyer knowledge or
20   experience there.  You have a law degree; is that
21   right?
22        A.   Yes.
23        Q.   From the University of Washington?
24        A.   Yes.
25        Q.   Were you in private practice?

Dow Constantine                                          June 16, 2011

1      A.    Yes, in the early 1990s.

2      Q.    Executive Constantine, just generally, what

3   type of law was your practice?

4      A.    Real property, small business, some land use,

5   in that general contractual law area.

6      Q.    Were you in a firm?

7      A.    I was in a small firm by the name of

8   Constantine & Benis.  We had at any point between

9   three and five attorneys.

10     Q.    Are you still a member of the Washington

11  State Bar Association?

12     A.    I am.

13     Q.    What's your bar number?

14     A.    19377.

15     Q.    That's a number people just generally don't

16  forget.

17     A.    That's correct.

18     Q.    All right.  Let's go back to SeaMAC.  So,

19  what happened as the meeting came to an end?

20     A.    Well, the conclusion, and I can't say

21  specifically what the last thing in the meeting was

22  that was said, but the conclusion was I agreed with

23  Metro Transit that the ad should run, and people left.

24     Q.    All right.  Was there any dissent expressed?

25     A.    I don't think there was dissent expressed.  I

Dow Constantine                                    June 16, 2011

1    remember Frank Abe wanting me to spend enough time to

2    understand that there would be concern at least and

3    controversy in the community, but that was coming from

4    him not as a decision maker about this, but as a

5    person who was going to have to respond to any public

6    concern that was expressed.

7         Q.   What type of concern did Mr. Abe identify,

8    potential concern?

9         A.   I think he was generally bringing to my

10   attention that this ad would be offensive to some

11   members of the community.

12        Q.   Which particular community or members?

13        A.   Well, community meaning our greater King

14   County community, and specifically those who disagree

15   with either the message or the ad or image, or were

16   offended by the image of the demolished building and

17   children.

18        Q.   Do you remember any discussion concerning the

19   First Amendment implications of the advertising policy

20   and proposed SeaMAC ad during that meeting?

21             MR. KOLDE:  Object to the form of the

22   question, and caution the witness not to discuss

23   attorney-client communications.  General discussion

24   between lay people, please testify about.

25        Q.   I mean, you are a lawyer.  You would not be

Dow Constantine                                    June 16, 2011

1    disqualified, I don't think.

2        A.    In general, the Metro staff in bringing me up

3    to speed and introducing me to this policy made clear

4    their, I guess, belief that Metro had a, had an

5    obligation to accept advertising to an extent, but

6    that that obligation was limited, and that this policy

7    outlined the limitations, this language in section 6

8    outlined the limitations.

9        Q.    Do you recall a discussion about other ads or

10   posters that had been placed on Metro buses in the

11   past that had provoked reaction from the public?

12           MR. KOLDE:   Objection, asked and answered.

13           Go ahead.   Answer again.

14       A.    Yeah.  Well, actually, I do recall at that

15   meeting that somebody raised the issue of the atheist

16   ads that were placed about, I guess, a year or two

17   before, and, you know, they pointed out that some

18   people objected to those, but that the ads ran anyway.

19       Q.    Is this the ad where the slogan was something

20   to the effect, "Yes, Virginia, there is no God"?

21       A.    Correct.

22       Q.    All right.  Was there any discussion about

23   the accuracy of the content of the proposed SeaMAC ad?

24       A.    I don't remember there being discussion at

25   that meeting about whether the statements were true or

Dow Constantine                                    June 16, 2011

 1   sections like that throughout the schedule, and I was

 2   just wondering:  Do you just block out the whole time

 3   then, or what?

 4       A.   I think this was an attempt to try to keep

 5   free the week before Christmas, which is usually a

 6   slow time around King County government, so that the

 7   Executive could get some time off.  It didn't work out

 8   that way.

 9       Q.   Yes, sir.  Was it your intent, say, the week

10   before that you would have been taking time off during

11   the parts of your schedule that say "Do not schedule"?

12       A.   Yes.  I think the intent was that I would not

13   come into the office during that week unless needed.

14            (Exhibit-144 marked.)

15       Q.   Executive Constantine, Exhibit-144 is an

16   email that came to you from Rochelle Ogershok on

17   December 17, 2010 at a little bit after five in the

18   afternoon.  When you are done looking at it, let me

19   know, please.

20       A.   Okay.

21       Q.   Who is Ms. Ogershok?

22       A.   I think she is a communications or

23   spokesperson for one of our departments.

24       Q.   This email came to you --

25       A.   Well, it came to

Dow Constantine                                June 16, 2011

Page 59

1      A.    So, there were people who I know personally,

2  community leaders, et cetera, who attempted to contact

3  me through my front desk here generally, and, you

4  know, there are people who I would want to get back to

5  personally, but I was pretty much focused on the

6  internal discussions with the staff prior to making a

7  decision.  I know I spoke with some community members,

8  but I think those were after the decision was made.  I

9  can't be certain they were all after the decision was

10  made.

11      Q.    Do you know who Howard Gale is?

12      A.    If I'm remembering, he's the citizen who

13  asked to come in and meet with me, and I think it

14  was -- well, am I mixing him up with the guy who tried

15  to place the ad?

16      Q.    Probably not.

17      A.    Okay.  There was one gentleman, this may have

18  been Howard Gale, who asked to come in and meet with

19  me after the decision was made not to run the ad, and

20  I did agree to meet with him in this office.

21      Q.    All right.

22      A.    He, as I recall, if this is the same guy, was

23  someone who wanted the ads to run.

24      Q.    All right.  Did you speak with Jenny Durkan

25  before you made the decision to not have the ads run?

Dow Constantine                                          June 16, 2011

1      A.    I did.

2      Q.    How did that come about?

3      A.    Sometime after the course of that week, I

4  began trying to seek advice from law enforcement

5  officials about their recommendations as I was

6  becoming increasingly concerned due to the threats we

7  received, the potential for violence against our

8  system, disruption of our system, vandalism to our

9  system, and I do not know at this point how our

10 telephone conversation got set up, but I had a

11 telephone call, and Frank Abe of my staff listened in

12 on it with her, with Jenny's permission, and I asked

13 her as the U.S. Attorney for her analysis of that

14 situation, and any recommendations she might have.

15     Q.    Do you remember when that was?

16     A.    I think that was towards the end of this

17 process, so probably on the 22nd, which was Wednesday.

18     Q.    Was it before you made the decision?

19     A.    Yes.

20     Q.    Had you spoken with Ms. Durkan before in your

21 position as the King County Executive?

22     A.    I don't think on any business matters.  She's

23 been a prominent citizen around town as long as I've

24 been involved in elected office, and so when I run

25 into her at a public event, for example, but I don't

Dow Constantine                                    June 16, 2011

 1      Q.    Executive Constantine, I couldn't help but

 2   notice here in your office you have on your coffee

 3   table a dictionary for U.S. Arabic legal terms.

 4      A.    Yeah.

 5      Q.    How come that's here of all the books that

 6   one could have?

 7      A.    That was given to me by a visitor to the

 8   office, and it may well have been the gentleman who

 9   you mentioned earlier I invited into the office to

10   discuss this issue with me unsolicited.

11      Q.    Was there any specific advice that Ms. Durkan

12   gave you during the call you had?

13      A.    No.  I think so far as I can recall, these

14   notes pretty well sum up what she said.  She was not

15   willing to advise us as to whether or not to have the

16   ads run.  She shared her opinion about the

17   vulnerability of transit systems and the, and the

18   concern about doing anything that would heighten the

19   vulnerability or likelihood that they would be

20   targets, and gave me the name of the contact at the

21   FBI, and requested that I send him any threatening

22   messages.

23      Q.    Did Ms. Durkan share with you any information

24   that the U.S. Attorney's Office or the FBI or the

25   Department of Justice have about communications

Dow Constantine                                                    June 16, 2011

1    request?

2         A.    Yes.

3         Q.    Tell us about the call please.   What was

4    said?

5         A.    Well, I asked her for her opinion as a law

6    enforcement officer of whether we should run the ads.

7    I believe that she was reasonably well informed of the

8    volume and character of the communications that were

9    being received by the County.

10        Q.    How did you come to that view?

11        A.    I think I asked her, and we discussed for a

12   while the decision that I needed to make about whether

13   I should persist in having the ads run, or whether I

14   should change course.   She quite strongly recommended

15   as a law enforcement officer that -- well, she was

16   quite clear that she thought that the buses were very

17   vulnerable to attack, and that if she were in my

18   position, she would be concerned about the

19   communications that we were receiving and not run the

20   ads.

21        Q.    Did she have any specific information that

22   she disclosed to you about her concerns about the

23   vulnerability of the buses?

24        A.    I think she had the same basic information

25   about the threats that were being issued that I was

Dow Constantine                                          June 16, 2011

1    dealing with.  She had in addition to that, her

2    experience of many years as a law enforcement officer

3    and as the sheriff of King County.  She didn't say

4    anything more specific than that, other than buses are

5    very vulnerable.  It's easy to attack them, something

6    as simple as throwing, I believe her words were rocks

7    or bricks.

8        Q.   In fact, things like that happen on buses

9    frequently; right?

10                MR. KOLDE:  Object to the form of the

11   question.

12                Go ahead and answer.

13       A.   I don't think there's a lot of brick throwing

14   going on on our buses.

15       Q.   Are you aware that there are situations that

16   occur with Metro buses where people are injured

17   because people are shot or attacked or accosted on the

18   buses?

19                MR. KOLDE:  Object to the form of the

20   question, compound.

21                Go ahead and answer.

22       A.   Certainly incidents happen on the buses, on

23   the sidewalks, on the streets everyday.  They're not

24   necessarily related to bus advertising.

25       Q.   And what specific information of threats to

1  you given any information about the details of a plan
2  that the operations side of Metro had developed if the
3  ads were going to be run on the 27th?
4      A.    No.  I was given to understand that they were
5  developing plans to deal with potential disruptions,
6  or attempts to disrupt bus service.  The prospect, as
7  expressed by Mr. Bachtel, of drivers refusing to show
8  up because of concerns for their personal safety, I
9  did not have any specific information about any
10  contingency plans or the possibility of Metro being
11  able to make up for that refusal to come to work.
12     Q.    You did not have any information on that?
13     A.    No.
14     Q.    We got a double negative there.  Did you have
15  any information on that?
16     A.    I didn't know what Metro's specific plans
17  were, other than it was expressed to me it would be a
18  problem if our drivers were unwilling to drive our
19  buses.
20     Q.    All right.  Were you given any information
21  about the routes that would be run?
22     A.    No.
23     Q.    Or which streets the buses would run in?
24     A.    I was given general, the general idea that
25  the buses with the ads would be as all of our ads

Dow Constantine                                    June 16, 2011

1  placed all around the County, that it was not possible

2  to say that a particular ad would appear in a

3  particular neighborhood or on a particular route.

4      Q.   Were you given any information about steps

5  Metro operations were intending to take to protect the

6  buses when they were not being driven but were in the

7  bus barns?

8      A.   I don't remember any specific information.

9  Obviously the bus barn has security already, but I

10 know that Metro was making plans to the best of their

11 ability to protect their fleet against what seemed to

12 be fairly significant threats.

13     Q.   Were you told that the people at Metro who

14 were working on this operation plan had come up with a

15 plan that they concluded with work?

16          MR. KOLDE:  Objection, assumes facts not

17 in evidence.

18          Please answer.

19     A.   No, I was not told that they had a plan that

20 they thought would work.

21     Q.   Okay.  In paragraph 14, there's some

22 information here about your discussion with

23 Ms. Durkan, and some of the language that you have

24 attributed to her is in quotes.  Do you see that?

25     A.   Um-hum.

# EXHIBIT N

Page 1

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

---------------------------------------------------------

SEATTLE MIDEAST AWARENESS          )  No.

CAMPAIGN, a Washington             )  2:11-cv-00094-RAJ

non-profit corporation,            )

                Plaintiffs,        )

        vs.                        )

KING COUNTY, a municipal           )

corporation,                       )

                Defendants.        )


---------------------------------------------------

        Deposition Upon Oral Examination Of

                MICHAEL L. DeCAPUA

---------------------------------------------------

June 21, 2011

500 Fourth Avenue, Suite 900

Seattle, Washington




REPORTED BY:  PEGGY FRITSCHY HAMILTON, RPR, CSR, CLR,

29906/No. 2704

Michael L. DeCapua                                    June 21, 2011

Page 67

 1      Q.    And so by following it, I mean, how does that

 2   happen?  Do you go to your computer, and that's one of

 3   you favorites?

 4      A.    It's not a favorite.  I check it

 5   occasionally.

 6      Q.    What about Al Jazeera?  Do you ever look at

 7   that?

 8      A.    Occasionally.

 9      Q.    Are there any other Arabic or Middle Eastern

10   or Southeast Asian websites that you look at?

11      A.    No.

12             (Exhibit-161 marked.)

13      Q.    Mr. DeCapua, we're going to look at a few

14   documents.  Most of them are emails.  I can tell you

15   having to lay my own eyes on many of these, many of

16   the exhibits contain much of the same email traffic.

17   Because of the way it came to us, it looked like it

18   started in the same place and went in different

19   directions.  Why don't you take a look at this one.

20   This is a good launching pad, Exhibit-161.  It's a

21   four-page document, and when you are done, let me

22   know, please.

23      A.    Okay.

24      Q.    So, Exhibits-161, if we could go to the third

25   page to begin.  There's an email from somebody named

Michael L. DeCapua                              June 21, 2011

Page 68

1    Kim Goodrich that was sent to Kevin Desmond on

2    December 22, 2010 at 4:10 a.m., assuming that's the

3    correct information.  Do you see that?

4         A.   Yes, I do.

5         Q.   You've seen this email before; is that right?

6         A.   Yes.

7         Q.   This email refers to the Al-Qassam Brigade.

8    That is the website you were referring to?

9         A.   Yes.

10        Q.   This email from Ms. Goodrich, or

11   Mr. Goodrich, came to you at some point; is that

12   right?

13        A.   Yes.

14        Q.   How did it get to you?

15        A.   Mr. Desmond forwarded it to me on May 22nd,

16   at 7:29 a.m.

17        Q.   You know that because on the second page of

18   the exhibit there's an email where he sent the

19   Goodrich email to you; right?

20        A.   Yes.

21        Q.   Do you believe that's accurate:  December 22,

22   2010, 7:29 a.m.?

23        A.   Yes.

24        Q.   Had you ever heard of Al-Qassam before that?

25        A.   Yes.

Michael L. DeCapua                                    June 21, 2011

Page 86

1     A.    Not prior to the receipt of the December 22nd

2   email.

3     Q.    So, when you wrote to Mr. Tisdale and

4   Mr. Spinden on the morning of December 22, you said

5   that "The Metro bus ad controversy has far outreached

6   the First Amendment issues."  Do you see that?

7     A.    I do.

8     Q.    What's the tipping point for you on that one?

9   I mean, at what point is a controversy outreaching the

10  First Amendment?

11            MR. KOLDE:   Objection, calls for a legal

12  conclusion, vague.

13            Go ahead and answer.

14    A.    All of the discussions I had heard and the

15  KING 5 News story dealt with First Amendment issues.

16  There was no mention of a potential terrorist threat,

17  there was no mention of emails threatening service

18  disruption, there was no emails or phone calls

19  mentioning anything along those lines.  What we are

20  looking at is strictly from a security standpoint.

21  There was the First Amendment issue, but now there's a

22  security issue, and the security issue in my mind was

23  a compilation of the totality of the things that we

24  were now looking at and where our visibility was

25  directed.

Michael L. DeCapua                                    June 21, 2011

                                                        Page 106

1      A.    Right.

2      Q.    Did Captain Mulligan ever respond to this

3   email to you?

4            MR. KOLDE:   Objection, calls for

5   speculation.

6            Go ahead.

7      A.    I don't recall if she did, or not.

8      Q.    Did Sergeant Hurley respond to this email,

9   respond to you after he got this email?

10     A.    Again, specifically I don't remember if they

11  responded to this email.

12     Q.    Were there any other pieces of information

13  that you asked Metro Transit Police to forward to the

14  JTTF concerning the SeaMAC Metro bus ad issues of

15  December 2010?

16     A.    Transit Police indicated to me that they had

17  forwarded the information that they had received from

18  other Metro sources to JTTF.

19     Q.    Okay.  Did you ask Metro Transit Police to

20  forward any specific information to the JTTF about the

21  SeaMAC Metro bus ad issues?

22     A.    Other than this, no.

23     Q.    Other than what we see here in Exhibit-163?

24     A.    No.

25

Michael L. DeCapua                                          June 21, 2011

Page 115

 1   particular event, no.

 2       Q.   Do you know what it is?

 3       A.   No, I don't.

 4       Q.   Have you ever visited it?

 5       A.   No.

 6       Q.   You passed Mr. Larm's email onto some folks

 7   at your end with your email there at 6:05 p.m.; right?

 8       A.   Correct.

 9       Q.   Do you believe that this is the first time

10   that you passed Mr. Larm's email on as reflected here

11   in Exhibit-165?

12       A.   Yes.

13       Q.   Was there any follow-up by you after sending

14   this?

15       A.   Yes.

16       Q.   What was that?

17       A.   On the last page of Exhibit-165, it indicates

18   that the State Fusion Center is working on a

19   situational assessment, and Seattle PD would like to

20   collaborate with Metro and other agencies, and my

21   response to Doug is yes, we are looking for a

22   situational assessment.  Since the JTTF declined to

23   provide one, we went through The Fusion Center

24   requesting that situational assessment, and in that

25   same conversation, Mr. Larm indicated that there was a

Michael L. DeCapua                                    June 21, 2011

Page 116

 1   great deal of concern amongst the Seattle Police

 2   Department tactical teams and staff regarding where

 3   buses with these ads would be physically running in

 4   the street, and if they were going by the Jewish

 5   Federation Center.

 6        Q.   Did SPD Intel do a strategic assessment?

 7        A.   We asked for a situational assessment.  I

 8   have never seen anything from a State Fusion Center,

 9   and as I mentioned, JTTF declined to provide us one.

10        Q.   I think earlier you said they refused, JTTF.

11   Okay.  My question was strategic assessment.  Did SPD

12   Intel provide a strategic assessment in connection

13   with the SeaMAC Metro bus ads?

14             MR. KOLDE:  I believe that's misstating

15   his prior testimony.  The terminology is situational

16   assessment.

17             MR. GRANT:  I see an email that does say

18   situational assessment, and that's his -- he has his

19   answer there.  Now I'm asking whether they did a

20   strategic assessment.

21             MR. KOLDE:  Object to the form of the

22   question.

23             If you understand it, please answer.

24        A.   I don't know what they did in terms of their

25   assessment internally.  We would not necessarily see

Michael L. DeCapua                                    June 21, 2011

 1   that.

 2        Q.   Do you know if SPD did a situational

 3   assessment?

 4        A.   Yes, they did.

 5        Q.   Did you see it?

 6        A.   No.  That was the substance of the phone call

 7   from Mr. Larm regarding the Jewish Federation Center

 8   and the buses.

 9        Q.   Is that SPD intelligence thought it would be

10   a good idea to avoid the Jewish Center?

11        A.   No -- well, again, I'm not going to

12   characterize what they said, because again, it was a

13   phone call.  What I'm trying to get to is the fact

14   that SPD was concerned from a situational standpoint

15   with respect to where our buses were running.

16        Q.   Okay.

17        A.   How that fit into their assessment, I don't

18   know.

19        Q.   Do you know if SPD was provided with

20   information about the operations part of the bus ad

21   campaign:  which routes, which buses, which times?

22        A.   Yes, they were.

23        Q.   Were you part of the discussions leading up

24   to the development of that part of the Metro response?

25        A.   No.

Michael L. DeCapua                                    June 21, 2011

                                                      Page 154

    1       A.    She drafted it.

    2       Q.    Yes, sir.  Did she think it was a good plan?

    3             MR. KOLDE:   Objection, calls for

    4     speculation about her state of mind.

    5             Go ahead and answer.

    6       A.    I think you would have to ask her that

    7     question.  The rest of us thought it was a good plan.

    8       Q.    When you say the rest of it, who's that?

    9       A.    That would be myself, and subsequently

   10     Mr. Harrington upon his return, the Seattle Police

   11     Department, and other agencies that reviewed it.

   12       Q.    Can you tell us who they were?

   13       A.    TSA was one, FTA was another.  This is the

   14     plan we had to send forward with the transit security

   15     grant request to reprogram the money, and this is also

   16     the plan that Kevin stuck his head in the door to

   17     remind me to encourage her to send to him.

   18       Q.    If we go to the first page, Exhibit-176, at

   19     the top Mr. DeCapua, Kevin Desmond is sending you an

   20     email, and it's just him to you, December 23, 2010 at

   21     11:29 p.m.  Do you see that?

   22       A.    Yes.

   23       Q.    And he's telling you that the ad will not be

   24     posted, nor will any counter ads.  Do you see that?

   25       A.    Right.

# EXHIBIT O

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

----------------------------------------------------------------

SEATTLE MIDEAST AWARENESS          )

CAMPAIGN, a Washington non-profit )

corporation,                       )

                   Plaintiff,     )

  vs.                              ) No. 11-cv-00094-RAJ

KING COUNTY, a municipal           )

corporation,                       )

               Defendant.     )

----------------------------------------------------------------

30(b)(6) Deposition Upon Oral Examination of

KEVIN DESMOND

----------------------------------------------------------------

500 Fourth Avenue

Ninth Floor

Seattle, Washington

DATE:  May 12, 2011

REPORTED BY:  Christina Atencio, CCR #2749

30(b)(6) - Kevin Desmond                              May 12, 2011

Page 9

1              MR. GRANT:  Indeed.

2       A.  If I leave something out, if I inadvertently omit

3   something that's not on the formal org chart, that can be

4   accessed elsewhere.  I'm perfectly happy to draw my org

5   chart.

6       Q.  Okay.  Well, let's do that.

7       A.  It's an odd request, anyway.  Okay.  GM means me.

8       Q.  I can tell you that artwork relative to distance of

9   the lines, those kinds of things, are not important.  We're

10  mostly trying to see visually how everybody fits in with

11  each other.

12      A.  I mean I'm going to leave some things out because I

13  can't necessarily do this fully by memory.

14      Q.  All right.

15      A.  So I'm the general manager of King County Metro

16  Transit.  King County Metro Transit is a division of the

17  King County Department of Transportation, which is a

18  multi-modal organization consisting of transit roads,

19  airport, marine and fleet.  I report to the King County

20  Department of Transportation director, Harold Taniguchi, who

21  reports through to the King County Executive's office.

22          In my job I have numerous direct reports who

23  represent the various different operating sections of the

24  agency.  I also have a deputy general manager who has

25  numerous sections reporting to him.  So the organization

Page 10

1    from a formal reporting status is split that way.  So this

2    would be operations, vehicle maintenance, power and

3    facilities.

4         Q.  I'm sorry.

5         A.  Sales and customers.

6         Q.  I'm sorry.  What was the third one?

7         A.  Operations, vehicle maintenance, power and

8    facilities, --

9         Q.  Oh, okay.  Thank you.

10        A.  -- sales and customer services, paratransit, and

11   ride share operations.  Under the deputy general manager is

12   security, which is the Metro Transit Police, safety,

13   administration and budget, service development, and design

14   and construction.  And he also has the human resources,

15   which is on a dotted line to other people outside of our

16   organization.  The human resources department; it's a major

17   operation.  I'm probably -- oh, I have rail, rail

18   operations.  And again I'm probably leaving something out,

19   so that's the basic org chart.

20        Q.  It sounds like what you're saying, it's at least

21   this.  There's a couple --

22        A.  It's at least.

23        Q.  Can we go with that?

24        A.  Yes.

25             MR. GRANT:  Let's have this marked.

30(b)(6) - Kevin Desmond                              May 12, 2011

                                                              Page 11

1           (Exhibit 23 marked.)

2      Q.   It's been marked as Exhibit 23.  You said Harold

3 Taniguchi is the current director?

4      A.   Yes.

5      Q.   You are the general manager and were in 2010; is

6 that correct?

7      A.   That's correct.

8      Q.   Who is the current deputy general manager?

9      A.   Jim Jacobson.

10     Q.   Who was in that position --

11     A.   Same person.

12     Q.   -- in 2010?  All right.  So the boxes that are under

13 the deputy general manager included Metro Transit; is that

14 right?

15     A.   Included what?

16     Q.   Metro Transit Police?

17     A.   Yes.

18     Q.   So that function reports directly to the deputy

19 general manager, if I understand Exhibit 22?

20     A.   The contracted organization of the Metro Transit

21 Police report to the deputy general manager.  There's also a

22 reporting responsibility through the sheriff's office.  So

23 we have a contract through the sheriff for the provision of

24 Metro Transit Police services.  They're all sheriff

25 deputies.  So they are employees of the sheriff organization

30(b)(6) - Kevin Desmond                              May 12, 2011

Page 12

 1   but as a contract operation they are responsive to us.  We
 2   set their program.  But again it's a complicated
 3   relationship because they work for the sheriff and they
 4   operate under the policies and procedures and the general
 5   oversight of the sheriff.
 6        Q.  Who does Metro Transit Police report to on Exhibit
 7   23?
 8        A.  The deputy general manager.
 9        Q.  And is it through the Metro --
10        A.  It's security.
11        Q.  Security, all right.
12        A.  Secretary is Metro Transit Police.  It's primarily
13   Metro Transit Police.  It's not solely Metro Transit Police.
14        Q.  And in 2010 who was the person in charge of the
15   security box on Exhibit 23?
16        A.  Major Dave Jutilla.
17        Q.  And is Major Jutilla a Department of Transportation
18   employee or sheriff?
19        A.  He's an employee of the sheriff.
20        Q.  Okay.
21        A.  He's a uniformed officer of the sheriff's department
22   as a major.
23        Q.  What about advertising?  What's the box that the
24   advertising policy for Metro Transit fits in?
25        A.  The advertising --

30(b)(6) - Kevin Desmond                          May 12, 2011

Page 13

1        MS. RITCHIE:  Counsel, if I could just interrupt for

2   a minute.  You're referring to Exhibit 23 when you're

3   talking about the different boxes, correct?

4        MR. GRANT:  Absolutely.

5     A.  The advertising function is under sales and customer

6   services.  And the group that the advertising function

7   reports to is the marketing group.  So the advertising --

8   the person -- the project manager in charge of the

9   advertising contract reports up through the supervisor of

10  marketing who reports to the manager of sales and customer

11  services.

12    Q.  In 2010 who was in charge of the box that is sales?

13    A.  Darwin Campbell is the manager of sales and customer

14  service.

15    Q.  And back in 2010?

16    A.  Correct.

17    Q.  And the box just below her?

18    A.  Just above her is Bob Virkelyst, the supervisor of

19  marketing.

20    Q.  And then advertising?

21    A.  Sharron Shinbo.

22    Q.  Are these three people Department of Transportation

23  employees?

24    A.  Yes.

25    Q.  What in 2010 was King County's practice for a review

# EXHIBIT P

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

-------------------------------------------------------

SEATTLE MIDEAST AWARENESS          )   No.

CAMPAIGN, a Washington             )   2:11-cv-00094-RAJ

non-profit corporation,            )

                  Plaintiffs,      )

        vs.                        )

KING COUNTY, a municipal           )

corporation,                       )

                  Defendants.      )


---------------------------------------------------

        Deposition Upon Oral Examination Of

                KEVIN DESMOND

---------------------------------------------------

May 31, 2011

500 Fourth Avenue, Floor 9

Seattle, Washington




REPORTED BY:  PEGGY FRITSCHY HAMILTON, RPR, CSR, CLR,

29906/No. 2704

Kevin Desmond                                        May 31, 2011

Page 14

 1   display on a King County Metro bus?

 2              MS. RITCHIE:   Objection, it's a compound

 3   question.

 4       A.   In connection with consultations with

 5   Ms. Shinbo and the PAO, yes, I did.

 6       Q.   PAO, that's the prosecuting attorney's

 7   office?

 8       A.   Yes.

 9       Q.   That would include Mr. Ramels and

10   Ms. Carlson?

11       A.   Yes.

12       Q.   Were there other King County prosecuting

13   attorneys that were involved in the decision or

14   leading up to the decision in November 2010 concerning

15   the SeaMAC ad and the advertising policy?

16              MS. RITCHIE:   And I'll object with respect

17   to whether or not this question seeks to obtain

18   information that's protected by the attorney-client

19   privilege, and again, caution the witness.

20       Q.   Right now were there --

21       A.   Not to my knowledge.

22       Q.   All right.  Let's go back to the earlier

23   question.  Had you yourself come to a conclusion about

24   whether the SeaMAC ad qualified for display based on

25   the King County advertising policy before the

Kevin Desmond                                                May 31, 2011

Page 15

1    Executive did?

2        A.    Yes.

3        Q.    What was your opinion?

4        A.    That the advertising, that the copy submitted

5    met our policy guidelines.

6        Q.    Was it disqualified by any of the

7    restrictions in your view?

8              MS. RITCHIE:  Objection, for purposes of

9    timing.  What timeframe are you talking about?

10       Q.    The same timeframe:  Before it was submitted

11   to the Executive in November 2010.

12       A.    At that time -- please repeat your question.

13       Q.    Yes, sir.  Were there any restrictions that

14   disqualified the SeaMAC ad from being displayed on

15   King County buses when you looked at it before it was

16   submitted to the Executive in November 2010?

17       A.    At that time, no.

18       Q.    Other than attorneys, Mr. Desmond, were there

19   other King County employees who had reviewed the

20   SeaMAC ad and compared it to the King County

21   advertising policy before it was submitted to the

22   Executive in November 2010?

23             MS. RITCHIE:  Objection, calls for

24   speculation.

25             But go ahead and answer, if you can.

Kevin Desmond                                          May 31, 2011

1    what she thought about it, what she would do with it,

2    what I thought about it, what I thought we should do

3    about it, and she moved on and I moved on.

4        Q.   What did she think should be done?

5        A.   I do not recall specifically the conversation

6    that Captain Mulligan and I had and what she suggested

7    she would be doing and what I instructed her to do.

8    She was the acting police chief that week, so I would

9    have expected her to follow-up as appropriate with

10   Metro Transit Police and to begin to make various

11   different inquiries with our law enforcement friends.

12       Q.   You said she was the acting police chief.

13   You mean for Metro Transit Police?

14       A.   Yes, because Major Jutilla, I believe, was on

15   vacation, so Captain Mulligan was acting on his

16   behalf, yes.

17                  (Reporter read back as requested

18                  the last answer.)

19       Q.   Do you remember what any of those steps were

20   about the photographs?

21       A.   I do not recall the specifics at this time.

22       Q.   Did you ever talk to Harold Taniguchi about

23   the photocopies of the pictures that Lisa Mulligan

24   showed you?

25       A.   Not at that time.  Harold was on vacation.

Kevin Desmond                                          May 31, 2011

Page 80

 1   December 20, say, at 8:30 in the morning, just about
 2   the time you walk into the staff meeting before you
 3   learn about the public comments about the SeaMAC ad,
 4   do you know what the structure was at Metro to handle
 5   incoming comments concerning a particular ad?
 6       A.   Well, there's not a specific structure for
 7   incoming ads.  There's a particular structure for
 8   incoming public inquiries.
 9       Q.   That's what I'm asking about.  Right.  So,
10   what was the structure for comment coming in about an
11   ad that either was going to be displayed on a bus or
12   was already being displayed?
13       A.   As I said, there's not a structure specific
14   to an ad.  There's a structure for public comment, so
15   the normal course of events for public comment, public
16   complaints is that it ultimately goes to Carri
17   Brezonick.  She is in charge of the group within Metro
18   that receives email comments, the customer comments'
19   site on our website.  She's in charge of the people
20   who receive telephone calls, who receive the
21   complaints from our complaint line.
22            When other people within the organization,
23   such as me or the director 's office, for example, or
24   the Executive's office receive complaints and comments
25   from the public, they would normally route them either

Kevin Desmond                                          May 31, 2011

1    via me or directly to Ms. Brezonick for handling, and

2    she has a system in place for how to respond to the

3    types of -- you know, the multiplicity of types of

4    things that we got.

5         Q.   You mentioned earlier that leading up to the

6    briefing with the Executive in November 2010 that you

7    had recognized that the SeaMAC ad was controversial;

8    right?

9         A.   Potentially controversial, yes.

10        Q.   And Metro had approved and displayed ads that

11   were controversial in the past; right?

12        A.   Right.

13        Q.   Was there any advanced planning in connection

14   with the SeaMAC ad in terms of bus routing or which

15   buses the ad would go on given that?

16        A.   No.

17        Q.   Do you know if that had ever occurred with

18   any earlier ads?

19        A.   To my knowledge, no.

20        Q.   Is that something that you would know about?

21        A.   In my tenure at Metro, I would have known

22   about, yes.

23        Q.   Okay.  Tenure as general manager?

24        A.   Yes.

25        Q.   Did you get information from The Executive's

Kevin Desmond                                    May 31, 2011

Page 85

1  awareness.

2       Q.    Who were you working with, Mr. Desmond, to

3  try to figure out how many communications everybody

4  was talking about?

5       A.    Well, primarily Ms. Brezonick, because she is

6  the focal point, but there was more than that.

7  Ms. Thielke, as you know, received a lot of

8  communications, Laurie Brown received a lot of

9  communications.  It was too early to, I think,

10 understand the volume of communications coming from

11 out -- or being received outside of our organization.

12 We just knew that it was a lot.

13      Q.    Was there an effort to try to get people at

14 King County who were getting outside communications to

15 funnel them to one particular source?

16      A.    When?  At what point in time?

17      Q.    On Monday, December 20.

18      A.    I believe during the course of the day as we

19 were understanding the information was coming from all

20 over the place, there were discussions to figure out

21 how to in effect create a sort of a central

22 clearinghouse for all the information.  Again, that

23 would have been Ms. Brezonick.  That was her

24 responsibility in the organization.  I do not believe

25 we were attempting to do that from the outside of the

Kevin Desmond                                          May 31, 2011

1   to collect the enormity, you know, the totality of

2   everything that was coming in from all over the place.

3   I mean, City Council members were getting this stuff,

4   too.

5       Q.   City of Seattle?

6       A.   City of Seattle.  Different government, so

7   that was not my focal point, per se.  I was overseeing

8   all of this.  I knew that we were collecting this

9   information, but the specifics of when, who, and how,

10  you'd have to ask other people.

11      Q.   Would that include Ms. Brezonick?

12      A.   Yes.

13      Q.   Are you aware of anybody else within Metro

14  that was doing the same type of task besides

15  Ms. Brezonick?

16      A.   The same type of task, what type of task do

17  you mean?

18      Q.   We're talking about gathering the

19  communications, emails and phone calls, that were

20  coming in to the County about the SeaMAC ad, and

21  trying to figure out how many there were and what

22  their content was.

23      A.   Gathering and assessing the content, I

24  believe Carri was in charge of that.  She was at that

25  point, I believe, put in charge with that.  That

Kevin Desmond                                          May 31, 2011

1     A.    What we had seen as a result of the KING 5

2   story, and that the flurry of emails over the weekend

3   was being generated by one or more pro-Jewish or

4   pro-Israeli websites that were being broadcast

5   throughout the United States and internationally, as a

6   matter of fact, and as a result a lot of people who

7   subscribe to those websites were writing to us.

8     Q.    And what did that mean to you in terms of

9   your assessment of the situation?

10    A.    I just wanted to make sure that people who at

11  that point in time, which was middle of the day on the

12  first day of the crisis, understood that a lot of the

13  complaints were coming from out of state, out of our

14  region.  A lot of them were coming from King County.

15    Q.    But is there any particular significance that

16  they were from out of state?

17    A.    Other than what I just said, no.

18    Q.    The fact that they were coming from out of

19  state, did that have any impact on your evaluation of

20  what best to do about local interest or opinions?

21    A.    At that point in time, we were five hours

22  into a mounting crisis situation, so that was an

23  observation that I had in the context of probably

24  other dialogue that we were having with a variety of

25  different folks.

Kevin Desmond                                          May 31, 2011

                                                        Page 164

 1                 (Reporter read back as requested the

 2                 question that was pending.)

 3       A.    Yes.

 4       Q.    Do you remember how many of those you saw

 5   during the week of December 20?

 6       A.    I saw a lot of them, because I got the emails

 7   this time.  This time my name somehow got associated

 8   with the campaign to issue those emails, so I got

 9   quite a few of these directly, all of which I sent to

10   Carri Brezonick.

11       Q.    Did you consider the communications

12   protesting the display of the ad to be some sort of a

13   campaign?

14       A.    To a degree, yes.

15       Q.    And what do you mean?

16       A.    Well, as I said, as a result of the KING 5

17   story, the fact that we got so many emails from so

18   many different places around the globe so quickly, and

19   as I recall there was other evidence of where that

20   came from, that it was either one or more pro-Israeli,

21   pro-Jewish websites that picked up the KING 5 story,

22   sent that out to subscribers or people who otherwise

23   read those websites, and as a result of, we got

24   inundated with complaints.

25       Q.    Were you aware of any effort that King County

Kevin Desmond                                                    May 31, 2011

Page 165

 1   engaged in to try to work backwards and figure out who

 2   was behind that campaign?

 3       A.   No.

 4            (Exhibit-71 marked.)

 5       Q.   Have you looked at Exhibit-71?

 6       A.   Yes.

 7       Q.   Who is Detective Hoyle?

 8       A.   I don't know.  I don't recall what this was

 9   in reference to.

10       Q.   Do you remember speaking with Lisa Mulligan

11   about him on December 20, 2010?

12       A.   I do not recall this exchange or Detective

13   Hoyle.  Captain Mulligan would have to refresh my

14   memory.

15       Q.   Okay.

16            (Exhibit-72 marked.)

17       Q.   Exhibit-72, I think, begins with an email

18   that came to you from somebody by the name of Kim

19   Goodrich; right?

20       A.   Apparently so, yes.

21       Q.   Do you know who Kim Goodrich is?

22       A.   No.

23       Q.   Did you read this email when it came to you?

24       A.   Probably.

25       Q.   At the time this came in, Mr. Desmond, had

Kevin Desmond                                              May 31, 2011

 1   Sharron was to refresh my memory on when and how she

 2   brought these ads to my attention and how we addressed

 3   them.

 4       Q.    Okay.  When you say how you addressed them,

 5   you mean how you reviewed them with Ms. Shinbo?

 6       A.    Sharron and I reviewed -- took a look at

 7   these ads, and when I looked at the ads, the creatives

 8   for both ads, my response very quickly was these would

 9   violate our policy, and we wouldn't post these ads

10   under any circumstance.

11       Q.    Why did you say we wouldn't post them under

12   any circumstance?

13       A.    The ad copy itself was extremely incendiary.

14   The images on the ads and the language is not

15   something that would comport with the guidelines, in

16   my estimation.

17            MR. GRANT:  Are you talking about

18   Exhibit-75 and 76?

19       A.    Yes, sir.

20            MR. GRANT:  Thank you.

21       Q.    As well as the ad that was not given to you

22   today, the third one that you recall, is it the same,

23   the same reason?

24       A.    I would have to look at the other ad.

25       Q.    We'll go with 75 and 76 today.

# EXHIBIT Q

Page 1

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

--------------------------------------------------------

SEATTLE MIDEAST AWARENESS          )   No.

CAMPAIGN, a Washington             )   2:11-cv-00094-RAJ

non-profit corporation,            )

                Plaintiffs,        )

        vs.                        )

KING COUNTY, a municipal           )

corporation,                       )

                Defendants.        )


---------------------------------------------------

30(b)(6) Deposition Upon Oral Examination of:

                  KING COUNTY

          DESIGNEE: CAPTAIN LISA MULLIGAN

---------------------------------------------------

May 10, 2011

500 Fourth Avenue, Floor 9

Seattle, Washington



REPORTED BY:  PEGGY FRITSCHY HAMILTON, RPR, CSR, CLR,

29906/No. 2704

30(b)(6) - Captain Lisa Mulligan                    May 10, 2011

                                                        Page 13

 1   operations part of the house, who are the two direct

 2   reports there?

 3        A.   Patrol and what's written out is BEES.  It's

 4   and acronym for bicycle enforcement and emphasis

 5   squad.

 6        Q.   All right.  Thank you.

 7             During the November, December 2010,

 8   January 2011 timeframe, where did you fit on this

 9   organizational chart?

10        A.   I was the administrative captain.

11        Q.   Who was the operations captain?

12        A.   Captain Bob Baxter.

13        Q.   Who was the major?

14        A.   Major Dave Jutilla, J-U-T-I-L-L-A.

15        Q.   Who were the direct reports to you during

16   that period of time?

17        A.   During the month of --

18        Q.   Well, when I say the period of time, I'm

19   referring to November and December of 2010 and January

20   of 2011.

21             MR. KOLDE:  Counsel, part of the issue is

22   that particular week that this happened, Captain

23   Mulligan was the acting major, so just that's why

24   she's asking for clarification.

25             MR. GRANT:  All right.

30(b)(6) - Captain Lisa Mulligan                    May 10, 2011

Page 14

1      Q.    That helps, because I didn't know that.

2            MR. KOLDE:   That's why she's here today.

3      Q.    And that particular week would be roughly

4    December 17th, to December 23?

5      A.    The week of the 20th through the 25th I was

6    acting major.

7      Q.    Where was Major Jutilla during that period of

8    time?

9      A.    Specifically?

10      Q.    I think just in terms of a designation within

11    his employment would be fine.

12      A.    Vacation.

13      Q.    Very well.  I don't think we need to know or

14    he wants to share where that may have been.  He was on

15    a vacation.

16      A.    Yes.

17      Q.    And the policy is that somebody at the

18    captain level would fill in for that position during

19    that period of time, and you did it?

20      A.    I did.

21      Q.    Had you ever served in that capacity before

22    that particular time?

23      A.    Yes.

24      Q.    Who were the people that were reporting to

25    you during -- when you were serving as the acting

# EXHIBIT R

Page 1

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

------------------------------------------------------------

SEATTLE MIDEAST AWARENESS            )

CAMPAIGN, a Washington non-profit )

corporation,                         )

                Plaintiff,      )

  vs.                                )  No. 11-cv-00094-RAJ

KING COUNTY, a municipal             )

corporation,                         )

                Defendant.       )

------------------------------------------------------------

Deposition Upon Oral Examination of

CAPTAIN LISA MULLIGAN

------------------------------------------------------------

500 Fourth Avenue

Ninth Floor

Seattle, Washington

DATE:  June 9, 2011

REPORTED BY:  Christina Atencio, CCR #2749

Captain Lisa Mulligan                                    June 9, 2011

                                                         Page 20

 1     Q.  I'm just trying to make sure I get the terminology
 2   right.
 3     A.  Well, that's not a technical term either.  You're
 4   asking what I would call it.  That's what I would call it.
 5   It's our day-to-day operating function so...
 6     Q.  All right.  I mean the day-to-day operating function
 7   of the MTP is to make sure that the buses are as safe as
 8   possible for the drivers and the passengers, right?
 9     A.  Yes, among other things, yes.
10     Q.  What other things are there?
11     A.  Well, employees.  Maybe I didn't hear you say that.
12     Q.  I didn't say that.  So employees?
13     A.  General safety, education.
14     Q.  Could I stop you at employees for a moment?
15     A.  Sure.
16     Q.  Which employees?  King County?
17     A.  Metro Transit employees.
18     Q.  What are the functions that Metro Transit Police
19   provide to employees of Metro?
20     A.  The same that we provide for the public.  You know,
21   when we're keeping the public safe, there's a good chance
22   we're keeping the employees safe and vice versa.
23     Q.  Other than drivers, what -- bus drivers -- what type
24   of Metro employees would Metro Transit Police be serving?
25     A.  We see ourselves as serving all of them; so base

Captain Lisa Mulligan                                      June 9, 2011

Page 51

```
 1      A.  Yes.

 2      Q.  And how did -- what was the division?

 3      A.  The first week, this January 20th through 25th I was

 4  acting; and then the following week when I was on vacation,

 5  Captain Baxter was acting major.

 6      Q.  Okay.  Were the two of you serving as acting major

 7  at the same time?

 8      A.  No.

 9      Q.  Were you scheduled to be on vacation sometime during

10  the week of December 20?

11      A.  No.

12      Q.  Were you scheduled to be on vacation the following

13  week?

14      A.  Yes.

15      Q.  So the week of December 27?

16      A.  Yes.

17      Q.  Did you go on your vacation?

18      A.  I did.

19      Q.  Well done.  What is it that Major Jutilla told you

20  about the SeaMAC ad when he said that he had been aware of

21  it before the news story?

22      A.  Oh, no recollection about specifics.  I just know he

23  was aware.  It had been discussed at a meeting at some point

24  and he was aware of it.  I have no recollection of anything

25  specific.
```

Captain Lisa Mulligan                                    June 9, 2011

Page 53

1        A.   It does.

2        Q.   Was that kind of the situation here?

3        A.   Yes, but not -- yes.

4        Q.   Were you on duty either Saturday the 18th or Sunday

5    the 19th of December?

6        A.   No.

7        Q.   Were you on duty December 20?

8        A.   Yes.

9        Q.   The Monday.  Did you have discussions with anybody

10   about the news story after you saw it on television but

11   before you showed up to work on December 20?

12       A.   My husband.

13       Q.   Okay.  Let's not talk about that.

14       A.   Okay.

15       Q.   Did you have contact with anybody at MTP concerning

16   the news story, the SeaMAC ad, after you saw it on

17   television but before you showed up to work on Monday,

18   December 20?

19       A.   No.

20       Q.   What's the next thing you remember about what you

21   were doing or how you came to be aware of the SeaMAC ad and

22   the issues surrounding that.  You saw it on TV.  What was

23   the next thing?

24       A.   One of our sergeants called for a meeting to give me

25   copies of -- a couple of photographs that had been found

Captain Lisa Mulligan                                    June 9, 2011

Page 54

 1    over the weekend to be sure I had them and to be sure that I

 2    -- if I felt it was appropriate, pass them along to Metro

 3    employees.

 4         Q.   Was this Sergeant Lockhart?

 5         A.   No.

 6         Q.   Who was it?

 7         A.   It was Sergeant Rick Connelly.

 8         Q.   Did you see the photos that day or copies of the

 9    photos?

10         A.   Yes.

11         Q.   Did Sergeant Connelly show them to you?

12         A.   Yes.

13         Q.   Is that the first time you saw those?

14         A.   In this context, yes.

15         Q.   Have you seen them in other contexts?

16         A.   There is one photograph that's pretty highly

17    publicized I have seen before in different situations,

18    settings.

19         Q.   Tell me about that, please.

20         A.   It's a photograph of a double-decker bus.  I believe

21    it's in London.  It's been blown apart on a city street.

22         Q.   And in what context had you seen that picture

23    before?

24         A.   I believe I've seen it in the news.  I think I've

25    seen it in training environments.  I think it's pretty

Captain Lisa Mulligan                                    June 9, 2011

Page 55

1    widely publicized -- and maybe not the exact picture but

2    that scene.

3        Q.  Do you remember if there was any message that came

4    with the pictures?

5        A.  There was a message that was written on -- the same

6    message written on all three pictures.

7        Q.  Which was what?

8        A.  From memory, two names, Taniguchi and Desmond --

9        Q.  These are Metro employees?

10       A.  Kevin Desmond is the general manager of Metro, and

11   Harold Taniguchi is the elected official in the Department

12   of Transportation, as I understand it anyway.  So the

13   question again was...

14       Q.  Did you see any other writing besides their names?

15       A.  Yes.  Something it was around no to -- language in

16   quotes -- no to Muslim bus ads -- or, yeah -- no to

17   anti-Muslim bus ads or something along those lines.  I would

18   have to see them to refresh my memory.

19       Q.  Do you remember anything else that was on this?

20       A.  On any of them or just -- any written language?

21       Q.  Yes, ma'am.

22       A.  No, not that I remember.

23       Q.  There was the picture, whatever those showed,

24   whatever the picture displayed and then there was some

25   handwriting.

Captain Lisa Mulligan                                    June 9, 2011

Page 56

1      A.  Right.

2      Q.  Do you remember anything else?

3      A.  Besides the name and phrase and the phrase that I'm

4   kind of blotching, no, I don't remember anything else.

5      Q.  What did Sergeant Connelly say when he showed these

6   to you?

7      A.  He said I figured you would probably want to see

8   this before your general manager's meeting and basically

9   told me where they were found and just kind of summarized

10  the incident for me.

11     Q.  What did he say?

12     A.  He said they had been left under the door under the

13  customer sales office down by King Street over the weekend

14  sometime.  They were found by a security guard.  And he told

15  me that Deputy Lockhart had taken a report.  We talked about

16  getting the originals fingerprinted, placed into evidence,

17  and that was about it.

18     Q.  Did that happen?  Did the papers get fingerprinted?

19     A.  The originals went into evidence to be

20  fingerprinted.

21     Q.  Do you know if they were fingerprinted?

22     A.  I don't know.

23     Q.  Who would know that?

24     A.  Who would know that right now?

25     Q.  Who would know if they were ever fingerprinted?

Captain Lisa Mulligan                                    June 9, 2011

1    words to the effect I approve of the plan that you've come

2    up with?

3        A.  It meant to me move forward and make it happen.

4        Q.  Did you understand it to mean that he thought that

5    this is a plan that would work given all the information

6    people were dealing with?

7            MR. KOLDE:  Objection, calls for speculation, vague.

8    Go ahead and answer.

9        A.  He and I had actually had a discussion at one point

10   during, I believe, the meeting where I made it clear to

11   everyone that whatever we did wasn't going to ensure

12   anyone's safety.  So I don't know if that answers your

13   question.  But for me I knew going into it that he approved

14   of this plan, and I don't think any of us had any

15   expectation that it was going to be a sure plan.  No plans

16   are ever so...

17       Q.  And I certainly didn't mean to imply that that's

18   what the standard was.  Did you think this was the best plan

19   that Metro should come up with?

20           MR. KOLDE:  Object to the form of the question.  Go

21   ahead.

22       A.  Can you clarify what you mean by the question, what

23   they should come up with?

24       Q.  Right.  I mean let's step back a second.  You were

25   tasked by Mr. Desmond to come up with a deployment plan,

Captain Lisa Mulligan                                    June 9, 2011

Page 124

1    right?

2        A.   Yes.

3        Q.   And you went to a meeting that involved some of the

4    Metro operational personnel with Mr. Desmond, right?

5        A.   Yes.

6        Q.   And then after that meeting, you met with your own

7    team, Sergeant Meyers, Sergeant Olmstead, Mr. Norton, and

8    had some input from Mr. Alidina?

9        A.   Yes.

10       Q.   And following that, you and your team crafted the

11   framework for the deployment plan that was sent to Mr.

12   Desmond on December 22, 2010 at 3:14 p.m.?

13       A.   Yes.

14       Q.   Did you think that was the best plan that was needed

15   based on the information that you had?

16           MR. KOLDE:  Object to the form.  Go ahead and

17   answer.

18       A.   I felt that it was the best we could do with the

19   resources that we had.

20       Q.   For example, it looks like you decided to not

21   recommend a high range MTP response; is that correct?

22       A.   Yes.

23       Q.   And is that because you felt it was not necessary

24   given the information that you were dealing with?

25       A.   No.

Captain Lisa Mulligan                                    June 9, 2011

Page 125

1    Q.  Why is it that you chose mid-range instead of high

2    range?

3    A.  Because given what we knew, while I did feel it was

4    necessary for us to have a solid plan, I felt it had to also

5    be a reasonable plan and one that we could grow into

6    something bigger if we needed to.  We didn't really know

7    what we were going to face.  And my level of concern about

8    it didn't change the fact that we didn't know what we were

9    going to face.  So my experience tells me that a middle plan

10   is typically the best place to start just because it can

11   grow if it has to.

12   Q.  Or shrink?

13   A.  Or shrink if it has to, absolutely.  You bet.

14   Q.  But underlying all this, isn't part of your decision

15   making to come up with the most effective plan you can given

16   what you know?

17   A.  Yes.

18   Q.  All right.  Is that what you think you did with this

19   deployment plan that you sent to Mr. Desmond on December 22?

20   A.  Yes.

21   Q.  All right.  I mean if you thought you needed a high

22   range MTP response plan, would you have recommended that?

23   MR. KOLDE:  Object to the form of the question.  Go

24   ahead and answer.

25   A.  I really -- I think it actually is asking me to kind

Captain Lisa Mulligan                                      June 9, 2011

Page 126

1   of change what I knew.  What I knew at the time, I felt like

2   we had built the most effective plan we possibly could given

3   what we had and what we knew.  And if we could predict the

4   future, which we can't.  In my business I stopped trying a

5   long time ago.  So I guess I'm not really sure how to answer

6   that.

7       Q.  Well, I think you did.

8       A.  Okay.

9       Q.  Thank you.  So I would like to come back, I guess,

10  to what happened or what you were trying to communicate to

11  Mr. Desmond on December 23, 2010 at 3:20 when you sent him

12  back the deployment plan and then added the words "stand

13  down" or "continue".  So I take it that when you were

14  writing to Mr. Desmond on Thursday, the 23rd at 3:20, you

15  knew by then that the bus ads would not be displayed; is

16  that right?

17      A.  Yes.

18      Q.  And based on that information, King County Metro

19  Transit Police deployment plan was changed by saying certain

20  things would not happen and we could tell what they are by

21  looking at what was labeled as "stand down"?

22      A.  Yes.

23      Q.  I'll take one example.  Under the MTP category, we

24  have the word "stand down", which is what you were telling

25  him on Thursday.  But what you were saying is as of

Captain Lisa Mulligan                                    June 9, 2011

Page 159

 1      A.  Because we had, through the planning process,

 2   identified that the buses that would pull the ads would be

 3   on routes that would go to the Burien Transit Center.  And

 4   we felt it was important to keep him and his law enforcement

 5   agency aware of what might be coming their way.

 6      Q.  If I could come to your troops message at the

 7   bottom, the message that had been sent to the Metro Transit

 8   Police personnel on Monday, December 20, it looks like the

 9   second to the last sentence, "Some of the calls had been

10   borderline threatening".  Do you see that?

11      A.  Yes.

12      Q.  Were any of the calls that fell in that category

13   borderline threatening followed up by anybody at Metro

14   Transit Police?

15      A.  Not that I'm aware of, no.

16      Q.  Is that something that you would have been aware of

17   given your position as the acting major during that week, in

18   particular, with this issue?

19      A.  I would love to think so, but I would say probably

20   not.  I can't imagine that anybody followed up on any calls.

21      Q.  All right.  And could I get a sense of what you

22   would mean by followed up?

23      A.  We didn't have any case reports that were being

24   actively investigated as a result of a phone call or a

25   message.  We didn't have any of our staff actively trying to

Captain Lisa Mulligan                                    June 9, 2011

                                                        Page 160

1    identify people who were involved in leaving a message or

2    sending an e-mail.  We didn't have any of that.

3        Q.  If there had been that type of follow up, is that

4    something that would have been within the responsibility of

5    the Metro Transit Police?

6        A.  Not necessarily.

7        Q.  All right.  Who else would have been involved in

8    this process of following up if there were say threatening

9    calls or e-mails?

10       A.  FBI could be involved, any one of the detectives

11   from any of -- it would really depend upon where the call

12   came from, the origin point.  So any number of agencies or

13   people could be involved in that.

14       Q.  I'm not sure that it's important to get the complete

15   inventory of who it could have been as it would be to find

16   out the answer to this question.  As far as you know, were

17   any of these borderline threatening calls that are

18   referenced in your e-mail to your troops that were sent out

19   on Monday, were any of those ever referred for follow up to

20   any of the potential law enforcement agencies that could

21   have been involved?

22           MR. KOLDE:  Objection, calls for speculation.  Go

23   ahead.

24       A.  Not to my knowledge.

25       Q.  Do you know if any threatening or potential

Captain Lisa Mulligan                                    June 9, 2011

                                                        Page 161

 1   threatening or borderline threatening call or e-mail that

 2   was received by King County was followed up on by law

 3   enforcement?

 4        MR. KOLDE:  Object to the form of the question,

 5   calls for speculation, vague.  Go ahead.

 6        A.  I don't know.

 7        Q.  All right.

 8            (Exhibits 101 and 102 marked.)

 9        Q.  We've handed you two documents at the same time.

10   Exhibit 101 is an e-mail that appears to have come from

11   William Hurley on Tuesday, December 23 at 3:34 a.m.

12        A.  Okay.

13        Q.  Regarding the winter holiday deployment plan, right?

14   Is that what you got there?

15        A.  Yes.

16        Q.  And then Exhibit 102 is titled Metro Transit Police

17   2010 Winter Holiday Deployment Plan.

18        A.  Yes.

19        Q.  Are you familiar with that document, Exhibit 102?

20        A.  Yes.

21        Q.  Did you have any role in writing Exhibit 102?

22        A.  Did not.

23        Q.  Is this -- that is, is Exhibit 102 -- is that the

24   deployment plan, the winter deployment plan, you have been

25   referring to earlier during your testimony today?

Captain Lisa Mulligan                                      June 9, 2011

                                                          Page 182

 1   checked in on us and how we were doing, just checking the

 2   status of things.  And I don't remember when it came

 3   specifically, but I remember that she did call at one point

 4   just to check in to see how we were holding up.

 5       Q.  And you believe that that would have been after the

 6   phone call that you talked about earlier and before the call

 7   where you let her know that the decision had been made not

 8   to display?

 9       A.  Yes.

10       Q.  Do you believe there was more than one call during

11   those two times?

12       A.  There may have been but I don't remember for sure.

13       Q.  Did you ever have any direct meetings with the

14   sheriff about what you were doing in connection with the

15   SeaMAC issues?

16       A.  One-on-one meetings together in the same room type

17   meetings?

18       Q.  Well, in-person meetings, whether it was one on one

19   or not, but whether it was in person?

20       A.  We did not.

21       Q.  Within Metro Transit Police, were you the highest

22   command level person dealing directly with the Metro Transit

23   Police response to the issues surrounding the SeaMAC ad on

24   the buses?

25       A.  Yes.

# EXHIBIT S

Jim O'Rourke                                                    May 6, 2011

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

--------------------------------------------------------

SEATTLE MIDEAST AWARENESS        )   No.

CAMPAIGN, a Washington           )   2:11-cv-00094-RAJ

non-profit corporation,          )

                 Plaintiffs,    )

      vs.                        )

KING COUNTY, a municipal         )

corporation,                     )

              Defendants.    )


-------------------------------------------------

Deposition Upon Oral Examination of

JIM O'ROURKE

-------------------------------------------------

May 6, 2011

900 King County Admin. Bldg.

Seattle, Washington




REPORTED BY:  PEGGY FRITSCHY HAMILTON, RPR, CSR, CLR,

29906/No. 2704

Jim O'Rourke                                                    May 6, 2011

Page 39

1     Q.    Had you received any data in terms of an
2   assessment of the potential of disruption of service
3   of the Metro buses?
4     A.    The data that I was relying on was the number
5   of customer contacts that we had received.
6     Q.    The number of them?
7     A.    Yes.
8     Q.    Do you remember how many customer contacts
9   you are talking about?
10    A.    I believe by Wednesday it was in excess of
11  2,000.
12    Q.    Had you received any assessment that would be
13  more of a qualitative assessment of what those
14  contacts were about or what they were saying or things
15  of that nature?
16    A.    I, of course, had the snippets from Carri on
17  Monday at the staff meeting, but I was most impressed
18  by the quantity as opposed to the specifics of the
19  contacts, because the quantity far outweighed the
20  quantities that we had received in the past.
21    Q.    How did you learn that there had been about
22  2,000 contacts by Wednesday morning?
23    A.    Carri was updating us as things went along.
24    Q.    When you met with Mr. Desmond before your
25  staff meeting on Wednesday, was anybody else present?

Jim O'Rourke                                          May 6, 2011

                                                        Page 41

 1              Then I discussed the various reactions

 2    that I had received at that point in time from various

 3    folks; for instance, I had been copied on an email

 4    from Paul Bachtel, the union president, expressing

 5    from some union members that they didn't want the ads

 6    to run, that it would make their job much more

 7    difficult to have the ads on the buses, that in some

 8    cases they were politically opposed to the ads, and in

 9    some cases they were afraid to drive the buses, and I

10    discussed with the staff the plan in terms of what we

11    would do with transit operators; specifically whether

12    we would allow a transit operator to not drive the bus

13    if they simply politically disagreed with the ad, or

14    whether they had to express a safety concern.

15         Q.   What's the policy?

16         A.   We don't have a specific policy in that area,

17    but our practice has been that if somebody politically

18    disagrees with something, that they are required to

19    drive the coach anyway, but if they express a safety

20    concern, we'll evaluate them and potentially take them

21    off the route.

22         Q.   How does that work, Mr. O'Rourke, to try to

23    evaluate the safety concern that's raised by an

24    operator?

25         A.   Basically we have someone interview the

Jim O'Rourke                                                    May 6, 2011

Page 47

 1      Q.    Anything else that was discussed at your
 2   staff meeting, you know, than that?
 3      A.    Concern from the other base supervisors and
 4   the other section supervisors about what all would
 5   have to be dealt with in a situation like this.  This
 6   was an unusual situation for us.  We've dealt with
 7   demonstrations before, we've dealt with threats
 8   before, but in most of the cases in which we dealt
 9   with demonstrations or threats, they were not threats
10   directly to us and they were not demonstrations about
11   us as an agency, and so it presented a little bit of
12   an unusual situation that we had to, if you will, deal
13   with on more of an ad hoc basis.  It didn't fit neatly
14   in our plans.
15      Q.    By the time you are having your staff meeting
16   on Wednesday, Mr. O'Rourke, what threats were there?
17      A.    There were some threats implied in a number
18   of the emails.
19      Q.    How many?
20      A.    I don't know.
21      Q.    I mean, was somebody looking at that?
22      A.    Yes.  Carri Brezonick.
23      Q.    And what were the threats?
24      A.    I do not know.  It was simply generally
25   communicated to me that some of the emails were

Jim O'Rourke                                          May 6, 2011

Page 48

 1    threatening.

 2        Q.    Anything else that was discussed at your

 3    staff meeting about this ad?  So far I think what I

 4    heard you say is there was the announcement that

 5    Ryerson would be the base, the discussion about how to

 6    interview or speak with any operators that may have

 7    objected to operating a bus with that ad on it, and

 8    then anything else besides that?

 9        A.    There was a little bit of discussion about

10    where the Executive was on running the ad, and I guess

11    I would say that the staff was generally dissatisfied

12    with his position that we should still be running the

13    ads, because the staff felt that this was a safety

14    issue and that it was going to cause us a considerable

15    amount of work and was going to be putting the

16    operators, if you will, in a position which was

17    unusual for them.

18        Q.    Okay.  And this happened to be the week of

19    Christmas?

20        A.    Yes.

21        Q.    All right.  So, I take it that's part of the

22    concern of people in terms of trying to have to deal

23    with this?

24        A.    Well, yes.  Part of the concern was that

25    between my Wednesday morning staff meeting and Monday,

Jim O'Rourke                                                    May 6, 2011

 1   ideally is all buses on the 509 corridor, because we

 2   have a lot of service out of Ryerson that goes down

 3   SR509.  That makes it likely that our police focus

 4   could be in Burien and downtown, at both ends of where

 5   that service goes, and that we can then take care of

 6   whatever other arrangements need to be made to locate

 7   the police or to reroute the service if necessary in

 8   certain areas.

 9             Then the other factor that came up was how

10   we are going to deal with the operators come Monday

11   morning, and I wanted a base chief to be present in

12   the base and to talk to every individual operator

13   before they went out, so that the same person made a

14   consistent judgment about whether it was a safety

15   issue for the operator, or they're simply refusing on

16   political grounds or whatever to drive the coach, and

17   I also wanted the chief to be there to assess the

18   operator, because normally that would be the job of

19   the base dispatcher, but I did not want to have that

20   set on top of what a base dispatcher normally has to

21   do to get service out of the base on a Monday morning.

22      Q.   How many drivers are we talking about, say,

23   on the Monday morning would that have been?

24      A.   I believe we were talking about 12 buses, so

25   that would have been 12 drivers on Monday morning, and

Jim O'Rourke                                           May 6, 2011

Page 51

1    a different 12 drivers on Monday afternoon.

2        Q.    All out of Ryerson?

3        A.    Yes.

4        Q.    When does the ATU become involved in this

5    process?

6        A.    That's kind of a general question and

7    difficult to answer in that form.

8        Q.    Well, was there any collaboration with the

9    union in terms of how Metro is going to work with its

10   drivers in this process of dealing with drivers who

11   might object to driving a bus with the ad on it?

12       A.    So, as I said previously, there was

13   communication with Paul Bachtel after the plan was

14   developed to run out of Ryerson to run on the 509

15   corridor, et cetera.  I called him up and I said,

16   Look, here's what we are going to do:  If the driver

17   has a safety concern, they won't have to drive the

18   bus.  We're going to have a chief on the base to

19   evaluate that safety concern.  If the driver has a

20   political concern, that's not a valid reason for not

21   driving the bus.  We are going to send them out there

22   anyway.  I wanted to assure him that we had them at

23   that base for a reason, that we had police presence

24   out there to protect the drivers in case there was

25   some sort of incident or a demonstration that they had

Jim O'Rourke                                               May 6, 2011

Page 58

1   we don't have enough service on that corridor to do 12

2   a.m. and 12 p.m. trips, what shall we do?  And so they

3   presented me with a few alternatives, and one of the

4   alternatives included Magnolia, and I said okay to

5   Magnolia as an additional place that we would run the

6   coaches.

7        Q.   Why Magnolia?

8        A.   Once again, it was a decision based on the

9   amount of service that we had in that area, and from

10   my perspective on the location in Magnolia, it was

11   relatively close to downtown, and if we had police

12   resources located downtown, it wouldn't take them very

13   long to get out to Magnolia.

14        Q.   Was there any consideration about the area or

15   neighborhood that the buses would be going through,

16   that a particular area might be more sensitive in

17   terms of its reaction to this particular message?

18        A.   Yes.  We had a concern because the buses were

19   going to go down Third Avenue past, I believe, it's

20   the Jewish Federation Building; at any rate, where

21   there was a shooting a number of years ago and

22   somebody was killed, and so we incorporated in the

23   plan of rerouting the buses around the block that

24   contained that building, so that they wouldn't be

25   passing directly in front of the building.

Jim O'Rourke                                          May 6, 2011

1    routes, the routes themselves, to avoid the Jewish

2    Federation facility on Third Avenue, the plan in place

3    to speak with or interview operators that may have had

4    a concern, coordinate with Metro Transit Police, and

5    the assignment of the buses in terms of their parking

6    at the base to make sure the right bus went on the

7    right route?

8        A.   Yes.  There's one other component that I

9    didn't mention.  I'm sorry.

10       Q.   That's quite all right.  That's why we go

11   through this.

12       A.   On Monday morning I authorized the addition

13   of four report operators.  A report operator is a

14   person who sits in the base on the day of service and

15   gets assignment to a route, because another operator

16   cannot operate that route for whatever reason.  So,

17   they call in sick or whatever happens on day of

18   service, a report operator handles that.  If we know

19   about it a day ahead of time, the extra board handles

20   it, but the report operator is specifically for that

21   day.

22            What we did is we said we're going to put

23   four extra report operators on Monday morning, and if

24   it is the base chief's judgment that an operator has a

25   valid safety concern, we will have the report operator

Jim O'Rourke                                          May 6, 2011

Page 62

1   take the route instead of the operator who is assigned

2   to the route.  Presumably what we would do in this

3   situation based on past practices, we would pay the

4   operator anyway as if they had driven the route.  We

5   would just relieve them of duty with pay.

6       Q.   This is some type of a procedure that Metro

7   Transit has worked with before?

8       A.   When we need extra operators to do a service,

9   we quite often add extra report operators to handle

10  the extra service.  If we know that there's a

11  possibility of demand for service on a given day, but

12  we're not sure about it up until that day, then we may

13  add some report operators just to make sure that we

14  have enough bodies around to handle the service.

15      Q.   Anything else that was in the contingency

16  plan?

17      A.   I don't recall anything else.

18      Q.   So, on Wednesday at the end of the day, the

19  end of the workday, you are getting a report from who

20  on the contingency plan?

21      A.   Abdul Alidina.

22      Q.   Were you satisfied that that was a plan that

23  would work?

24      A.   Yes.

25      Q.   I take it you have a lot of confidence in the

Jim O'Rourke                                        May 6, 2011

Page 63

1    ability of King County Metro to run the bus system?

2         A.   Yes.

3         Q.   This isn't the first time you've run into

4    something where there was going to be a snag in the

5    operation; right?

6         A.   That's correct.

7         Q.   And I take it you've run into things that

8    were much more problematic than this?

9         A.   Yeah.  I guess extreme adverse weather

10   situations are certainly a lot more problematic.

11        Q.   How about the WTO?  Were you around when that

12   was going on?

13        A.   I was.  I was supervising Ryerson Base at

14   that point in time.

15        Q.   And Ryerson Base was a location for the

16   operation that was affected by the WTO?

17        A.   Right.

18        Q.   Right.  And you had to deal with that?

19        A.   Yes.

20        Q.   I take it pretty successfully?

21        A.   Generally, yes.

22        Q.   All right.  I mean, were you expecting in

23   December of 2010 when the SeaMAC business was going

24   on, were you expecting anything like what the WTO was?

25        A.   No, because it was a significantly more

Jim O'Rourke                                          May 6, 2011

Page 76

1      Q.   That's part of his job?

2      A.   Yeah.

3      Q.   I take it he does his job pretty well?

4      A.   He does.

5      Q.   You can rely on him?

6      A.   Yes.

7      Q.   And when you say to do something, he does it?

8      A.   Yes.

9      Q.   He came up with a pretty good plan in this

10  case, I take it?

11     A.   Yes.

12     Q.   So, what happened on Thursday from your end

13  in terms of the SeaMAC situation and Metro buses?

14  This would be December 22, Thursday -- December 23,

15  pardon me, Thursday, December 23.

16     A.   That's a really good question.  I wish I had

17  reviewed my calendar.  I don't know if I was in the

18  office that day, or not.  I may have been monitoring

19  email from home on that day, but I'm not sure.

20     Q.   And do you normally take Thursdays off?

21     A.   No.  My daughter was in town for winter

22  vacation.

23     Q.   Do you remember anything about what would

24  have happened on that particular day, that is,

25  Thursday, the 23rd, with the buses and the SeaMAC ad?

Jim O'Rourke                                    May 6, 2011

Page 87

1    it, is a Metro Transit Police function; is that right?

2        A.    Yes.

3        Q.    At your end, it's just can we roll the buses

4    out and have drivers on it?

5        A.    And where are they going to go, yeah.

6        Q.    Okay.  All right.  Do you remember having any

7    discussions with Lisa Mulligan about the questions

8    that she was raising here:  limiting the number of

9    days or the times or cameras?  Things of that nature?

10       A.    I did not directly have discussion with Lisa.

11   I believe Sharron had answers to some of these

12   questions, though.

13       Q.    Sharron Shinbo?

14       A.    Yes.

15       Q.    Did the operations part of this ever consider

16   having the ads put on the buses for different days,

17   other than say at the time that they were scheduled to

18   go?

19       A.    Not that I'm aware of.  From the start of

20   this whole situation there seemed to be an assumption

21   that we were running the ads starting December 27th,

22   and I never questioned whether they could be moved to

23   another day or not for a start time.

24       Q.    I mean, I'm asking partly because it looked

25   like part of the, from an operations' standpoint, part

# EXHIBIT T

Page 1

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

------------------------------------------------------------

SEATTLE MIDEAST AWARENESS          )

CAMPAIGN, a Washington non-profit )

corporation,                      )

              Plaintiff,     )

  vs.                             ) No. 11-cv-00094-RAJ

KING COUNTY, a municipal          )

corporation,                      )

             Defendant.     )

------------------------------------------------------------

Deposition Upon Oral Examination of

PAMELA QUADROS

------------------------------------------------------------

1191 Second Avenue

Eighteenth Floor

Seattle, Washington

DATE:  June 24, 2011

REPORTED BY:  Christina Atencio, CCR #2749

Pamela Quadros                                    June 24, 2011

Page 17

1      A.   Well, so generally I mean once there is -- this is

2  the average.

3      Q.   Yes, ma'am.  And that's what I'm trying to find out.

4      A.   This is the average process.  The art process,

5  though there's still a component of that where it has to be

6  deemed applicable to the advertising restrictions and that

7  also takes place -- but we know this from the git-go from

8  the needs assessments.  So all along the process we know how

9  that client is going to move through the process based upon

10  the advertiser restrictions.

11          So that happens all the time but it's not

12  necessarily always forefront or evident because it's not

13  relevant necessarily all the time.  McDonald's doesn't have

14  to go through that.  That's why I was telling you the actual

15  path an advertiser goes through.

16      Q.   So during the needs assessment process, say if

17  someone -- say hypothetically -- if someone wanted to have

18  an ad on the side of a bus owned by Metro, so the Metro

19  advertising policy restrictions are in play, that would say

20  something like, come to our bar and drink as much alcohol as

21  you possibly can, the proposed advertiser would be told that

22  that message probably needs to be calibrated somewhat?

23      A.   Yes.

24      Q.   Okay.  But for places like McDonald's, at least in

25  the United States, that's not a particular issue?

Pamela Quadros                                          June 24, 2011

1      A.  Not that I can think of.

2      Q.  All right.  Why don't we talk about the could be

3  controversial category?  How does Titan know what that might

4  mean?

5      A.  Well, we refer to the advertising restrictions.

6      Q.  All right.  But then how does Titan decide whether a

7  particular ad might be controversial?

8      A.  If it's borderline, in the advertising restrictions.

9      Q.  All right.  Is the SeaMAC ad one that Titan had

10  deemed to be potentially controversial such that King County

11  should get a heads-up?

12     A.  Yes.

13     Q.  What was it about that ad that Titan made that

14  decision?

15     A.  Because it was borderline.

16     Q.  But I mean what was it about the ad that made it

17  borderline?

18     A.  The content.

19     Q.  All of it?  Some of it?

20     A.  All of it.

21     Q.  I mean, for example, part of the -- I'm going to

22  show you this very helpful copy of the SeaMAC ad.  It's been

23  marked as Exhibit 121 in some earlier deposition.  Does this

24  look like to you what was the SeaMAC ad that was going to go

25  on the King County bus?

Pamela Quadros                                        June 24, 2011

Page 30

1    like that in terms of the content or the message?

2        A.  No, you can't really do that.

3        Q.  Yes, ma'am.  The question in terms of too

4    controversial or might be controversial is one that's based

5    on the King County advertising policy, I guess is what I'm

6    trying to figure out; is that right?

7        A.  Yes.  I mean, yeah, we just know our partners.

8        Q.  Did you have any discussions with your two

9    colleagues about the proposed SeaMAC ad before contacting

10   King County?

11       A.  I can't recall the time line.

12       Q.  Okay.  Is there anything that sticks out -- well,

13   let's try this.  Do you remember having discussions with

14   either of them really at any time before December 17th of

15   2010, which is the date of the King 5 News story?

16       A.  Yes, we definitely brainstormed with the client to

17   tame the ad down.

18       Q.  All right.  When you say the client, which one;

19   SeaMAC or King County?

20       A.  SeaMAC.

21       Q.  What do you mean we brainstormed?

22       A.  Well, again part of our sales process is being

23   consultants in trying to navigate meeting clients' needs on

24   that side as well as meeting the needs of our advertising

25   restrictions.  So you start that process and you massage it

Pamela Quadros                                          June 24, 2011

Page 34

1    that right?

2        A.  Six.

3        Q.  Oh, okay.  So six years.  Did you see what the final

4    mock-up for the SeaMAC ad was before it was actually sent to

5    King County?

6        A.  Yes, I would have seen it and, yeah.

7        Q.  And was it your view that the final that you sent on

8    satisfied the criteria of the advertising policy?

9        A.  Yes, to our -- to the best of our ability, we felt

10   we met the basic advertising restrictions.

11       Q.   Including the controversial part?

12           MR. KOLDE:  Objection, assumes facts not in evidence

13   about the controversial part being part of the written

14   policy.

15       Q.  You may still answer.

16       A.  So that day in time, okay.  I'm going to put -- that

17   day in time we felt that the ad met the advertising

18   restrictions that we were proposing.

19       Q.  Maybe I wasn't clear but that's what I meant.  I

20   mean at the time you passed it onto King County.

21       A.  We passed it onto King County as here's what we're

22   recommending, a copy for this program, run it up your flag

23   pole.

24       Q.  And the time you passed it onto King County, did you

25   understand it was King County that actually made the

Pamela Quadros                                    June 24, 2011

1       A.  Sharron.

2       Q.  Shinbo?

3       A.  Yes.

4       Q.  Other than maybe half a dozen phone calls and 1,400

5  e-mails, was there any other way that people communicated to

6  Titan who were not King County people about the SeaMAC ad?

7       A.  Not to my knowledge.

8       Q.  For example, letters, as old school as that may be?

9       A.  Not to my knowledge.

10      Q.  Someone actually coming in in person?

11      A.  No.

12      Q.  Did you give King County all of the e-mails that

13 Titan received?

14      A.  We did.

15      Q.  Do you remember when that first happened?

16      A.  All of them?

17      Q.  Yes, ma'am.

18      A.  I want to say that it was after -- I think it was in

19 discovery.

20      Q.  After the lawsuit was filed?

21      A.  Yes.

22      Q.  Before then, did Titan give King County any of the

23 e-mails?

24      A.  I would -- yes.  I sent a couple to King County.

25 And so typically we do that.  They get copies of our

Pamela Quadros                                    June 24, 2011

1      Q.  Do you think it was more than a hundred?

2      A.  Gosh, I don't know.  And quite honestly, a lot of

3  those, they were cc'd on so I didn't have to.  They went to

4  -- a lot of those e-mails went to myself, Dow Constantine,

5  Kevin Desmond, Sharron Shinbo, and Metro customer service

6  e-mail address.  So there was quite a few that they got and

7  I got at the same time.

8      Q.  Was there any discussion with Ms. Shinbo on the

9  topic of e-mails that were either threatening or potentially

10  threatening in terms of whether Titan should notify any law

11  enforcement officials about those.

12     A.  Not that I know of from law enforcement issues with

13  me.  I don't know what conversations she had with other

14  people at Titan or other people at Metro that had with

15  people at Titan.

16     Q.  So during the week of December 20th, who at Titan

17  was involved in the controversy that was occurring around

18  the SeaMAC ad and the King County Metro buses?

19     A.  Don Allman, Scott Goldsmith, Bruce Krivosha, Gail

20  Worthen, Jeff Smith, and Jennifer Quevedo to a certain

21  extent because it was her account.

22     Q.  And yourself?

23     A.  And myself.

24     Q.  Who at King County were the Titan people working

25  with during that week on that topic?  Sharron Shinbo?

Pamela Quadros                                          June 24, 2011

Page 70

1        Q.   Do you think an ad with a burning Metro bus that's

2   being depicted in a violent way would qualify under the King

3   County advertising policy for display on a King County bus?

4            MR. KOLDE:   Objection, calls for speculation.   It's

5   also not this witness's decision.

6        A.   I would have to review the advertising restrictions.

7        Q.   Okay.   Let's do that.   Exhibit 25 would indeed be

8   the contract between Titan and King County?

9        A.   Yes.

10       Q.   January 2005?

11       A.   Yes.

12       Q.   All right.   Let's take all our word for a moment

13   that it's complete, that is the contract.   And under Section

14   6, King County lays out the restrictions it has on

15   advertising.

16       A.   Right.

17       Q.   So I think what I'm just wondering if you could help

18   us out with, Ms. Quadros, whether somebody submitting an ad

19   that has a picture of a burning bus on it, regardless of the

20   text, would qualify for advertising under the policy or at

21   least with the text you can see on Exhibit 136?

22            MR. KOLDE:   Noting the same objection for the

23   record.

24       A.   Our first reaction we would tell the client we would

25   want to change the photo.

Pamela Quadros                                    June 24, 2011

 1      Q.   Why is that?

 2      A.   Because that is not a positive photo.  I mean the

 3   bottom line it's not a positive image.

 4      Q.   Would that image qualify under the policy?

 5           MR. KOLDE:  Same objection.

 6      A.   You know, I think it could definitely be offensive

 7   to some people.

 8      Q.   All right.

 9      A.   Not to mention it's violent so we don't typically

10   allow violent looking things like that but -- I would have

11   to cite the exact and that would take a little while.

12      Q.   It would.  But it's most likely you would find it

13   and say, no, it doesn't work, right?

14      A.   Well, we would have had them change that photo.

15      Q.   Yes, ma'am.

16      A.   Under normal circumstance.

17      Q.   So let's look at 137 -- and the advertising

18   restrictions are here if you need them.  I think we've got a

19   little better luck in being able to read the graphics that

20   are printed there, both the words and the picture.  Does

21   that proposed ad qualify under the restrictions of the King

22   County Metro advertising policy?

23           MR. KOLDE:  Objection, calls for speculation.

24      A.   Again, this one we would have definitely worked with

25   the advertiser not to have a significant number of these

Pamela Quadros                                    June 24, 2011

Page 72

1    images in the ad.

2        Q.  Like the ones with Adolf Hitler?

3        A.  Yes, absolutely.

4        Q.  Or equating any particular ethnic group with the

5    word savages?

6        A.  Yes, absolutely.  It's disparaging and it's

7    inappropriate.

8        Q.  Yes, ma'am.

9        A.  So, no, it wouldn't have gone very far.

10       Q.  Okay.  Before the SeaMAC ad was submitted to Titan,

11   had Titan worked on a potential advertising campaign where

12   it was words to the effect of Free Gaza?

13       A.  Yes.

14       Q.  Do you remember that one?

15       A.  Yes.

16       Q.  That was in 2009 about?

17       A.  About.

18       Q.  Do you know if any of the people that were with

19   SeaMAC were involved in that particular ad campaign?

20       A.  I don't know.

21       Q.  Who was the account executive on that one?

22       A.  I don't remember.

23       Q.  Ms. Quadros, was the process with the Free Gaza

24   campaign similar to the process with SeaMAC in that the

25   needs assessment was done, the graphics were completed, and

Pamela Quadros                                              June 24, 2011

Page 80

1      A.  Right.

2      Q.  So before then is what I'm asking about now.  Before

3   then, were you aware of any discussions?

4      A.  Like in 2005, 2006, where every now and then there

5   would be a discussion every time they had some push back of

6   complaints, they would be like, oh, you know, how do other

7   transit authorities handle this?  But nothing that week

8   you're referring to.

9      Q.  Okay.  Or really nothing that year?

10     A.  Nothing that year, yes.  Better answer.  Nothing

11  that year.

12     Q.  Did you get the sense from Ms. Shinbo that what she

13  was dealing with during the week of December 20 concerning

14  the SeaMAC Metro bus ad dialogue was time consuming?

15     A.  Oh, it was definitely time consuming.

16     Q.  And did you get that sense from her that that was

17  true of all the folks at King County that were having to

18  deal with that?

19     A.  I don't know.

20     Q.  Did she talk about what other people were doing?

21     A.  Not really.

22     Q.  But for her?

23     A.  For her.  That's her gig.  Everything points to her.

24         (Exhibit 196 marked.)

25     Q.  Ms. Quadros, we had marked as Exhibit 196 some

# EXHIBIT U

Page 1

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

--------------------------------------------------------

SEATTLE MIDEAST AWARENESS          )   No.

CAMPAIGN, a Washington             )   2:11-cv-00094-RAJ

non-profit corporation,            )

                 Plaintiffs,     )

      vs.                          )

KING COUNTY, a municipal           )

corporation,                       )

                 Defendants.     )


--------------------------------------------------------

30(b)(6) Deposition Upon Oral Examination of:

KING COUNTY

DESIGNEE: SHARRON SHINBO

--------------------------------------------------------

May 13, 2011

500 Fourth Avenue, Suite 900

Seattle, Washington



REPORTED BY:  PEGGY FRITSCHY HAMILTON, RPR, CSR, CLR,

29906/No. 2704

30(b)(6) - Sharron Shinbo                              May 13, 2011

Page 14

 1   because you don't really know what exactly Titan 360

 2   is.  Does that sound fair?

 3      A.   Yes.

 4      Q.   All right.  What are your duties as project

 5   manager?

 6      A.   I review transit advertising, and I oversee

 7   the administration of the transit advertising

 8   contractor.

 9      Q.   And that would be Exhibit-25, provided that

10   we could come up with Amendments 2 and 3?

11      A.   Yes.

12      Q.   Is there a practice in your unit for

13   determining whether a particular application to

14   advertise on a Metro bus meets the criteria of the

15   King County advertising policy?

16           MR. KOLDE:  Objection insofar as the

17   question uses the term unit.

18           But go ahead and answer the question.

19      Q.   Do you understand the question?

20      A.   Could you please repeat the question?

21      Q.   Let's do that.  In your position as manager,

22   is there a practice or are there policies for

23   determining whether the application for a particular

24   ad to go on a Metro bus satisfies the King County

25   criteria in its advertising policy?

# EXHIBIT V

Page 1

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

------------------------------------------------------------

SEATTLE MIDEAST AWARENESS          )

CAMPAIGN, a Washington non-profit )

corporation,                       )

                Plaintiff,     )

  vs.                              ) No. 11-cv-00094-RAJ

KING COUNTY, a municipal           )

corporation,                       )

                Defendant.     )

------------------------------------------------------------

Deposition Upon Oral Examination of

SHARRON SHINBO

------------------------------------------------------------

500 Fourth Avenue

Ninth Floor

Seattle, Washington

DATE:  June 14, 2011

REPORTED BY:  Christina Atencio, CCR #2749

Sharron Shinbo                                    June 14, 2011

Page 7

1      Q.   And as part of the program manager, do your duties

2   involve reviewing proposed ads that might be placed on the

3   sides of Metro buses?

4      A.   Yes.

5      Q.   Does that also include approval for proposed ads

6   that are being offered to be put on the sides of Metro

7   buses?

8           MR. KOLDE:   Objection, vague as to scope.   Go ahead

9   and answer.

10     A.   Yes.

11     Q.   How long have you had your current position?

12     A.   A little over 25 years.

13     Q.   Is it your experience or understanding that Metro

14  has always accepted non-commercial advertising for the

15  placement of ads on the sides of its buses?

16     A.   May I make one correction to what I just told you

17  about my position?

18     Q.   Yes, ma'am.   Please do.   Thank you.

19     A.   I wanted to clarify that I reviewed transit

20  advertising for 25 years, but I've had different positions

21  at Metro.

22     Q.   By positions, you mean...

23     A.   Job titles.

24     Q.   And perhaps different levels of responsibility?

25     A.   Yes.

Sharron Shinbo                                          June 14, 2011

1     Q.  Is that the decision making question?  Is there any

2  reason it should be denied?

3     A.  I don't understand what you're asking me.

4     Q.  I'm asking you to explain what you just told me.

5     A.  Okay.

6         MR. KOLDE:  Then ask her a question she understands.

7  Objection, vague.

8     Q.  Is that the decision making question for you?  Is

9  there reason why the ad should be denied?

10     A.  Yes.  After going through every line of our

11  advertising policy and looking at the ad itself, I'm asking

12  myself is there any reason that ad should be denied based on

13  those written policies.

14     Q.  That's your practice?

15     A.  It also -- are you asking me to explain my entire

16  review practice?

17     Q.  I am now.  So what is your entire review practice?

18  Why don't we do that first?

19     A.  As I stated in my earlier deposition, when I receive

20  an ad, it might usually be over -- attached to an e-mail

21  message.  I then go and I print out the ad on a color

22  printer and I physically take that ad and I physically take

23  the written advertising policies and I look at both the copy

24  and the text and I go through every single line, every

25  single policy of our written policy.  If there's a phone

Sharron Shinbo                                    June 14, 2011

Page 44

1   ahead and answer.

2       A.  Are you asking standards for review?

3       Q.  Well, I'm just trying to figure out how would Titan

4   know whether to send Metro an ad for Metro's review?

5       A.  I would assume they would look at the advertising

6   restrictions.  And if they have any questions, that they

7   send that proposed ad to Metro.

8       Q.  Questions about whether it applies or not, I mean --

9   pardon me -- whether it qualifies or not?

10      A.  Questions about whether the proposed ad in terms of

11  the copy and the text violate any of the restrictions.

12      Q.  Do you think that that decision making process by

13  Titan -- at least as communicated by Metro -- is when in

14  doubt, call us at Metro?

15      A.  Yes.

16      Q.  Do you think it's important to Metro to be able to

17  have the right to decide whether an ad does qualify or

18  should be rejected?

19      A.  Yes.

20      Q.  Is that a right that Metro believes it has

21  exclusively?

22          MR. KOLDE:  Object to the form of the question,

23  confusing.  Go ahead and answer.

24      A.  We have that right and have written that right in

25  the agreement.

Sharron Shinbo                                          June 14, 2011

Page 49

1    different creatives through the review process by King

2    County; is that correct?

3        A.  Yes.

4        Q.  And then of those approximate two to five, only one

5    was rejected; is that correct?

6        A.  Yes.

7        Q.  And the one that was rejected, you're referring to

8    the one that was rejected by the Executive sometime after

9    December 17, 2010; is that correct?

10       A.  Yes.

11       Q.  Is it also the same creative that the Executive had

12   approved in November 2010?

13       A.  You said the Executive approved?

14       Q.  I did -- well, I'm asking.

15       A.  The Executive did not approve a creative in

16   November.

17       Q.  What did he approve in the context of the SeaMAC ad?

18       A.  Kevin Desmond and I approved the SeaMAC ad in

19   November or December, that time frame.  We did not ask the

20   Executive for his approval.

21       Q.  Do you have an understanding, Ms. Shinbo, that King

22   County Executive Dow Constantine approved the display of the

23   SeaMAC ad on the side of a Metro bus before December 17,

24   2010?

25       A.  It was my understanding he concurred with Transit's

Sharron Shinbo                                          June 14, 2011

Page 53

1   anybody else involved in that decision including King County

2   Prosecuting Attorneys?

3           MR. KOLDE:  I'm going to object to the form of the

4   question.  It's argumentative and misleading.  Tha PAO is

5   not a decision maker here.  Go ahead and answer the

6   question.

7      A.  None of the attorneys are decision makers.  When we

8   go to the prosecuting attorney, we want to hear what they

9   have to say but they don't decide.

10     Q.  All right.  So other than Mr. Desmond and yourself,

11  was anybody else involved in the decision to approve the

12  SeaMAC ad?

13          MR. KOLDE:  Same objection as before.  Go ahead and

14  answer.

15     A.  No.

16     Q.  All right.  Ms. Shinbo, I've been drawing in terms

17  of the time frame, a distinction between before December 17,

18  2010 and after.  Do you understand that that's the date that

19  the news was reported that the ad was about to be displayed

20  on the bus?

21     A.  Yes.

22     Q.  Is it your understanding it was sometime after the

23  news was reported about what was going to happen, that it

24  was sometime after that news story that the decision was

25  made to not display the SeaMAC ad?

Sharron Shinbo                                              June 14, 2011

Page 61

1          MR. KOLDE:  Object to the form of the question, same

2     objection.

3          A.  Please clarify qualify.

4          Q.  Well, that it wouldn't be rejected.

5          A.  Oh, okay.  If it wouldn't be rejected, I might show

6     Kevin.  Because even though it might not be rejected, there

7     might be concern or reaction.

8          Q.  And what is it that you would consider, Ms. Shinbo,

9     in trying to decide whether to show Mr. Desmond an ad that

10    had been referred by Titan for King County's review?

11         MR. KOLDE:  Objection, misleading as to the purpose

12    of interaction with Mr. Desmond.  Go ahead and answer.

13         A.  Please repeat the question.

14         Q.  Yes, ma'am.  What kind of criteria were you

15    considering when you were trying to make the decision of

16    should I show this creative or this ad to Kevin Desmond

17    that's been referred to us by Titan for our decision?

18         MR. KOLDE:  Objection, misleading.  Go ahead and

19    answer.

20         A.  I don't use written criteria to decide whether I'm

21    going to talk to Mr. Desmond or show him the ad if it's been

22    rejected or it's been accepted.  I base that on my personal

23    experience of 25 years in knowing what kinds of ads

24    sometimes generate concern.

25         Q.  All right.  And I didn't mean to hamstring you with

Sharron Shinbo                                          June 14, 2011

Page 62

1   written criteria.  I meant any criteria.  And it's the last

2   part of your answer that I'm wondering if you could explain

3   a little bit more.  I mean what is it that made you look at

4   an ad and say this is maybe one I should check in with Kevin

5   Desmond on?

6        MR. KOLDE:  Objection, misleading.  Go ahead and

7   answer.

8     A.  The words on the ad were very negative, and I am not

9   a historical buff.

10    Q.  You're talking about the SeaMAC ad, right?

11    A.  Yes.

12    Q.  I'm talking about as a matter of your practice.  I'm

13  not focusing on the SeaMAC ad right now.  There's been about

14  a hundred ads or so over the last five or six years that

15  Titan sent to Metro and said or asked does this satisfy the

16  criteria of the advertising policy or not, okay.

17    A.  Fewer than a hundred.

18    Q.  Fewer than a hundred, all right.  And of those fewer

19  than a hundred, I understood you to say that if you thought

20  the ad did not, that you routinely would not ask Mr. Desmond

21  about that; is that correct?

22    A.  That the ad did not what?

23    Q.  Satisfy the criteria of the advertising policy that

24  is Exhibits 25 and Exhibit 25B.

25        MR. KOLDE:  Object to the form of the question.

Sharron Shinbo                                           June 14, 2011

Page 64

1   times that this has happened?

2          MR. KOLDE:  Same objection, calls for speculation,

3   asked and answered.  Go ahead and answer.

4          A.  I can't recall.

5          Q.  Ms. Shinbo, in those circumstances where Titan has

6   asked for Metro's decision on whether a proposed ad violates

7   the advertising restrictions, is it correct that if you've

8   decided it does violate the restrictions, that as a matter

9   of practice, you do not seek Mr. Desmond's input on that

10  decision; is that correct?

11         A.  If it's very clear to me in looking at the copy and

12  the text that it clearly violates one of the restrictions, I

13  don't ask Kevin Desmond for his input.

14         Q.  Okay.

15         A.  Unless there might be some controversy related to

16  the ad, we'll talk about it.

17         Q.  Earlier you said having a phone number or a web site

18  on the proposed creative was either required or -- well, it

19  was required, right?

20         A.  Yes, if it isn't clear who the advertiser is.

21         Q.  And I thought you said the reason that that's there

22  is that people who see the ad who might be concerned.  And I

23  wasn't sure I understood what you meant by that.

24         A.  Some people when they see an ad on a Metro bus,

25  believe it's Metro expressing what the bus says, what the

Sharron Shinbo                                    June 14, 2011

Page 68

1    Q.  What was it that you told him about the advertising,

2    the history of the advertising program?

3    A.  I probably talked about how long we had an

4    advertising program, since the '70s; that we always had

5    advertising written advertising restrictions in place during

6    that period in our contracts; that we had controversial ads

7    before but there was no basis on our current advertising

8    restrictions to prohibit this ad.

9    Q.  Did you think that the SeaMAC ad was controversial?

10        MR. KOLDE:  Objection as to temporal scope as to

11   timing.  Go ahead and answer.

12   Q.  Ms. Shinbo, as of the date of the meeting with the

13   Executive on November 9, going through that period of time,

14   did you think that the ad was controversial?

15   A.  Up to November 9th?

16   Q.  Yes, ma'am.

17   A.  I thought it might be controversial.

18   Q.  Did you think it was?

19        MR. KOLDE:  Objection, asked and answered.

20   A.  I thought it might be controversial.

21   Q.  Let me show you what has been marked as Exhibit 121.

22   I'm sorry I'm going out of order.  Do you recognize that

23   document?

24   A.  Yes, I do.

25   Q.  Is this the version of the SeaMAC ad that was

Sharron Shinbo                                          June 14, 2011

Page 70

1   history of the advertising policy on November 9?

2          MR. KOLDE:  Objection, asked and answered, calls for

3   speculation.  Go ahead and answer.

4      Q.  I meant the question.  What else did you tell him,

5   not what you've already testified about.

6          MR. KOLDE:  Same objection.  Go ahead and answer.

7      A.  That's all I can remember right now.

8      Q.  During that discussion about the history of the

9   Metro advertising policy, did you advise the Executive that

10  King County Metro had always accepted non-commercial

11  advertising?

12         MR. KOLDE:  Object to the form of the question,

13  mischaracterized prior testimony.  Go ahead and answer.

14     A.  Yes, I might have.

15     Q.  Did you tell him that the non-commercial advertising

16  that had been accepted included advertising concerning

17  candidates for elected office, ballot measures, and cause

18  advertising?

19         MR. KOLDE:  Same objection.

20     A.  Yes --

21         MR. KOLDE:  Calls for speculation.  Go ahead and

22  answer.

23     A.  I might have provided examples like that.

24     Q.  Did you tell the Executive that ads on King County

25  Metro buses had been displayed when they were controversial?

Sharron Shinbo                                         June 14, 2011

Page 71

1      A.  Yes.

2      Q.  Do you remember anything that the Executive said

3  during that meeting about the SeaMAC ad?

4          MR. KOLDE:  Same cautioning about attorney-client

5  privileged conversations, otherwise please answer the

6  question.

7      A.  I don't recall anything specific at this time.  The

8  meeting was quite sometime ago.

9      Q.  Do you know if anybody was taking notes?

10     A.  I wasn't paying attention.  I was speaking.

11     Q.  All right.  So this may be overly precise.  But I am

12  wondering if you know if anyone was taking notes or not of

13  the meeting?

14         MR. KOLDE:  Objection, asked and answered, calls for

15  speculation.

16         MR. GRANT:  You know, I don't see how you can object

17  on speculation when the question is do you know.  You need

18  to explain that to me.

19         MR. KOLDE:  She's answered the question.  She said

20  she didn't know.  She wasn't paying attention.  You're

21  asking her again.  You're inviting speculation.  That's an

22  appropriate objection.  You would be never allowed to do

23  that in court, and it's not appropriate at a deposition

24  either.

25         MR. GRANT:  Well, she actually didn't say whether

Sharron Shinbo                                          June 14, 2011

 1   making process?

 2        A.   I made a recommendation to Kevin.

 3        Q.   And what did he do with your recommendation?

 4        A.   He concurred.

 5        Q.   Did the Executive get involved in the decision about

 6   whether the Lucy with the puppet cleavage ad should be

 7   rejected?

 8        A.   No.

 9        Q.   All right.  Let's then go up to the next e-mail.

10   About eight-and-a-half hours later, Mr. Desmond is asking

11   you whether there are any free speech political messages

12   that we've rejected.  Do you see that?

13        A.   Yes.

14        Q.   Did you answer him on that one?

15        A.   I probably answered Kevin because I answer most of

16   his questions.

17        Q.   Yes, ma'am.  What was the answer?

18        A.   I probably said, no, there have been no political

19   messages that we've rejected.

20        Q.   Or no free speech political messages that have been

21   rejected, right?

22             MR. KOLDE:  Objection, mischaracterizes prior

23   statement.  Go ahead.

24        A.   I probably wouldn't have said free speech political

25   messages.

Sharron Shinbo                                          June 14, 2011

Page 112

1      A.   I think just the ad, having seen the ad.

2      Q.   Concerned about what?

3      MR. KOLDE:  Same objection, calls for speculation

4    about another person's state of mind.  Go ahead and answer.

5      A.   When he saw the text and graphics, he looked

6    concerned.

7      Q.   Ms. Shinbo, do you remember any time in the 25 years

8    you've been involved in the Metro advertising policy, where

9    the person in Mr. Abe's position that he had in November

10   2010 was brought into the process in terms of whether a

11   proposed ad should be rejected based on the language of the

12   advertising policy of Metro?

13     MR. KOLDE:  Objection, mischaracterizes prior

14   testimony about Mr. Abe's role.  Please answer the question.

15     A.   We weren't bringing Mr. Abe in for some role related

16   to whether or not the ad should be rejected.

17     Q.   What were you doing?

18     A.   I believe we were trying to notify Mr. Abe so that

19   we could brief the Executive on the ad and show him the ad

20   and show him our policies.

21     Q.   So was it your understanding that Mr. Abe was really

22   just a conduit to try to get to the Executive?

23     A.   Yes.

24     Q.   All right.  Mr. Desmond didn't have Dow Constantine

25   on his speed dial, I take it.  All right.  I mean did Kevin

Sharron Shinbo                                                    June 14, 2011

Page 134

1        MR. KOLDE:  Same objection.  It is vague and assumes

2    facts not in evidence about the purposes of the county's

3    policy.  And it asks this person for a legal conclusion that

4    she's not qualified to give.  Go ahead and answer.

5        A.  I'm having great difficulty understanding your

6    question.  Can you break up your question or clarify it or

7    ask it a different way?

8        Q.  I'm doing the best I can.  But I think I have

9    limited tools to make that happen, so let me try another

10   way.

11           Do you agree that one of the benefits of the

12   restrictions in the King County Metro advertising policy is

13   that it allows for freedom of thought and opinion here in

14   the United States, even though the views expressed in the

15   ads on the bus aren't agreed with by everybody?

16       MR. KOLDE:  Object to the form of the question.

17   It's vague and confusing, calls for a legal conclusion, and

18   it assumes facts not in evidence about the purposes of the

19   policy.  Go ahead and answer.

20       Q.  Ms. Shinbo, let's just be clear about something.

21   I'm not asking about the purpose.  I'm asking about the

22   benefits?

23       MR. KOLDE:  Same objection, also calls for

24   speculation about benefits.  Go ahead and answer.

25       A.  The benefit of our advertising policies, one of the

Sharron Shinbo                                    June 14, 2011

                                                      Page 136

 1   them.  It's not our message.

 2        Q.  Are you done?

 3        A.  Yes.

 4        Q.  She's talking about the King County Metro

 5   advertising policy; is that right?

 6        A.  Yes, and she attached the policy.

 7        Q.  Yes, ma'am.  And if you understood Titan was

 8   inaccurately characterizing the King County Metro

 9   advertising policy, would you have notified Titan that they

10   were doing so and directed them to stop doing it?

11        MR. KOLDE:  Same objections.  The witness has

12   testified she does not know.  Please answer the question

13   again.

14        A.  I believe I would have said it differently on behalf

15   of King County.

16        Q.  Yes, ma'am.  If you understood that Titan was

17   inaccurately reporting information about King County Metro's

18   advertising policy, would you have contacted Titan and told

19   them to quit doing that?

20        MR. KOLDE:  Objection, calls for speculation, asked

21   and answered.

22        A.  I think there's a difference between being

23   inaccurate and...

24        Q.  And what?

25        A.  I'm thinking of the right word to convey my

# EXHIBIT W

Sheriff Susan Rahr                                      June 23, 2011

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

--------------------------------------------------------

SEATTLE MIDEAST AWARENESS          )   No.

CAMPAIGN, a Washington             )   2:11-cv-00094-RAJ

non-profit corporation,            )

                 Plaintiffs,     )

      vs.                          )

KING COUNTY, a municipal           )

corporation,                       )

               Defendants.     )


----------------------------------------------------

      Deposition Upon Oral Examination Of

         SHERIFF SUSAN RAHR

----------------------------------------------------

June 23, 2011

500 Fourth Avenue, Suite 900

Seattle, Washington




REPORTED BY:  PEGGY FRITSCHY HAMILTON, RPR, CSR, CLR,

29906/No. 2704

Sheriff Susan Rahr                                    June 23, 2011

Page 21

 1                 Go ahead and answer.

 2      A.    Are you asking if I was concerned whether

 3 Captain Baxter could fulfill that role, or not?

 4      Q.    I think that's what I'm trying to get at.

 5 Were you?

 6      A.    I think under normal circumstances, a new

 7 captain would be perfectly capable.  With an unknown

 8 community reaction, I wanted to make sure he had

 9 another layer of consultation with Chief Cummings

10 during the course of that week.

11      Q.    Did you understand that that would have been

12 available to Captain Baxter during the week of

13 December 27?

14      A.    My discussions with Chief Cummings were that

15 she needed to be available to consult with him during

16 that week, rather than being on full vacation.

17      Q.    Okay.  She had earlier at least planned to be

18 an vacation the week of December 27?

19      A.    Yes.

20      Q.    But the plan was in light of the events that

21 were unfolding during the week of December 27 --

22 pardon me, December 20.  So, in light of the events

23 that were unfolding during the week of December 20th,

24 that Deputy Chief Cummings would be available as a

25 layer of support for Captain Baxter while he was the

Sheriff Susan Rahr                                    June 23, 2011

 1   specifically.

 2        Q.    Did you have more than the one communication

 3   with Mr. Desmond that you just identified?

 4        A.    I believe just one.  I don't think we had any

 5   further conversations.

 6        Q.    Was this in person?

 7        A.    On the telephone.

 8        Q.    Do you know if anybody else was participating

 9   in the call?

10        A.    I don't believe so.

11        Q.    What was your take on his attitude?

12             MR. KOLDE:  Objection, calls for

13   speculation.

14             Please testify.

15        A.    My recollection was that he was very

16   concerned about disruption, about danger to the people

17   riding the bus.

18        Q.    Did he say anything about where The Executive

19   was in terms of his thinking at that point in time?

20        A.    The impression I had from Kevin was that The

21   Executive was inclined to run the ads.

22        Q.    Did you yourself express an opinion about

23   that when you were speaking to Mr. Desmond?

24        A.    Yes, I did.

25        Q.    What was it?

Sheriff Susan Rahr                                    June 23, 2011

Page 26

1     A.    I told him that I thought that it was an
2  unreasonable risk.
3     Q.    And what exactly was the risk that you were
4  thinking about?  The risk of what?
5     A.    A couple of things.  As I said, I was
6  concerned about an emotional, spontaneous type of
7  reaction from people who may be marginally suffering
8  from emotional issues.  During the holidays, we always
9  see an escalation in suicides, fights.  Anything
10 involving emotional stability is going to be on the
11 edge around the holidays to begin with.
12    Q.    Is there anything else that you can recall
13 that you and Mr. Desmond discussed when you spoke with
14 him during the week of December 20?
15    A.    No.
16    Q.    Did you make any notes of the call you had
17 with Mr. Desmond?
18    A.    I doubt it.  I generally don't take notes.
19    Q.    Okay.  Do you recall sharing the information
20 you had from Mr. Desmond with anybody within the
21 Sheriff's Office?
22    A.    I may have.
23    Q.    All right.  When you were speaking to
24 Mr. Desmond that week, did you make any statement to
25 the effect that you were prepared to speak out

Sheriff Susan Rahr                                    June 23, 2011

 1      A.   In the discussion I conveyed to him my

 2   concern about the risks.  I recall him expressing his

 3   concern about First Amendment issues, and the

 4   necessity of balancing the First Amendment with risk

 5   to the public.  I don't remember the specific words.

 6   I think there was a conversation about whether or not

 7   we had specific terrorist threats from a terrorist

 8   group, and my general message to him was my concern

 9   was more for local people who were going to overreact;

10   have a bad reaction to the ads.

11      Q.   Do you recall The Executive giving you any

12   information about specific threats or potential

13   threats that he was aware of?

14      A.   I don't know if we talked about the specific

15   threats, no.

16      Q.   Sheriff Rahr, did you repeat to The Executive

17   the comment that you had made to Mr. Desmond about

18   your intent to speak out on this issue if asked?

19           MR. KOLDE:   Objection, misstates prior

20   testimony.

21           Go ahead and answer.

22      A.   I told him that I would speak out publicly

23   about my opinion if I was asked, yes.

24      Q.   What was his reaction to that?

25      A.   I don't recall if he had a reaction.

# EXHIBIT X

Linda Thielke                                          May 20, 2011

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

--------------------------------------------------------

SEATTLE MIDEAST AWARENESS          )   No.

CAMPAIGN, a Washington             )   2:11-cv-00094-RAJ

non-profit corporation,            )

                Plaintiffs,      )

      vs.                          )

KING COUNTY, a municipal           )

corporation,                       )

                Defendants.      )


--------------------------------------------------

Deposition Upon Oral Examination Of

LINDA THIELKE

--------------------------------------------------

May 20, 2011

500 Fourth Avenue, Suite 900

Seattle, Washington


REPORTED BY:  PEGGY FRITSCHY HAMILTON, RPR, CSR, CLR,

29906/No. 2704

Linda Thielke                                              May 20, 2011

1    the time you called Mr. Schauffler back, did you do

2    anything else about the SeaMAC ad?

3        A.    I probably looked up my talking points that

4    I've used in cases like this before.

5        Q.    When you say talking points, what do you mean

6    by that?

7        A.    This topic comes up not regularly, but often

8    enough that I have established some talking points

9    that I've written up using information provided to me

10   by the subject matter experts in the department, so

11   that I can give accurate information to the media.  A

12   lot of times they need to be educated about the

13   transit advertising in general.

14       Q.    They, the media?

15       A.    Correct.

16       Q.    And what was the topic that you had in mind?

17   You said this topic comes up enough that there were

18   these established talking points.

19       A.    Transit advertising.

20       Q.    Are there different talking points you

21   maintain for different topics?

22            MR. KOLDE:  Object to the form of the

23   question, vague as to transit advertising or other

24   subject matter.

25            Go ahead and answer.

Linda Thielke                                          May 20, 2011

Page 16

1        A.    So, I would ask, are you talking about

2    transit advertising, different topics within transit

3    advertising, or topics different than transit

4    advertising?

5        Q.    The latter, topics different than transit

6    advertising.

7        A.    Yes, I do have some talking points that I

8    take out if it's been a while.  I make sure they're

9    up-to-date before I use them.

10       Q.    Did you do that here with the SeaMAC ad, to

11   make sure they were up to date?

12       A.    I don't recall, but that would be my standard

13   practice.

14       Q.    Do you remember what the talking points were?

15       A.    They're generally about our guidelines that

16   are in part of our advertising contract.  That's

17   usually the ones that reporters have the most

18   questions about, and then sometimes they want to know

19   about the logistics of how does someone who wants to

20   advertise on the side of a bus go about doing it.  Do

21   they contact Metro directly?  So they sometimes have

22   questions about the actual how you do it.

23       Q.    Before contacting Mr. Schauffler, did you

24   look at the SeaMAC ad?

25       A.    I probably looked for that email from

Linda Thielke                                          May 20, 2011

Page 19

```
 1      Q.    How long was the interview?

 2      A.    They're usually less than five minutes.

 3      Q.    Who was present besides you and

 4  Mr. Schauffler during the interview?

 5      A.    Camera man.

 6      Q.    Were you filmed?

 7      A.    Yes.

 8      Q.    I haven't seen the story, so maybe you appear

 9  on the KING 5 story, and then I guess I would know

10  that, but I haven't.

11      A.    I don't know that I've seen it either.

12      Q.    Do you remember approximately what time of

13  the day the interview happened?

14      A.    Probably midafternoon.

15      Q.    Was it at your office?

16      A.    It was outside my office.

17      Q.    When you say outside your office, where was

18  it?

19      A.    On the street.  They like to do that on the

20  street, in case they can get a bus going by in the

21  background.

22      Q.    They're clever like that.

23      A.    They like the natural sound.

24      Q.    Yeah.  Do you remember doing anything else

25  that day in connection with the SeaMAC ad?
```

Linda Thielke                                    May 20, 2011

Page 62

1   campaigns, did Mr. Schauffler accurately quote you?

2       A.   Yes.

3       Q.   And these quotes were statements that you

4   made at the time that you were serving as King County

5   Metro Transit spokesperson about this particular

6   SeaMAC ad; right?

7       A.   Correct.

8            MR. KOLDE:   Object to the form of the

9   question, move to strike.

10           Go ahead.

11      Q.   If you go back to the first page,

12  Ms. Thielke, I may not get this exactly right, but

13  this document is supposed to be a printout from a

14  website published by an outfit that goes by Al-Qassam.

15  Did you ever see this particular document before, or

16  in this format?

17      A.   I don't remember seeing it.

18      Q.   Did you at some point learn that the KING 5

19  news story about the SeaMAC ad had run on this

20  website, Al-Qassam?

21      A.   I don't remember that, that name, Al-Qassam.

22      Q.   Did you hear about this particular story on a

23  website that was similar to Al-Qassam?

24      A.   I'm sorry.  I don't know what Al-Qassam is.

25      Q.   Okay.  I mean, had you ever heard that there

Linda Thielke                                          May 20, 2011

                                                      Page 115

 1   answered.

 2            Go ahead.

 3       A.    I believe that it was accurate.

 4       Q.    All right.  Without telling me what was said,

 5   in other words, just a yes or no or I don't know or I

 6   don't remember, have you had any communications with

 7   King County prosecuting attorneys involving the SeaMAC

 8   ad and the Metro advertising policy?

 9            MR. KOLDE:  I'm going instruct the witness

10   not to answer the question with regard to

11   communications that are related to this litigation.

12            MR. GRANT:  It's just a yes, no, I don't

13   know, I don't remember.  I don't want to know the

14   content yet.  That's a different question.

15            MR. KOLDE:  Well, counsel, I would

16   appreciate it if you could be more specific as to the

17   time period, and I think that might also have

18   something to do with the response and the objection

19   you are going to draw from us.  If you are able to

20   reduce the scope as to a particular time period, like

21   before or after December 23rd, I think that might be

22   helpful.  It's up to you.

23            MR. GRANT:  It is up to me, and I will let

24   the question stand.

25            MR. KOLDE:  Okay.  Same objection, and I